Submitted by:
Marianne Karas

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE PEOPLE OF THE STATE OF NEW YORK,

        Respondent,

                         Case No. 2011-02333

     -against-

TROY TOTESAU,

        Defendant-Appellant.

Nassau County Indictment No. 1916/09
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BRIEF FOR DEFENDANT-APPELLANT

Marianne Karas
Attorney for Defendant-Appellant
980 Broadway
Suite 324
Thornwood, New York 10594
(914) 434-5935

# TABLE OF CONTENTS

STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . 2

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . 4

    The Hearings . . . . . . . . . . . . . . . . . . . . 4
    The Trial. . . . . . . . . . . . . . . . . . . . . . 4
       The People's Case . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . 19

    Point One

    APPELLANT'S CONVICTION MUST BE REVERSED WHERE
    THE PROSECUTION IMPROPERLY ELICITED "DNA
    EVIDENCE" AGAINST APPELLANT THAT SHOWED—NOT
    THAT APPELLANT MATCHED THE DNA OF THE
    PERPETRATOR HEREIN, BUT THAT APPELLANT AND ONE
    AND A HALF BILLION OTHERS COULD NOT BE EXCLUDED
    ON THE BASIS OF THE DNA ANALYSIS, SUCH THAT THE
    TESTIMONY WAS NOT RELEVANT AND/OR WAS OF SUCH
    NEGLIGIBLE PROBATIVE VALUE THAT THE SAME COULD
    IN NO WAY OUTWEIGH THE OVERWHELMING PREJUDICE
    CAUSED BY ITS ADMISSION

    . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    Point Two

    APPELLANT WAS DEPRIVED OF HIS FUNDAMENTAL
    CONSTITUTIONAL RIGHT TO A FAIR TRIAL BY THE
    EGREGIOUS MISCONDUCT OF THE PROSECUTOR
    . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    Point Three

    AT TRIAL, APPELLANT WAS NOT AFFORDED THE
    EFFECTIVE ASSISTANCE OF COUNSEL TO WHICH HE IS
    ENTITLED UNDER BOTH THE FEDERAL AND STATE
    CONSTITUTIONS
    . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Point Four

APPELLANT WAS DENIED HIS RIGHT TO THE DUE
PROSCESS OF LAW AND TO A FAIR TRIAL BY THE
REPEATED, FLAGRANT USE OF INADMISSABLE
TESTIMONY TO IMPROPERLY BOLSTER THE WEAK
IDENTIFICATION TESTIMONY HEREIN

. . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Point Five

THE TRIAL COURT IMPERMISSIBLY DILUTED THE
PROSECUTOR'S BURDEN OF PROOF WHEN, AT THE VERY
OUTSET OF THE TRIAL, IT INSTRUCTED THE JURY THAT
ITS FUNCTION WAS TO DETERMINE WHAT IF ANYTHING
TOOK PLACE AND THAT ITS JOB WAS TO DETERMINE
WHETHER APPELLANT WAS GUILTY OF THE CRIME HEREIN

. . . . . . . . . . . . . . . . . . . . . . . . . . . 55

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . 62

STATEMENT PURSUANT TO RULE 5531 . . . . . . . . . . . . 63

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . 64

**STATEMENT**

This appeal is taken from a judgment of the Supreme Court of the State of New York, Nassau County (Ayers, J.), entered February 7, 2011, convicting appellant, after trial, of Robbery in the First Degree (two counts), Burglary in the First Degree (two counts), Robbery in the Second Degree, Attempted Assault in the Second Degree (four counts), and Unlawful Imprisonment, and sentencing him to concurrent terms of imprisonment with an aggregate maximum of twenty-five years with five years of post-release supervision on each applicable count.

## QUESTIONS PRESENTED

1.    Whether appellant's conviction must be reversed where the prosecutor improperly elicited what she claimed was "DNA evidence" against appellant but which showed not that appellant matched the DNA of the perpetrator but that appellant and a half a billion others could not be excluded on the basis of the DNA analysis?

2.    Whether appellant was deprived of his constitutional right to a fair trial by the conduct and comments of the prosecutor?

3.    Whether appellant was deprived of the right to the effective assistance of counsel under both the Federal and State Constitutions?

4.    Whether appellant was deprived of a fair trial where the prosecutor elicited improper testimony to bolster the identification testimony of the complainants in a case where evidence of identity was far from overwhelming?

5.    Whether the trial court impermissibly diluted the prosecutor's burden of proof?

3

## STATEMENT OF FACTS

The Hearings

On March 18 and 19, 2010, appellant and co-defendant Dexter

Lucas appeared before the Honorable John L. Kase for hearings

in the instant case. Appellant was represented by Mr. Paul

Zsuffa for purposes of the hearings.

At the conclusion of the hearing, the hearing court ruled

that the identification procedure met constitutional

standards, that there was probable cause to arrest appellant

for driving with a suspended license after he had been stopped

for driving while talking on a cell phone, that the first

statement made by appellant to the effect that the license

belonged to his brother would be suppressed because it was made

prior to Miranda warnings, and that later statements were

voluntary and given after proper warnings (H. 191-196,

206-209)[1].

The Trial

The case was moved to trial on November 29, 2010, at which

time appellant appeared, represented not by Mr. Zsuffa, but by

Mr. Dennis Lemke.

Before jury selection began, the trial court explicitly

told both attorneys that in light of the allegations in the case,

---

[1] Numerical references preceded by "H." are to the pre-trial hearing; those preceded by "T." are to the trial.

4

they were not permitted to use the prejudicial term, "home invasion" (T. 25). Specifically, to be clear, the court stated, "I do not want to hear the term 'home invasion' come out of anybody's mouth" (T. 25). The court stated that the term was "inflammatory" and had no legal significance as it was not a crime or statute under which a defendant could be charged (T. 25).

The trial court then gave its preliminary instructions to the jury panel. It told the jury that the purpose of a trial is for the jury to decide whether the accused "is guilty or not guilty" of the crimes charged (T. 36). The court went on to state that the jury's responsibility was to decide what the "accurate facts are with respect to what, if anything, took place on a particular time and place," and render a verdict as to "whether the defendant is guilty or not guilty of the crimes with which he is charged." (T. 25-26).

At the outset of her opening statement, the prosecutor told the jury that, "the Shah family was the victim of a violent gunpoint home invasion. Their lives were changed forever and everybody's worst fear, a home invasion, became a reality, for not just Mr. and Mrs. Shah but for their three small children." (T. 266). Thereafter, the prosecutor stated that appellant with his friend Dexter Lucas and an unidentified woman, "at gunpoint committed a home invasion." (T. 268). The prosecutor told the

jury that the family remember appellant's face even though he wore a ski mask for all but a few seconds of the incident, because in these circumstances a person remembers things (T. 275), told the jury that the children saw things no child should ever have to see when they saw the co-defendant strike their father (T. 276), and called the Shahs, a "poor, innocent family" (T. 279), before she again violated the direct mandate of the lower court, stating that appellant was arrested five hours after the "home invasion" (T. 284), and that appellant was responsible for that "home invasion" (T. 285). The prosecutor concluded her opening by telling the jury that the evidence would paint a picture, "a horrifying, scary picture, on that's everyone's worst nightmare, one that you don't want to see," of a "violent home invasion" (T. 287). Counsel for the defense failed to object and there was no admonishment by the trial court.

### The People's Case

Zarian Shah testified for the People that that she lives with her husband and her three children at 451 Roquette Avenue in Nassau County (T. 297). Mrs. Shah stated that although usually no ever came to their home, prior to August 13 of 2009, the family had had some construction done and, hence, they had workers in their home (T. 299). According to Mrs. Shah, on August 13, 2009, at approximately 12:00 p.m., her husband was

6

upstairs sleeping, when their eldest son came into the kitchen and told her that a man and woman were at the door (T. 299-300).

Mrs. Shah testified that when she went to the door and spoke to the woman, she noticed that there was a man behind her and that there was another man standing at the curb near a burgundy colored car (T. 300). Mrs. Shah testified that at this point the man on her doorstep put "a gun on her head" and pushed her into the house (T. 301). The witness testified that the man was wearing gloves but did not have anything over his face; at trial, the witness identified appellant as this man (T. 301, 311-312, 316).

Mrs. Shah testified that once he got into the house, this man put a mask on his face; she stated that the mask had slits, however, and she could still see his eyes and his face (T. 317-318). Mrs. Shah identified an exhibit marked as People's 14 as the mask this man was wearing and stated that she would remember the mask until her dying day (T. 318-321).

Mrs. Shah told the jury that the man she had seen at the curb then ran into the house wearing a mask and gloves; Mrs. Shah stated that this second man ran right up the stairs (T. 302, 316). Mrs. Shah testified that the first man meanwhile made her and her children lie on the floor but then ordered them all to go upstairs (T. 303-304). Mrs. Shah testified that upstairs, she saw that her husband had been tied up with tape and that

7

the second man was sitting on her husband, hitting him with a gun, and saying, "Give me the money"(T. 305-306). Mrs. Shah stated that her husband directed her to give the man his briefcase; Mrs. Shah stated that her husband told her the combination to unlock the briefcase (T. 307). Mrs. Shah told the jury that the assailants tied her and the children up with tape, told them not to go to the police, took the briefcase, and fled in the maroon car (T. 309-311). She testified that, though he wore a mask the entire time, she had recognized the voice of the second man as well as the "structure of his body" as being one of the construction workers who had recently been in the house (T. 313). Mrs. Shah testified that the briefcase contained cash, jewelry, and passports (T. 316-317).

At this point in the testimony, Ms. Shah was permitted to testify that she had viewed a line-up and that from that line-up she had been able to identify the man in the fourth seat as having been one of the people who had done this to her family (T. 314-315).

On cross-examination the witness admitted that when asked by the police immediately after the event to describe the first man, alleged to be appellant, she described him as having no facial hair, medium color skin, and neither thin nor fat (T. 333-335). Mrs. Shah did not recall telling the police that the man was five foot eight inches tall (T. 333).

8

Mrs. Shah was asked on cross-examination whether she picked out the man in the sixth seat as one of the assailants; at this time the witness stated that she did choose number six because she thought she was looking for Dexter; the witness stated that she now knew that Dexter was not present at the line-up (T. 339-341).

The People then called Rida Shah as a witness. Asked if he had any applications with respect to the witness, defense counsel stated that he did not (T. 345). Rida, nine years old at the time of trial, was then permitted to testify that she was eight at the time of the occurrence at issue herein (T. 346-347). She stated that, on the date in question, she was in the computer room when she saw a girl at the door and then heard her mother screaming (T. 347). Rida stated that she tried to pull the door to the computer room closed but that a man came, pulled her into the living room, and told her to sit down on the floor with her mother and her brothers (T. 347-348). Rida told the jury that the man was wearing a black ski mask, was holding a black gun, and had on doctor gloves (T. 348). The witness stated that even with the ski mask, she could see part of the man's face (T. 349-350, 357).

According to Rida, the man went upstairs and then came back down and told all of them to go upstairs where she saw another man on top of her father hitting him with a gun (T. 350-351).

9

Rida stated that this second man was yelling, "Where's the money" and that her father told her mother to get the briefcase, open it, and give the man the money (T. 352). Rida stated that the briefcase had money inside and that the men took the whole briefcase and tape up her and her brothers and her mother (T. 352-353).

At trial Rida identified appellant as the man who came in and pulled her from the computer room; despite that she had not known him before this incident, she called him Troy at trial (T. 353-356). She identified People's 14 as looking like the mask the man was wearing (T. 358). Rida was also permitted to testify that she viewed a line-up from which she identified appellant in the fourth seat as the man who pulled her from the room (T. 359-360).

On cross-examination the witness admitted that because of the ski mask she could not see the man's ears, or his hair, or his chin, or his eyes, or his nose (T. 363-364). Rida told the police that this man was about five feet ten inches tall and that he was shorter than the man upstairs (T. 364-365).

On re-direct, the child contradicted herself and stated that she had been able to see the man's eyes and a little more than his eyes (T. 365-366).

Syed Shah testified that he was twelve years old at the time of the incident and that he was fourteen at trial (T. 367).

10

Syed testified that on the date in question, he answered the door and saw a woman, a burgundy-colored car, and a man standing by the car (T. 366-369). He stated that his mother came to the door and someone hit her with a gun and another man came out and said sit on the floor and put your hands up behind your back (T. 369). Syed stated that this man did not have anything on his face when he came into the house (T. 369-370).

Syed stated that the man grabbed his sister from the other room and that another man entered the house and ran directly up the stairs (T. 371). Syed stated that the first man also went upstairs only to come back down and tell them all to go upstairs (T. 371-372). Syed told the jury that upstairs he saw his father lying on the bed, bound with tape and that the other man was sitting on top of him hitting him with a gun (T. 372). Syed said after his mother opened a briefcase containing money, jewelry, credit cards, and passports and after the family was tied up with tape, the men left (T. 373-374).

The witness identified People's 14 as the mask the first man wore (T. 376). Syed testified that at some point he figured out that the man on top of his father was one of the men who had come to the house to do construction (T. 376-377). The witness testified that he was taken to view a line-up but that he was very scared and nervous so he didn't pick any one (T. 378). The prosecutor followed up by asking, "You just, you said

11

you didn't want to pick anyone?" and the witness answered, "No, I was very scared." (T. 378). Counsel for the defense did not object and did not cross-examine the witness.

Syed Shah, Sr. testified next for the prosecution that before August 13, 2009, he had had some construction done on the family home and that the sheetrocker was Dexter Lucas (T. 380-381). Mr. Shah testified that Dexter Lucas came for eight to ten days and that each day Lucas would buy the supplies and Mr. Shah would go upstairs and get the cash to reimburse Lucas for his purchases (T. 381-386). Mr. Shah testified that on the 13th of August, he was asleep upstairs and woke to find someone sitting on top of him (T. 387). According to Shah, the man bound him with duct tape, hit him with a gun, told him not to look at him, and demanded money (T. 388-389). Mr. Shah stated that his family, brought into the bedroom by another man and a woman, was threatened, so Mr. Shah, through his wife, gave them his briefcase; Shah testified that they then bound the rest of the family with tape (T. 389-398). Shah testified that the briefcase contained $75,000.00, credit cards, his wallet, and his driver's license (T. 396-397).

Mr. Shah testified that both of the men had had guns and that both of the men wore masks (T. 402). He identified People's 14 as the mask worn by the other man, not Dexter Lucas (T. 403). Defense counsel asked one question on cross-examination:

"Dexter, was he known as big guy to you?" (T. 406).

Detective Thomas Fleming testified for the prosecution that he responded to the crime scene and recovered piece of latex glove, duct tape, an envelope, and a pair of scissors (T. 425-430, 432, 472).

Detective Patrick Byrne testified for the prosecution that there were no identifiable fingerprints on any of the items recovered in this case (T. 451).

Detective Laurel Tobias testified for the People that she took a DNA sample from Dexter Lewis (T. 462-463).

Anita Forteza, an employee of Alamo Car Rental, testified for the prosecution that on July 25, 2009, a medium red Kia was rented to Mariana Mitchell and that the car was still outstanding on August 13, 2009 (T. 488-491).

New York City Police Officer Khandakar Abdullah testified for the prosecution that at approximately 5:00 p.m., on August 13, 2009, he and his partner were in a marked police vehicle when they pulled over the driver of a maroon Kia for talking on his cell phone (T. 497-503). According to the officer, the driver, appellant, gave them his driver's license but based on a check, the license was suspended (T. 505). The officer testified that they placed appellant under arrest, searched him, and found a wad of cash in his pants pocket; the officer stated that he searched the car and found a black ski mask in

a pocket on the driver's side door and an identification cards in the name of Syed Shah, a wallet, and more cash on the center console (T. 505-538). Officer Abdullah testified that back at the stationhouse he asked appellant whether he wanted to have the car impounded or whether he would have someone come pick it up and permitted appellant to call someone to come get the car (T. 548-549).

On cross-examination the officer testified that appellant was six feet tall and had a goatee at the time of his arrest, that appellant was cooperative and did not try to hide anything as he was pulled over, and that there were no gloves or guns found in the car (T. 566, 571).

New York City Detective Michael Interdonati testified for the prosecution that on August 13, 2009, at approximately 5:30 p.m., he was working at the 75th precinct in Brooklyn when he took possession of identification and a wallet belonging to Syed Shah, called Mr. Shah, and, eventually contacted the Nassau County Police Department (T. 582-586).

Sydney Espana of the Nassau County Medical Examiner's Office testified for the People that he developed DNA profiles from samples received from Dexter Lucas and from appellant, and that he tested a green piece of plastic, a ski mask, and duct tape for the presence of genetic material (T. 615, 619-620). Espana testified that there was not enough genetic material

14

found on the plastic to develop a profile, and that on the duct tape they could tell that at least two people contributed to the DNA material found thereon but that neither of those people could have been either appellant or Lucas (T. 625-626). Espana stated that as to the ski mask, he tested the areas around the eyes and mouth, where he would expect to find DNA and developed a DNA profile therefrom (T. 629-630).

The witness was then permitted to testify the DNA was no match for Dexter Lucas and that, "It was determined that [appellant] can be included as a contributor to the mixture in the black ski mask," and that, "the alleles found in the DNA profile of [appellant] were found in the mixture that was found on the black ski mask" (T. 631-632). The prosecutor went on to elicit from the witness that the mixture of genetic material on the mask was from at least two individuals and followed up by asking, "So you're not able to make a determination as to whether or not *Troy Totesau alone* came in contact with this mask?" (T. 638).

Six pages into his cross-examination the witness finally testified that, in fact, the combination of alleles present in the profile developed from the ski mask would match one and a half billion people (T. 645). The witness admitted that he had the genetic material of the family members but that he did not develop DNA profiles from that so that they could be excluded

or not (T. 649).

Detective Michael Shirreffs testified that he took a DNA swab from appellant (T. 698).

Detective John Giambrone testified for the People that when the police conduct line-ups in general, they attempt to make them fair by choosing fillers who are of the same race and who have the same identifying characteristics, such as a beard; the witness testified that great care is taken to make sure that viewers of the line-up never see the fillers before the line-up so as to avoid contamination of the line-up (T. 705-706). With respect to the instant case, Giambrone testified that the Shah family was taken to a building where they could be kept so that they would not inadvertently view any of the line-up participants; he further testified that he explained to the children that they would be taken into a dark room and that, like watching television, they would be able to see the people in the box but the people would not be able to see them (T. 707-711). There was no cross-examination of this witness.

Dwight Davis testified for the prosecution that he lives at 471 Roquette Avenue in South Floral Park and that he has surveillance cameras on the front of his house and that those cameras were in good working order on August 13, 2009 (T. 717-718). This witness was not on the prosecution's list of witnesses but the trial court allowed the testimony over

16

objection (T. 713-714). There was no cross-examination of the witness.

Detective William Butler testified for the prosecution. He testified that on August 13, 2009, he responded to 451 Roquette Avenue; the witness stated, however, that he had no involvement in the investigation, but that he observed the members of the Shah family, two adults and three children, who were "very upset" (T. 732). The witness stated that, "They were crying, they were still scared and nervous. The whole incident basically had them in a state of panic." That was the sum total of his testimony. There was no cross examination.

At the conclusion of the testimony of this witness, it was put on the record that defense counsel asked for an offer of proof with respect to this witness and had objected to the testimony of this witness but that the trial court had ruled to permit the testimony (T. 736).

Detective Roy McComb testified for the People that he was not involved in the investigation at issue herein, but that on the date of the incident, he responded to the Shah home and witnessed that the children and the mother were very upset (T. 785-786).

Detective Russ Bastone testified for the People that on the date of the incident at issue herein he responded to the Shah home and witnessed that the family was "shaken up," that

17

the kids were crying, that Mr. Shah was disheveled (T. 789). This witness testified that he was told that the first male who came to the door was unmasked when he was at the door and later he put on a mask that was sort of like a ski mask, it was a pull over type mask, with a big opening in the front. And then the second male who came in the house had sort of a wrestler's ski mask, with the eyes cut out. (T. 792). The detective testified that the police found a neighboring house with video equipment on it and that the video was downloaded from the homeowner's system (T. 793-800). The witness testified that pursuant to interviews the police learned that appellant was married to Michelle Hazel and that Dexter Lucas was married to Mariana Mitchell (T. 819, 822). The detective testified that the witnesses did not describe the first man as having a beard despite that appellant had a mustache and a goatee on the date of this occurrence, according to his arrest photograph (T. 822-854).

## ARGUMENT

### POINT ONE

**APPELLANT'S CONVICTION MUST BE REVERSED WHERE THE PROSECUTION IMPROPERLY ELICITED "DNA EVIDENCE" AGAINST APPELLANT THAT SHOWED—NOT THAT APPELLANT MATCHED THE DNA OF THE PERPETRATOR HEREIN, BUT THAT APPELLANT AND ONE AND A HALF BILLION OTHERS COULD NOT BE EXCLUDED ON THE BASIS OF THE DNA ANALYSIS, SUCH THAT THE TESTIMONY WAS NOT RELEVANT AND/OR WAS OF SUCH NEGLIGIBLE PROBATIVE VALUE THAT THE SAME COULD IN NO WAY OUTWEIGH THE OVERWHELMING PREJUDICE CAUSED BY ITS ADMISSION.**

The jury here heard that the People had DNA evidence against appellant, when, in fact, they did not. The gross impropriety in admitting what was touted as DNA evidence, but was really evidence of nothing at all, created an overwhelming likelihood that the jury seized on the presence of "DNA evidence" in voting to convict. This Court cannot allow the verdict to stand under these circumstances.

DNA evidence may well be the strongest evidence available for establishing identity. Confronted with positive DNA evidence establishing a defendant's identity, a jury's determination with respect to that issue is a sure bet for conviction.

Indeed, in People v. Rush, 242 A.D.2d 108 (2d Dept. 1998), where the defendant's DNA positively matched that of the perpetrator, the jury convicted despite that the rape victim identified someone other than the defendant as her attacker. The Appellate Division upheld the conviction, stating that a

DNA match was "strong evidence" of the defendant's participation in the rape, because the chance that another person's profile would produce such a match was virtually nonexistent, i.e., 500 million to one. People v. Rush, supra. Thus, the Rush court went on to rule that, even though it was the only evidence of the defendant's identity, the DNA evidence constituted highly probative evidence that the jury could and did properly credit as establishing the defendant's guilt beyond a reasonable doubt, so that even though the victim identified someone other than the defendant as her attacker, the conflicting inferences to be drawn from her testimony were properly resolved by the jury based on the unrebuttable scientific DNA evidence.   People v. Rush, supra.

In light of the fact that DNA evidence is the most powerful tool in a prosecutor's arsenal, it is hardly surprising that in the case at bar, in her summation, the prosecutor led with her "DNA evidence," telling the jury that this case was not *just* about the DNA evidence (T. 996). Thus, the jury was told, right up front, that this case was about the DNA evidence and other evidence too, which would have been perfectly proper except for the fact that there was no DNA evidence that linked appellant to the crime.

Instead, the only "DNA evidence," a misnomer if ever there was one, linked one and a half billion people to the crime. That

is no evidence at all. The admission of this "scientific evidence" of nothing improperly prejudiced appellant, rendering it wholly impossible for him to have received a fair trial to which he was entitled under the Federal and State Constitutions.

The prosecutor's case against appellant consisted of two witnesses identifying him as one of two masked men who burglarized their home. One of these two witnesses was a child who only saw the perpetrator, masked, maybe through the eye holes in his ski mask. The second of the two, allegedly saw the perpetrator for seconds without a mask. It is hardly surprising that this witness seemed to pick appellant and another individual when asked to view a line-up. Beyond that, the People established that hours after the occurrence, appellant was driving a car borrowed from the co-defendant on this case, in which the police found items belonging to the victims.

Significantly, even though the perpetrator herein undeniably wore a ski mask against his skin—one that came in contact with his eyes, nose, mouth, hair, areas where DNA matching the perpetrators would certainly be found, and even though appellant's DNA was tested, no positive match was made. Again, no positive match could be made between appellant's DNA and the DNA material found on the ski mask worn by the perpetrator. That was a huge flaw in the People's evidence to

be overcome.

Yet, inconceivably, the People were permitted to introduce "DNA evidence," and to argue to the jury that there was "DNA evidence" in this case. Sydney Espana of the Nassau County Medical Examiner's Office testified for the People that he developed DNA profiles from samples received from Dexter Lucas and from appellant, and that he tested a green piece of plastic, a ski mask, and duct tape for the presence of genetic material (T. 615, 619-620).

Espana testified that there was not enough genetic material found on the plastic to develop a profile, and that on the duct tape they could tell that at least two people contributed to the DNA material found thereon but that neither of those people could have been either appellant or Lucas (T. 625-626). Espana stated that as to the ski mask, he tested the areas around the eyes and mouth, where he would expect to find DNA and developed a DNA profile therefrom (T. 629-630).

The witness was then permitted to testify the DNA was no match for Dexter Lucas but that, "It was determined that [appellant] can be included as a contributor to the mixture in the black ski mask," and that, "the alleles found in the DNA profile of [appellant] were found in the mixture that was found on the black ski mask" (T. 631-632). The prosecutor went on to elicit from the witness that the mixture of genetic material

22

on the mask was from at least two individuals and followed up by asking, "So you're not able to make a determination as to whether or not *Troy Totesau alone* came in contact with this mask?" (T. 638).

Not until the jury had sat through all of this witness' direct testimony and six pages into cross-examination did the expert witness finally concede that, in fact, the combination of alleles present in the profile developed from the ski mask *would actually match approximately one and a half billion people* (T. 645).

With the admission of this "DNA evidence" against appellant before the jury for its consideration, the prosecutor argued in summation that her case wasn't just about the DNA evidence alone (T. 996). She further told the jury that the DNA expert did not really say that the match was for appellant and one and a half billion other people (T. 1026), and then, pretending that the "DNA evidence" was evidence of something, argued to the jury that appellant's "alleles" were present at every location in the areas of wear on the mask (T. 1027), and that appellant, "is the one that can't be excluded (T. 1032).

Appellant and one and a half billion others. Appellant's alleles and those matching one and a half billion others.

There was no DNA evidence in this case. The outrageously improper admission of this testimony and the manner in which

it was utilized by the prosecutor deprived appellant of any semblance of a fair trial and sets a dangerous and scary precedent.

In New York, the general rule is that all relevant evidence is admissible unless its admission violates some exclusionary rule. People v. Alvino, 71 N.Y.2d 233 (1988). Evidence is relevant if it has any tendency in reason to prove the existence of any material fact, i.e., it makes determination of the action more probable or less probable than it would be without the evidence. People v. Lewis, 69 N.Y.2d 321 (1987); Richardson, Evidence § 4 [Prince 10th ed.]. Not all relevant evidence is admissible as of right, however. Even where technically relevant evidence is admissible, it may still be excluded by the trial court in the exercise of its discretion if its probative value is substantially outweighed by the danger that it will unfairly prejudice the other side or mislead the jury. People v. Alvino, supra; People v. Acevedo, 40 N.Y.2d 701 (1976); People v. Scarola, 71 N.Y.2d 769 (1988).

At bar, the evidence sought to be admitted was not relevant. That the DNA showed that appellant and one and a half billion people could have been wearing that ski mask is not a material fact. Even were this not so, any negligible value in the "fact" that appellant and one and a half billion other people could have worn that mask is completely outweighed by the

24

overwhelming likelihood that the jury was prejudiced by the fact that the prosecution had "DNA evidence" against appellant, and was doubtless misled, in this highly technical area, into thinking that the evidence was something more than it was—which was absolutely nothing. Indeed, the prosecutor's arguments concerning the "DNA evidence" made sure that the jury was good and misled.

The prosecutor told the jury she had "DNA evidence," and pretended that the "DNA evidence" was evidence of something, when she told the jury that appellant's "alleles" were present at every location in the areas of wear on the mask (T. 1027), and that appellant, "is the one that can't be excluded (T. 1032). This is not a case where the prosecutor was merely making an argument and the jury was free to accept or reject it based on their own recollection of the testimony. Here, this "alleles" terminology was highly technical to anyone without an advanced degree in biology and, as the prosecutor well knew, when she said that appellant's alleles were present at every location on the mask, the jury heard that appellant's DNA was all over the mask. It is patently unfair. And DNA being what it is, the prejudice was fatal.

Though the issue and what the result must be seems obvious, the decision of the court in People v. Days, 31 Misc.3d 586, 592-593 (N.Y.Co.Ct. 2011), is germane. There, it was the

defendant trying to subpoena evidence to show partial "DNA matches" of other suspects. The Days court wasn't having any of it.

Indeed, in People v. Days, supra, the court stated that a "match" of only some alleles "*is of questionable scientific value*" and that partial "matches" are "problematic because the information developed from such comparisons *may appear to be significant when, in fact, it has no significance whatsoever*" People v. Days, supra, citing (Duceman Affidavit, ¶ 8) (emphasis added). The Days court ruled that a subpoena duces tecum is an appropriate vehicle to compel production of specific documents which are relevant and material, but that the information concerning partial alleles "matches" was "of dubious relevance or materiality, [so that] this Court is not persuaded that the information sought directly bears on the issue of the defendant's guilt or innocence." People v. Days, supra. The court went on to rule that the evidence sought to be subpoenaed would not be admissible into evidence because, "Evidence concerning these less than 'partial matches' is of marginal value and would unduly prejudice the People and, to a near certainty, would inject speculation and substantial confusion into this trial." People v. Days, supra. Yes, indeed.

Here, as in People v. Days, supra, any negligible probative value of evidence that appellant and one and a half billion other

26

people could have matched the alleles found on the mask was far and away outweighed by the prejudicial impact of the jury hearing that the People had DNA evidence against appellant. That the prosecutor used the "evidence" to mislead the jury, is icing on the cake. See also Point Two, infra. In a case where the evidence of identity was weak, due in part to the lack of DNA positive evidence and in light of the lack of opportunity for the victims to see the actual perpetrator, there was no overwhelming evidence of guilt. Indeed, it is this lack of overwhelming evidence that surely led the prosecution to grasp at non-existent DNA evidence. Accordingly, the egregious error in admitting this highly prejudicial testimony and in allowing the prosecutor to use it to mislead the jury and introduce confusion into the case cannot be deemed harmless error.

Finally, absolutely none of the foregoing—the admission of "DNA evidence" that was evidence of nothing, the prosecutor misleading the jury by telling them she had DNA evidence and that appellant's alleles could be found all over the ski mask, the prosecutor denying that her witness said that the alleles matched appellant and one and a half billion other people, but see T. 645, 651—none of it was objected to by a defense attorney who was missing in action during the course of this trial. See Point Three, infra. Because appellant was virtually unrepresented, because the prosecutor took that as an

27

opportunity to conduct herself with the utmost impropriety, because there is a very real likelihood that the jury latched on to DNA evidence and nothing else, making it impossible to tell what they would have done had they been properly informed that there was no DNA evidence, and because allowing this conviction to stand creates a terrifying precedent, this Court must reverse in the interest of justice.

Appellant's conviction should be reversed in all respects.

**POINT TWO**

**APPELLANT WAS DEPRIVED OF HIS FUNDAMENTAL CONSTITUTIONAL RIGHT TO A FAIR TRIAL BY THE EGREGIOUS MISCONDUCT OF THE PROSECUTOR.**

The trial in the instant case was rife with impropriety laid squarely at the feet of the prosecutor. The prosecutor's egregious conduct went untempered by a defense attorney who wholly failed to protect his client's rights, see Point Three, infra, and by a trial court who recognized the misconduct but did nothing to curtail it.  The prejudice wrought undeniably contributed to the jury's verdict; accordingly, appellant's conviction must be reversed by this Court.

The People's case at trial contained glaring problems. First, thought the perpetrator wore a ski mask that came in contact with his eyes, mouth, nose, skin and hair, and as such should have contained ample DNA, the police were unable to match the DNA from the mask to appellant's DNA. Second, the eyewitness' had little to no opportunity to view the perpetrator. Two of four could make no identification and the "identifications" of even the two were suspect and shaky.  One of the two never saw the assailant except through the eye holes of the mask. The second described the man alleged to have been appellant as having no facial hair, when appellant had a beard on the date of the crime which was the same date as his arrest. This witness's description

29

of the perpetrator's size was far off from appellant's size. This witness also identified two men from the line-up at which she supposedly could identify appellant.

Against this backdrop, the prosecutor consistently resorted to gross impropriety and blatant misconduct to win a conviction. She clearly thought this was necessary to tip the scales of justice and, indeed, her misconduct compromised the overall fairness of the trial and won a conviction that might not have been won absent the egregious impropriety.

A defendant, while not entitled to a perfect trial, is entitled to a fair one. People v. Smith, 97 N.Y.2d 324, 330 (2002); People v. White, 57 N.Y.2d 129, 135 (1982); People v. Gorghan, 13 A.D.3d 908, 911 (3d Dept. 2004). Therefore, certain fundamental rules govern the conduct of the prosecutor in a criminal trial. The prosecutor must refrain from acting so as to deny a defendant his constitutional right to a fair trial. See People v. Petrucellit, 44 A.D.2d 58,59 (1st Dept. 1974); see also People v. Gonzalez, 137 A.D.2d 618, 619 (2d Dept. 1988); People v. Roopchand, 137 A.D.2d 35 (2d Dept. 1985), aff'd 65 N.Y.2d 837 (1985); People v. Schaff, 71 A.D.2d 630, 631 (2d Dept. 1979).

An analysis of prosecutorial misconduct entails evaluating the overall fairness of the trial. Smith v. Phillips, 455 U.S. 209, 219 (1982). In assessing whether a

conviction will be overturned by reason of prosecutorial misconduct, the question is "whether the misconduct deprived the defendant of a fair trial". People v. Roopchand, supra. Here, evaluating the overall fairness of the trial, this Court should conclude that the conduct of the prosecutor cannot be countenanced—that it deprived appellant of a fair trial and secured a conviction that otherwise would not have been won. Smith v. Phillips, supra.

At the outset, it should be noted that though some of the impropriety was not objected to by defense counsel below, as set forth in Point Three, infra, counsel's performance fell short of that required under either the state or federal constitution. Insofar as appellant was not zealously defended by counsel, in light of the pervasiveness of the misconduct, and because the misconduct so impacted the case that it likely produced a conviction that would not otherwise have been won, appellant asks that this Court review any unpreserved matters in the interest of justice.

First, the prosecutor herein improperly elicited "DNA evidence" that proved nothing more than that appellant was one of one and a half billion people who could have worn that ski mask and then she used the testimony to mislead the jury, telling them that she had DNA evidence and that appellant's alleles were all over the mask. She went on to state that the expert couldn't

31

say how many people would be a match for the alleles, though her witness twice testified to one and a half billion (T. 645, 651). See Point One, supra. The prejudice wrought by this impropriety alone made it impossible for appellant to have received a fair trial. See Point One, supra; Smith v. Phillips, supra.

That said, the prosecutor's misconduct permeated every aspect of the trial. Before jury selection began, the trial court explicitly told both attorneys that in light of the allegations in the case, they were not permitted to use the prejudicial term, "home invasion" (T. 25). Specifically, to be clear, the court stated, "I do not want to hear the term 'home invasion' come out of anybody's mouth" (T. 25). The court stated that the term was "inflammatory" and had no legal significance as it was not a crime or statute under which a defendant could be charged (T. 25).

Yet, at the outset of her opening statement, the prosecutor told the jury that, "the Shah family was the victim of a violent gunpoint home invasion. Their lives were changed forever and everybody's worst fear, a home invasion, became a reality, for not just Mr. and Mrs. Shah but for their three small children." (T. 266). Thereafter, the prosecutor stated that appellant with his friend Dexter Lucas and an unidentified woman, "at gunpoint committed a home invasion." (T. 268). The prosecutor told the

jury that the family remember appellant's face even though he wore a ski mask for all but a few seconds of the incident, because in these circumstances a person remembers things (T. 275), told the jury that the children saw things no child should ever have to see when they saw the co-defendant strike their father (T. 276), and called the Shahs, a "poor, innocent family" (T. 279), before she again violated the direct mandate of the lower court, stating that appellant was arrested five hours after the "home invasion" (T. 284), and that appellant was responsible for that "home invasion" (T. 285). The prosecutor concluded her opening by telling the jury that the evidence would paint a picture, "a horrifying, scary picture, on that's everyone's worst nightmare, one that you don't want to see," of a "violent home invasion" (T. 287).

Counsel for the defense failed to object and there was no admonishment by the trial court. Thus, the prosecutor started right in on the path she would follow throughout the trial, using the forbidden inflammatory term "home invasion" in flagrant disregard of the lower court's ruling while also improperly inflaming the jury and engendering sympathy at every turn, with phrases like, "everyone's worst nightmare" and the children saw things no child should ever have to see. People v. Ashwal, 39 N.Y.2d 105 (1976)(prosecutors must stay within the four corners of the evidence and not make arguments that serve to inflame

33

the jury or evoke sympathy). Moreover, the prosecutor started right in improperly bolstering her weak identification evidence, telling the jury that in these types of situations a person remembers and recognizes the perpetrator. People v. Carter, 40 N.Y.2d 933 (1976)(it is improper for the prosecutor to vouch for the credibility of her witnesses).

The prosecutor conducted a trial by ambush. She repeatedly called surprise witnesses, some five in all, leading the lower court to express its distain for what it termed her "trial by surprise" tactics (T. 735-736), even though, as the trial court pointed out, she clearly knew about the existence of all of the surprise witnesses. The prosecutor's conducted blind-sided an attorney who had already come into the case late and was woefully unprepared. See Point Three, infra. Too, the prosecutor elicited improper hearsay and testimony that served no purpose other than to improperly bolster the testimony of her witnesses and to make her identification evidence and her case seem like more than it was. See Point Four, infra.

With everything that she got away with during the course of the trial, it is hardly surprising that the prosecutor went to town in her summation, knowing full well at that point that there would be no complaint from defense counsel and no restraint by the lower court. As previously set forth, the prosecutor started right in by telling the jury that she had

34

DNA evidence against appellant and that his "alleles" were all over the ski mask (T. 996-997).

Again, though she had been specifically instructed not to do so, the prosecutor referred to the incident herein as a home invasion over and over again, at one point going so far as to tell the jury that this was a home invasion for which appellant must be held to account; and the prosecutor didn't just step slightly over the boundary clearly delineated by the trial court, she trampled it, using the forbidden term on nearly every page of her summation, sometimes two and three times. (T. 996, 997, 998, 999, 1000, 1003, 1006, 1007, 1010, 1012, 1017, 1022, 1033). As she had in her opening statement, the prosecutor again told the jury that this type of victimization, a home invasion, was "everyone's worst nightmare" and that it became a reality for this family; she told the jury that no child should have to live through something like this (T. 1012). This was patently improper. People v. Ashwal, supra.

Moreover, the prosecutor repeatedly denigrated the defense calling it "ridiculous," and telling the jury that the defense, "grasps at straws" with their arguments (T. 1006, 1011, 1032). This too was patently improper, as this veteran prosecutor well knew. See e.g. People v. Clark, 195 A.D.2d 988 (4th Dept. 1993)(reversal required where the prosecutor denigrated defendant's case, asserting that defense counsel was

35

"blowing smoke").

In a case with less than overwhelming evidence, the veteran prosecutor led the jury to believe that there was DNA evidence where there was not. She vouched for the credibility of her witnesses and repeatedly elicited testimony that served to improperly bolster the testimony of those witnesses. She blind-sided the defense over and over again, calling surprise witnesses at the last moment. She repeatedly violated the lower court's direct instruction to refrain from using the inflammatory term "home invasion," made arguments to inflame the jury and evoke their sympathy, and denigrated the defense. Insofar as the prosecutor's case was well less that overwhelming, can the misconduct by the prosecution herein be excused as harmless. See People v. Crimmins, 36 N.Y.2d 230 (1975).

Too, it must be considered that the substantial prejudice to defendant arising out of the prosecutor's misconduct was compounded herein by the complete and utter failure of the trial court to take appropriate steps to dilute the effect of that conduct. Under these circumstances, courts have ruled that a trial court's failure to act to curtail the prosecutorial misconduct lends an imprinter of approval to the prejudicial conduct such that reversal is mandated without an attempt to measure the strength of the People's case. People v. Ashwal,

36

supra; People v. Payne, 187 A.D.2d 245 (4th Dept. 1993).

In sum, the culmination of the veteran prosecutor's impropriety infringed on appellant's fundamental constitutional rights requiring that he be afforded a new trial. Smith v. Phillips, supra.

**POINT THREE**

**AT TRIAL, APPELLANT WAS NOT AFFORDED THE EFFECTIVE ASSISTANCE OF COUNSEL TO WHICH HE IS ENTITLED UNDER BOTH THE FEDERAL AND STATE CONSTITUTIONS.**

Whether counsel, who was belatedly assigned to represent appellant on the serious charges at issue herein, didn't have time to adequately prepare, didn't know the law, or didn't care, matters little. At trial, appellant's trial counsel failed to mount a cogent defense, failed to advocate for appellant in any significant respect, and made no attempt to shield appellant from the flagrantly prejudicial and improper conduct of the prosecutor that was fatal to any defense. Under the circumstances herein, counsel's failings were so "egregious and prejudicial" as to deprive appellant of his constitution right to counsel under both the Federal and State Constitutions. People v. Caban, 5 N.Y.3d 143, 152 (2005); People v. Satterfield, 66 N.Y.2d 796, 797 (1985); Strickland v. Washington, 466 US 668 (1984); Hill v. Lockhart, 474 US 52 (1985); Cf. People v. Alicea, 229 A.D.2d 80 (1st Dept. 1997). Accordingly, appellant must be afforded a new trial at which he is meaningfully represented by counsel.

The right of an accused to the effective assistance of counsel is guaranteed by both the Federal and State Constitutions. United States Constitution, 6th Amendment, New

38

York Constitution, Art. I, Section 6.   To prevail on a claim that he was deprived of such right, a defendant "bears the well-settled, high burden of demonstrating that he was deprived of a fair trial" as a result of counsel's performance. <u>People v. Hobot</u>, 84 N.Y.2d 1021, 1022 (1995). An attorney's representation is constitutionally effective unless the evidence, the law and the circumstances of the particular case, viewed in their totality and as of the time of the representation, show that the attorney failed to provide "meaningful representation." <u>People v. Hobot</u>, <u>supra</u>; <u>People v. Flores</u>, 84 N.Y.2d 184, 187 (1995). "What constitutes effective assistance is not and cannot be fixed with yardstick precision, but varies according to the unique circumstances of each representation." <u>People v. Baldi</u>, 54 N.Y.2d 139 (1981).

In reviewing claims for ineffective assistance of counsel, the standard is whether the record, viewed objectively, "reveal[s] the existence of a trial strategy that might well have been pursued by a reasonably competent attorney." <u>People v. Satterfield</u>, <u>supra</u>.   To succeed on a claim of ineffective assistance of counsel, a defendant must demonstrate the "absence of strategic or other legitimate explanations" for counsel's conduct. <u>Strickland v. Washington</u>, <u>supra</u>.

In addition to showing that counsel's performance was deficient, a defendant must show both that the deficient

39

performance prejudiced the defendant. Hill v. Lockhart, supra; People v. McDonald, 1 N.Y.3d 109 (2003). The second prong focuses on whether counsel's constitutionally ineffective performance affected the outcome. Strickland v. Washington, supra; Hill v. Lockhart, supra; People v. McDonald, supra. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." People v. McDonald, supra; Strickland v. Washington, supra. Under the facts of the instant case, counsel's performance satisfied neither federal nor state constitutional mandates.

In the instant case, counsel for the defense took over well after the preliminary stages of the case some seven weeks before trial (T. 241). Indeed, during the preliminary trial motions, counsel stated for the record that he had just gotten the case and there was a lot of material to go through at the last minute so that he didn't think there would be an alibi defense; at this time, stating that appellant wanted him make a speedy trial motion, counsel took a position adverse to appellant's in front of the trial court and stated that he did not think that there were grounds for the same (T. 235, 241). Taking a position adverse to one's client in open court has been held to be ineffective assistance of counsel. See e.g. People v. Betsch, 730 N.Y.S.2d 645 (4th Dept. 2001)(defendant was denied the

effective assistance of counsel "when defense counsel took a position adverse to that of defendant" during argument of defendant's *pro se* motion because, although defense counsel had no duty to support the motion, he could not take a position that was adverse to that of his client).

And so began the trial during which counsel who was supposed to represent appellant half-heartedly went through the motions while allowing the prosecution to trample appellant's rights. It got to the point that, at times, the trial court seemed to be begging defense counsel to make an argument to stop the Assistant District Attorney's conduct.

At the very outset, though she had been warned by the court not to refer to the prejudicial term, "home invasion", the prosecutor used it repeatedly during her opening remarks with no objection from defense counsel. There could be absolutely no strategic reason for this. It was clearly prejudicial and defense counsel had no reason at all to fear that his objection would be overruled in front of the jury. The court below had already ruled on the matter.

During the course of the trial itself, defense counsel, who put on no case on appellant's behalf, showed very little inclination to challenge the People's case for his client. Counsel failed to conduct any cross-examination of eleven of the People's witnesses, Bukiari Shah, one of the complainants

who did not identify appellant, Anita Fortiza, Detective Lyndon Johnson, Detective John Giambrone, Dwight Davis, Detective Butler, Detective Nash, Detective Lee, Detective Higgins, Detective Daniel Flynn, and Officer Roy McComb, who was first on the scene. He conducted severely limited cross-examinations of other witnesses, including asking only two questions of Syed Shah, one of the four witnesses to the incident at issue and asking only one question of the one of two adult witnesses to this crime.

Nor can an argument be made that defense counsel chose as a matter of strategy not to challenge so many of the People's witnesses because they were irrelevant where counsel made absolutely no effort to properly preclude any of the aforementioned testimony. Thus, at the same time that counsel was not challenging the People's witnesses, he showed no inclination to protect appellant by properly keeping irrelevant and prejudicial witnesses from taking the witness stand against appellant.

The prosecution repeatedly called surprise witnesses, some five in all, leading the lower court to express its distain for what it termed her "trial by surprise" tactics (T. 735-736). The court below all but begged counsel for the defense to set forth that he was prejudiced thereby. It got to the point that, after yet another unnoticed witness was sprung on the defense

42

and the court by the prosecutor, whose flagrant and deliberate misconduct is the subject of Points One and Two, supra, the trial court admonished defense counsel for "tap-dancing around his objection" (T. 715). Even in the face of the lower court's engraved invitation to please make an objection, counsel did not properly advocate the point on appellant's behalf. Thus, even with the lower court admonishing him, counsel did not state that he had had no time to prepare to cross-examine the surprise witnesses and that he was blind-sided by their appearances. Instead, counsel settled for merely not cross-examining the surprise witnesses (T. 713-715, 735-736, 742, 747, 753). Accordingly, testimony that should have been precluded on proper objection, instead, went in wholly uncontested. An attorney properly advocating on appellant's behalf should have asked for an offer of proof with respect to the surprise witnesses, and added a lack of relevancy, as well as improper bolstering, see Point Four, infra, to his arguments that he had been prejudicially blind-sided by the People's trial by ambush.

Most egregiously, counsel made no attempt to protect appellant from the rampant prosecutorial misconduct that was a clear attempt to compensate for weaknesses in the People's case; in the face of all of the egregious and prejudicial impropriety heaped on by the prosecutor, Points One and Two, supra, counsel was utterly silent. It is utterly inconceivable

43

that counsel raised no objection to the admission of the People's "DNA evidence" and the arguments that this in any way proved identity. As set forth in Point One, supra, this evidence was wholly inadmissible and highly prejudicial. Too, since counsel's chosen defense, such as it was, was to concede that the events took place as the complainants said but that appellant was not the masked perpetrator and thus, identity was the only issue, there can be absolutely no strategic reason for allowing the jury to think it was hearing DNA evidence to establish the same.

Similarly, counsel allowed the prosecution to elicit testimony from witnesses which served only to bolster the identification testimony of the complainants herein. See Point Two, supra, Point Four, infra. Again, this improper testimony, admitted without a peep, went directly to bolster the main weakness in the People's case at the expense of the trial strategy chosen by counsel and there can be no legitimate rationale for counsel's failure in this respect.

Against the backdrop of a trial in which defense counsel did nothing to protect his case and hence appellant from the impropriety of the prosecutor, it is not in the least surprising that the prosecutor's improper comments in summation met with no protest. Again, counsel did not object to the already forbidden term "home invasion" which the prosecutor used again

44

and again. Nor, did he object to the myriad of other improper comments and arguments by a prosecutor looking to shore up a weak case of identity against appellant. See Point Two, supra.

Viewed objectively, this record reveals objections that would have been strenuously made by any reasonably competent attorney. People v. Satterfield, supra. There is no possible explanation for counsel's abject failure to so object. Strickland v. Washington, supra. By wholly failing to protect his client so that the jury could consider proper evidence, or the lack thereof, counsel's performance cannot be said to constitute the effective assistance of counsel to which appellant was undeniably entitled.

Counsel's deficiencies were certainly not the product of any possible trail strategy, fell far below acceptable standards of competence, and were so egregious and prejudicial as to deprive appellant of a fair trial. People v. Satterfield, supra; People v. Caban, supra; People v. Wiley, 120 A.D.2d 66 (4th Dept. 1986). Counsel's inexplicable and egregious failure to ensure that the jury evaluated only admissible evidence and was able to consider that appellant was not the masked assailant here, make it apparent that appellant was denied the effective assistance of counsel. Appellant, denied the effective assistance of counsel under both the federal and state standard, is entitled to a new trial.

## POINT FOUR

**APPELLANT WAS DENIED HIS RIGHT TO THE DUE PROSCESS OF LAW AND TO A FAIR TRIAL BY THE REPEATED, FLAGRANT USE OF INADMISSABLE TESTIMONY TO IMPROPERLY BOLSTER THE WEAK IDENTIFICATION TESTIMONY HEREIN.**

The crucial issue for consideration by the jury at trial was whether, or not, the People established beyond a reasonable doubt that appellant was the perpetrator at issue herein. Identification, the central issue, was a problem, however, because, by all accounts, the perpetrator wore a ski mask. To compensate for the weaknesses in her case with respect to identification, the prosecutor resorted to eliciting testimony to improperly bolster the weak identifications made by her witnesses and to misfocus the jury in order to win a conviction that could not otherwise have been had.

It has long been the New York rule that, absent a situation covered by CPL 60.25, a witness may not testify at trial to having overheard an eyewitness make a pre-trial identification of the defendant. People v. Trowbridge, 305 N.Y. 471 (1953). The rationale is twofold. Such evidence is hearsay. Moreover, it improperly bolsters the identification testimony of the eyewitness since the mere repetition of the identification by a third party has the potential of placing disproportionate emphasis on the identification and to influence the jury unduly

46

with respect to its reliability. Bolstering an eyewitness's identification by calling a succession of witnesses who swear that they saw and heard him identify the same person upon previous occasions is strictly forbidden as it gives the idea to a jury that there is an impressive amount of testimony to identification when such is really not the fact. People v. Caserta, 19 N.Y.2d 18 (1966).

The same evils which Trowbridge and its progeny sought to avoid occur when a police witness is permitted to testify as to the lack of suggestiveness surrounding the identification procedure in order to prop up the reliability of the identification. Thus, in People v. Rosario, 127 A.D.2d 209 (1st Dept. 1987), the testimony of the People's police witness stressed the accuracy of the identification of perpetrator. The Rosario court held that such testimony "could not help but bolster that same witness's identification of defendant, and was undoubtedly elicited with that design." People v. Rosario, supra. Thus, the prosecution was able not only to suggest, that the identification at issue was accurate, but also to enhance the witness's general credibility as an identification witness. People v. Rosario, supra.

Stating that courts must be mindful of their obligation to strike a neat balance between possible prejudice to the defendant, and the indispensability of the evidence to the

People's case, and that "it goes without saying that any substantial doubt on this score should weight the scales in favor of the defendant," People v. Stanard, 32 N.Y.2d 143 (1973), the Rosario court held that the detective's bolstering testimony about the identification highly prejudicial and should not have been permitted. People v. Rosario, supra; see also People v. Hall, 82 A.D.2d 838 (2d Dept. 1981)(detective's testimony that the witness looked through a one-way mirror and picked "somebody out", constituted improper inferential bolstering); People v. Annis, 48 A.D.2d 622 (1st Dept. 1975)(where the court held that inferential bolstering could constitute reversible error). Similarly, courts have held that eliciting testimony to show a complainant's fear or nervousness in a defendant's presence is improper inferential bolstering. People v. Zanfordino, 78 A.D.2d 558 (2d Dept. 1980) (error to elicit testimony from a police witness describing the complainant's extreme physical reaction upon seeing the defendant).

A violation of the Trowbridge bolstering rule may not be overlooked except "where the evidence of identity is so strong that there is no serious issue upon the point" People v. Caserta, 19 N.Y.2d 18 (1966). At bar, the evidence of identity was quite weak at the same time that the amount of improper evidence deliberately used to bolster the same was substantial; under

the circumstances, a new trial is required notwithstanding defendant's failure to object. People v. Hall, supra.

The perpetrator herein wore a ski mask during the incident making it highly unlikely that the complainants could reliably identify him. It is not surprising, therefore, that the prosecution did not attempt to conduct a line-up identification of appellant upon his arrest. Indeed, though appellant was arrested on August 13, 2009, the same date as the incident at issue, no line-up procedure was immediately conducted, despite that if the witnesses were going to be able to make an identification, they would have had a better chance of accurately doing so, or not, as close to the time of the incident as possible. Yet, seemingly out of the blue, the People did conduct a line-up herein on December 17, 2009, some four months later.

Of the four witnesses to the events at issue, two could not make an identification. This is hardly surprising in light of the fact that the perpetrator was masked. Yet, one of the two non-identifying witnesses, Bukiari Syed, the child who answered the door and saw the perpetrator without his mask, was permitted to testify that he was very scared and nervous so he didn't pick any one (T. 378). The prosecutor followed up by asking, "You just, you said you didn't want to pick anyone?" and the witness answered, "No, I was very scared." (T. 378).

The third witness, an eight-year-old child, was apparently able to pick appellant from the line-up even though she never saw the perpetrator for a moment without the mask and even though she testified at trial that that because of the ski mask she could not see the man's ears, or his hair, or his chin, or his eyes, or his nose (T. 363-364). At a later point in her testimony, the child contradicted herself and stated that she had been able to see the man's eyes and a little more than his eyes (T. 365-366). Still, an eight-year-old picking one out of six men four months after maybe seeing his eyes in the slits of a mask does not a particularly strong identification make.

The final witness to allegedly make an identification was Mrs. Shah but it came out on cross-examination that she actually picked two men out of the six man line-up. The witness tried to explain that she thought that she was looking for the co-defendant in the line-up, a man she had seen on many occasions without any mask, so she was looking for him. She picked someone even though the co-defendant, who she'd seen many times, was not in the line-up. The description of perpetrator by this witness did not match appellant's characteristics in terms of his build and in terms of facial hair.

Against the backdrop of the very weak identification evidence, the prosecutor resorted to grossly improper conduct to win a conviction, telling the jury there was DNA evidence

and that appellant's alleles were all over the ski mask and making improper comments to inflame the jury, Points One and Two, supra. The prosecutor also improperly elicited testimony to bolster the weak identifications of her witnesses.

Detective John Giambrone was called to testify about how line-ups in the precinct where these line-ups were held are done in general so as to avoid suggestiveness. He was permitted to testify that he was concerned that the young children were going to be frightened at this line up and to detail what steps were taken to insure fairness and to calm the children (T. 710-711). Similarly, Detective Manual Nash was called to testify that nothing improper occurred during the line-up. Detective Steven Higgins testified that Syed Shah was very nervous as he escorted him to the line-up room on December 17, and that Syed seemed unsure; Higgins testified that he tried to calm Syed down (T. 775-776). Like the others, Detective Daniel Finn was called to testify that he was one of the fillers in the line-up and that the line-up was conducted fairly. (T. 776-782).

Detectives William Bultler and Roy McComb were permitted to testify at how upset the Shah family was on the date of the incident and that they were in a state of panic (T. 730-732, 782-787). Detective Russ Bastone also testified at length to how upset the family was on the date of the incident. The prosecutor then elicited improper hearsay from this witness to

51

bolster the accounts of her witnesses. The witness stated that "our witness was able to tell us that She looked out of the window and she saw the car traveling North …" (T. 798). It should be noted that the hearsay was so egregious that even this defense counsel made one of his rare objections (T. 802-803). Undaunted, however, the prosecutor continued in the same vein eliciting hearsay to bolster the testimony of other witnesses and hence her case as to identity. (T. 816-822).

With respect to Syed, the witness who answered the door and thus saw the perpetrator without his mask but was never the less unable to make an identification, the prosecutor, with her comments and questions, led the jury to believe that this witness could identify appellant but that he had been afraid to do so. She then bolstered the testimony of the witness to the effect that he could have made an identification but was afraid, by eliciting a plethora of improper testimony about how scared the children were after the incident, about how the police were concerned at the time of the line-up that the children would be nervous, and about how this witness was, in fact, nervous at the identification procedure. People v. Zanfordino, supra. The repeated introduction of this testimony by a platoon of police witnesses for the People established no relevant fact and served merely to improperly bolster the credibility of this witness and of the prosecutor's suggestion

52

that he could identify appellant.

Similarly, confronted with a situation where the jury had to be wondering how the eight-year-old who never saw the perpetrator without his mask could possibly make a reliable identification, the prosecutor resorted to bolstering the identifications somehow made at the line up by eliciting testimony concerning the line-up procedure. This served to misfocus the jury's attention from how reliable these identifications could possibly be, leaving the jury to think that where all the many police witnesses testified in such detail about the line-up that it had to be accurate. The use of such improper testimony bolstered the identifications and the credibility of the witnesses and took the issue of identification away from the jury. People v. Rosario, supra; People v. Hall, supra.

Under the circumstances of this case, where there was no DNA evidence to connect appellant to this crime in any way but the jury was allowed to think that there was and where the perpetrator wore a ski mask making identification unlikely, the impropriety in allowing the prosecutor to repeatedly elicit testimony to bolster the weak identification evidence cannot be considered harmless. The evidence of the defendant's identity was far less than overwhelming, and it cannot be said that there was no significant probability that the egregious

53

errors contributed to his conviction. People v. Caserta, supra. Further, his conviction must be reversed despite the lack of objection. People v. Hall, supra; see also Point Three, supra.

## POINT FIVE

**THE TRIAL COURT IMPERMISSIBLY DILUTED THE PROSECUTOR'S BURDEN OF PROOF WHEN, AT THE VERY OUTSET OF THE TRIAL, IT INSTRUCTED THE JURY THAT ITS FUNCTION WAS TO DETERMINE WHAT IF ANYTHING TOOK PLACE AND THAT ITS JOB WAS TO DETERMINE WHETHER APPELLANT WAS GUILTY OF THE CRIME HEREIN.**

At the beginning of this closely contested trial, the trial court endeavored to give the jury preliminary instructions— instructions it would have to carry it through the many days during which it heard first the People's evidence and then the arguments of the prosecutor and the defense. At this crucial juncture, the lower court instructed the jury that its function was to determine what, if anything, took place at a particular time and place, and that its job was ultimately to determine whether appellant was guilty of the crime charged by the government. Because, rather, the jury's function was to determine whether the People had met their burden of proving each element of the crimes charged beyond a reasonable doubt, the court's instructions, which suggested otherwise, impermissibly diluted the burden of proof. Accordingly, appellant's conviction should be reversed.

At trial, the People's proof as it pertained to the crucial issue of the identity of the masked perpetrator, alleged to be appellant, was weak. There was no DNA evidence where there should

55

have been DNA evidence. Only two of five witnesses could make any identification, because the assailant was masked. Of the two who could supposedly identify the assailant, one never saw the man without his mask and the other, who swore that she saw the assailant unmasked, though only for mere seconds, was, for obvious reasons, unsure of her identification at the line-up. Obviously, then, the crucial issue for consideration by the jury was the sufficiency of the People's proof with respect to identity.

Appellant was stymied in his effort to hold the People to their burden of proof, however, by, among other things, see also Points One through Four, supra, the conduct of the trial court, that diluted this crucial standard. In a case where it would consistently allow the prosecution to run roughshod over appellant's constitutional rights without a peep from defense counsel, Point Three, supra, the trial court began by instructing the jury, "Now the purpose of a trial is for a jury to decide, on the basis of evidence presented in the courtroom, whether a person who is accused of a crime by the government is guilty or not guilty of that crime." (T. 36). The court went on to state that this jury's responsibility was to evaluate the evidence that would be presented in, "here in the courtroom and decide what the believable and accurate facts are with respect to what, if anything, took place on a particular time and place in question."

(T. 36-37). Because the jury sat to determine whether the prosecution had proven appellant's guilty beyond a reasonable doubt, the trial court erred when its initial instruction could only have led the jury to believe that its function was merely to determine what happened, rather than that it functioned to assess whether the People had established the elements beyond a reasonable doubt. The erroneous and highly prejudicial instructions impermissibly diluted the People's burden of proof and thereby deprive appellant of his constitutional right to a fair trial.

There are few principles of criminal law more fundamental than the prosecutor's burden of proving guilt beyond a reasonable doubt; indeed, the United States Supreme Court has explicitly held that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S.358, 364. To this end, the jury must be unequivocally informed that the burden of proof beyond a reasonable doubt lies with the prosecutor, that the defendant does not labor under the same heavy load with respect to his defense, and that where the defendant chooses to rely on the lack of proof beyond a reasonable doubt as his defense, the defendant has absolutely no burden of proving anything. See e.g. People v. Robinson, 36 N.Y.2d 244 (1975); People v. Bacon, 84 A.D.2d 680

(4th Dept. 1981); People v. Fox, 72 A.D.2d 146 (1st Dept. 1980). A comment which suggests otherwise impermissibly shifts the burden of proof from the prosecution where it belongs to the defendant and constitutes reversible error.   See People v. Iskander, 74 A.D.2d 880, 881 (2d Dept. 1980); People v. Sharp, 71 A.D.2d 1034 (3d Dept 1979); People v. Bacon, supra.

Thus, in People v. Iskander, supra, where the defendant was found guilty of withholding from a building's owners the rents that he had collected as their agent, the trial court erred with a single sentence when it instructed the defense counsel during his cross-examination of the complainant, "it's your job to show that he received the monies which he claims he never got." Because the court's instruction suggested that the defendant had something to prove, the comment was held to be "highly prejudicial [in that] it had the effect of shifting the burden upon the defense to prove that defendant's innocence." The defendant's conviction was therefore reversed.

Likewise, in People v. Sharp, supra, where the trial court stated that if the evidence disproved the defendant's guilt, the jury must acquit, that one erroneous instruction shifted the burden of proof and mandated a reversal. Perhaps most aptly, in People v. Bacon, supra, where the trial court's instructions gave the impression that the jury's determination hinged on whether they believed the People's witnesses or the defense witnesses,

58

the burden was impermissibly shifted to the defendant and reversal was mandated.

Here, as in People v. Bacon, supra, the trial court's instruction that the jury's verdict hinged on what it determined had happened gave the impression that the People's burden was far less that the standard of proving each and every element of the crimes charged beyond a reasonable doubt. The effect was to impermissibly dilute the constitutionally mandated standard of proof which had to be established for a conviction and reversal of appellant's conviction is therefore mandated. See In re Winship, supra; People v. Bacon, supra; People v. Sharp, supra.

It is beyond cavil that appellant herein had every right to the defense he proffered at trial, where appellant sought to hold the People to its burden of establishing the elements of the crime, especially identity, beyond a reasonable doubt; he was not obliged to present any evidence or to prove anything whatsoever. In re Winship, supra. Accordingly, it was entirely proper and permissible for appellant to rest upon the presumption of innocence and to hold the prosecution to its burden of proving each element of the crime charged beyond a reasonable doubt.

The assertion by the trial court to the jury that it sat to determine what had happened let the jury believe that it could convict on something less than proof beyond a reasonable doubt. The prejudicial preliminary instructions impermissibly diluted

the burden of proof, and the trial court erred in so instructing the jury. In this case, where appellant chose to highlight the insufficiency in the People's case insofar as it failed to prove identity beyond a reasonable doubt, the lower court's error in wrongly eroding the constitutionally mandated burden of proof was all the more egregious and mandates reversal. People v. Iskander, supra; People v. Iskander, supra, People v. Bacon, supra; People v. Sharp, supra.

Nor does the court's subsequent charge as to reasonable doubt in general, in which it recognized the presumption of innocence and the prosecution's burden of proof beyond a reasonable doubt, salvage the illegality of its previous instructions to the contrary. The conflict inherent in the court's instructions on this all important standard could certainly have caused some or all of the jurors to convict absent proof beyond a reasonable doubt. Where the charge conveyed the erroneous instruction that the jury sat to determine what happened and thereby diluted the People's burden of proof, the very real possibility of irreparable prejudice cannot be overlooked. Accordingly, appellant's conviction was unconstitutionally obtained and should be reversed in the interest of justice.

Finally, because a jury instruction which improperly shifts the burden of proof cannot be deemed harmless, see e.g. People

v. Williams, 95 A.D.2d 866, 867 (2d Dept. 1983); Sanstrom v. Montana, 442 U.S. 510, 526, harmless error analysis is inapplicable in this case, as to this issue. The trial court's charge which diluted the prosecution's burden of proof deprived appellant of the right to a fair trial and his conviction must be reversed.

**CONCLUSION**

THE JUDGMENT APPEALED FROM SHOULD BE
REVERSED.


Dated: Thornwood, New York
       July 2012


                    Respectfully submitted,


                    MARIANNE KARAS
                    Attorney for Defendant-Appellant
                    980 Broadway
                    Suite 324
                    Thornwood, New York 10594
                    (914) 434-5935

62

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

THE PEOPLE OF THE STATE OF NEW YORK,
                    Respondent,

        -against-

Troy Totesau,
                    Defendant-Appellant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                    STATEMENT PURSUANT TO RULE 5531

1.    The indictment number in the court below was 1916/09 .

2.    The full names of the original parties were The People of

the State of New York against Troy Totesau and Dexter Lucas.

This appeal is on behalf of Mr. Totesau.

3.    This action was commenced in the Supreme Court of the State

of New York, County of Nassau.

4.    This action was commenced by the filing of an indictment.

5.    This appeal is from a judgment convicting appellant, after

a jury trial, of Robbery in the First Degree (two counts),

Burglary in the First Degree (two counts), Robbery in the Second

Degree, Attempted Assault in the Second Degree (four counts),

and Unlawful Imprisonment, and sentencing him to concurrent

terms of imprisonment with an aggregate maximum of twenty-five

years with five years of post-release supervision.

6. This appeal is from a judgment entered February 7, 2011 (Ayres,

J).

## CERTIFICATE OF COMPLIANCE

The brief for appellant is printed in Courier New, double spaced. The footnotes is in Times New Roman. The font size is 12.   The word count is 13,415.