*To be argued by:*
Ames C. Grawert
*(15 Minutes)*

# Supreme Court of the State of New York
# Appellate Division: Second Judicial Department

---

THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

- *against* -

TROY TOTESAU,

*Defendant-Appellant.*

A.D. NO.:
2011-02333

IND. NO.:
1916N/09

## RESPONDENT'S BRIEF

**KATHLEEN M. RICE**
District Attorney, Nassau County
Attorney for Respondent
262 Old Country Road
Mineola, New York 11501
(516) 571-3800

Andrea M. DiGregorio
Ames C. Grawert
  Assistant District Attorneys
    *of Counsel*

# TABLE OF CONTENTS

Page

Preliminary Statement.................................................................................... i

Statement of Facts
    Introduction........................................................................................ 1
    The Hearing....................................................................................... 4
    The Trial............................................................................................ 4
        The People's Case ..................................................................... 5
        Defendant's Case...................................................................... 12
        Verdict and Sentence .............................................................. 13

Point I
    Claims of Error Stemming From Alleged Prosecutorial
    Misconduct Are Either Unpreserved, Meritless, Or Both............................ 14

      A.  All Claims But One Are Unpreserved ................................................. 14

      B.  The Prosecutor's Comments Were Within
          the Bounds of Permissible Advocacy.................................................. 15

      C.  Any Error Was Harmless......................................................................... 24

Point II
    Two Victims Credibly Identified Defendant, And Defendant's
    Unpreserved Claim That The People Improperly Bolstered
    This Testimony Is Meritless ........................................................................... 26

Point III
    Defendant's Contentions Regarding Introductory Remarks
    That The Court Made During Voir Dire Is Unpreserved
    And Without Merit ......................................................................................... 31

Point IV
      Defendant Received Effective Assistance of Trial Counsel......................  36

      A.  Defendant Admirably Defended a Difficult Case...............................  38

      B.  Failure to Make Meritless Objections Does Not Demonstrate
            Ineffectiveness.........................................................................  39

      C.  Counsel's Effective Response to Two Issues Forecloses Any
            Claim that His Representation Was Constitutionally Deficient........  41

      D.  Undeveloped Minor Points Do Not Merit Reversal..........................  43

Conclusion...................................................................................................  47

Certificate of Compliance

# NEW YORK SUPREME COURT

Appellate Division - Second Department

————••✛••————

## THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

*- against -*

### TROY TOTESAU,

*Defendant-Appellant.*

————••••————

# RESPONDENT'S BRIEF

———

Preliminary Statement

Defendant Troy Totesau appeals from a judgment of the Supreme Court, Nassau County, dated February 7, 2011, convicting him, following a jury trial, of two counts of robbery in the first degree (Penal Law § 160.15[3], [4]), two counts of burglary in the first degree (Penal Law § 140.30[3], [4]), one count of robbery in the second degree (Penal Law § 160.10[1]), five counts of unlawful imprisonment in the second degree (Penal Law § 135.05), and four counts of assault in the second degree (Penal Law § 120.05[1], [6]). By this judgment, defendant was sentenced to serve

i

(respectively) two determinate terms of fifteen and twenty-five years each, five one-year, determinate terms of imprisonment, and four indeterminate terms of one-and-a-third to four years each.   All terms are to run concurrently.   Defendant was also sentenced to two concurrent, five-year terms of post-release supervision, assessed various surcharges, and ordered to make restitution of $35,000, representing his one-half share of the proceeds of his crime, to be executed by way of a civil judgment (Ayres, J., at trial and sentence).

Defendant remains incarcerated pursuant to the judgment of conviction. Dexter Lucas ("the codefendant") was charged with burglary in the first degree (Penal Law § 140.30[3], [4]) and robbery in the first degree (Penal Law § 160.15[3], [4]) for participating in the crime, but was ultimately acquitted for lack of identification.

## S T A T E M E N T   O F   F A C T S

Introduction

On the afternoon of August 13, 2009, Mr. Syed Shah, a New York City taxi driver who regularly works late nights, was asleep in his bedroom on the second floor of his home in South Floral Park, Nassau County, New York. Meanwhile, his wife, Zariah, prepared an afternoon meal for her family, while her two sons watched television in the family room, and her daughter, Rida, used the family computer in an adjoining room.

Initially feigning an innocuous interest in the home, three individuals approached, prepared to shatter this peaceful family scene. The first, a woman, rang the doorbell and was greeted by the Shah's eldest son. When Mrs. Shah reached the door, just behind her son, defendant appeared, placed a gun to her head, and forced himself inside the home. Only then did defendant put on a mask and, still pointing a gun at his victims, force Mrs. Shah and their children to the floor of their family room. Another male assailant ran past them and directly up the staircase into Mr. Shah's bedroom, where the intruder woke, detained, bound, and assaulted Mr. Shah, demanding money. Held at gunpoint and repeatedly beaten, Mr. Shah ultimately surrendered a briefcase containing tens of thousands of dollars, passports, identification materials, and credit cards, which the two assailants and their female

1

accomplice emptied into a bag before escaping in a maroon sedan. All told, the three escaped with $75,000, which comprised the Shah family's entire life savings. Defendant and his cohorts had also stolen the Shah's credit cards, passports, and other materials, including Mr. Shah's driver's license.

Later that day, in east Brooklyn, patrolling New York City Police officers observed defendant using a cellular telephone while driving, and detained him. Defendant's car—a maroon Kia—matched the description of the getaway car used in the Shah robbery. Prominently visible on the vehicle's dashboard were Mr. Shah's driver's license, piles of cash in $20 bills, and pawn shop receipts. After the New York City officers notified the Nassau County Police Department, defendant was ultimately arrested as a suspect in the Shah robbery, and later identified by members of the Shah family as the first male assailant.

Charged with burglary and robbery in the first degree (Penal Law §§ 140.30[3], [4]; 160.15[3], [4]), as well as unlawful imprisonment and assault in the second degrees (Penal Law §§ 135.05; 120.05[1], [6]), defendant elected a jury trial. Defendant was ably represented by a prominent member of the Nassau County bar, who vociferously challenged the People's proof of identification. Following a jury verdict of guilty, Supreme Court Justice David Ayres sentenced defendant to serve five determinate terms of one year imprisonment, one for each count of unlawful imprisonment; two

2

determinate terms of fifteen and twenty-five years imprisonment for the second and first degree felonies, respectively; four indeterminate terms of between one-and-a-third and four years imprisonment on each assault count, and to five years of post-release supervision.

Defendant now appeals, claiming that: (1) various instances of inflammatory and otherwise improper conduct by the prosecutor merit reversal; (3) impermissible bolstering of identification testimony deprived him of a fair trial; (3) the trial court somehow "diluted" the People's burden of proof; and (4) trial counsel was constitutionally ineffective for, *inter alia*, failing to object to some subset of these errors.

The majority of these claims are unpreserved, and all are meritless. The prosecutor properly elicited DNA testimony and appropriately commented thereon. The prosecutor's limited resort to colorful language did not so taint the trial as to require reversal; and, in any event, defendant's counsel used identical language. No bolstering occurred whatsoever. And, trial counsel mounted a capable defense, even securing the dismissal of several indictment counts. This Court should affirm defendant's conviction for his role in this violent, horrifying crime.

3

The Hearing[1]

A joint pretrial hearing was held on March 18 and 19, 2010 (Kase, J., at hearing). The court resolved Wade and Huntley[2] issues regarding defendant in the People's favor (H6, 196), with the exception of one statement, which was suppressed under Wade (H209-09). Defendant appeals none of the court's determinations.

The Trial

At the start of voir dire, the court admonished the People to avoid using the phrase "home invasion" as a synonym for "burglary" during jury selection, out of a concern that the phrase has no legal significance, and could be needlessly inflammatory:

> It can be called—to the extent that you are going to deal with the specifics of the case, which is very generally in a jury selection, I'm going to ask you both to avoid the terms "home invasion." I don't think that I think that the import of those terms is too inflammatory

(T25). The phrase was brought up by prospective jurors at several points (T69, 74, 78, 212), a possibility the court also contemplated (T26), and at the close of jury selection, defense counsel successfully challenged and removed one prospective juror

---

[1]     Citations to court transcripts are made as follows: a "T" immediately preceding a page number indicates the trial transcript, "H" the hearing transcript, and "S" the sentencing transcript. Names preceding these designations refer to the witness whose testimony is being recounted. Page numbers preceded by "Br." refer to defendant's brief.

[2]     United States v. Wade, 388 U.S. 218 (1967); People v. Huntley, 15 N.Y.2d 72 (1965).

who used the expression "right off the bat" in voir dire (T87). However, both the People and defense counsel obeyed the court's request and avoided describing the charged crime as a "home invasion" for the duration of jury selection.

The court did not separately request that counsel avoid using the expression "home invasion" after jury selection. As a result, the phrase was used repeatedly during trial, by both parties. The People used the phrase during opening (T266, 268, 285, 287) and closing statements (T996, 1000, 1007, 1012, 1017, 1033), and several times during the case in chief (T897, 900). Defense counsel used the term as well, first while cross-examining one of the People's witnesses (T850), later while arguing for a trial order of dismissal (T933), and lastly in closing (T957, 982). In each instance, no objection was made by either party.

The People's Case

On the afternoon of August 13, 2009, ZARIAH SHAH was in her kitchen, preparing food for her family (Zariah: T299-300).[3] Contractors, led by codefendant Dexter Lucas, had recently completed a ten- to twelve-day sheetrocking project on her home (Syed: T381). But this work was done, and the family rarely entertained guests (Zariah: T299). As such, she was not expecting any callers.

---

[3]     To avoid confusion when identifying testimony given by members of the Shah family, transcript citations are preceded by the family members' *first* names, and the name of Syed Bukiari Shah, the family's eldest son, is abbreviated to "Syed Jr." when appearing in this context. Neither truncation, nor our usage of first names, implies any disrespect to the family.

5

Nonetheless, her twelve-year-old son, named SYED BUKIARI SHAH after his father, answered a knock at the door (Syed Jr.: T368; Zariah: T300). Upon opening the door, Syed saw a woman who, in the style of a census worker, began to ask questions concerning who lived in the home (Zariah: T301; Syed Jr.: T369). Mrs. Shah followed her son, and arrived to see defendant (Zariah: T314-15, T341; Rida: T360), an African-American man, unmasked and standing behind the "census" recorder (Zariah: T301). Before Mrs. Shah could react, defendant put a gun to her head and demanded entry (id.). Because defendant was still unmasked, Mrs. Shah was able to see him "properly" (id.).

Once inside, and still wielding a gun, defendant donned a mask, and forced Mrs. Shah and her two sons to the floor (Zariah: T302). The Shah's only daughter, RIDA SHAH, initially attempted to lock herself in the computer room to avoid being caught by defendant (Rida: T348). But, hearing a noise from the computer room, defendant opened the door, reached in, pulled out Rida Shah, and forced her, too, to the ground (Zariah: T302; Ridah: T370). Rida was able at least to see the lower half of defendant's face, and his eyes, as she was dragged out of hiding (Rida: T349, 365-66).

While defendant immobilized Mr. Shah's wife and children, a second man ran into the house, also donned a mask and, without delay, rushed directly up the stairs (Zariah: T301). Before this new intruder pulled the mask over his face, Syed Jr. was

able to see the man's face clearly, and later identify him as codefendant Dexter Lucas, based on the many times Syed had previously observed Lucas in his home (Syed Jr.: T376-77). After ascending the stairs codefendant Lucas entered the master bedroom, woke up SYED SHAH, sat on his back to immobilize him, and, while still holding him at gunpoint, bound Mr. Shah and demanded that he identify and surrender his valuables (Syed: T387-88). Based on their prior relationship, Mr. Shah also quickly recognized this assailant as codefendant Lucas (Syed: T403). By the time Mr. Shah was incapacitated, defendant had forced the rest of the family into Mr. Shah's bedroom (Zariah: T304; Syed: T391), where Mrs. Shah observed her husband bound and held by the second gunman (Zariah: T305; Rida: T351; Syed Jr.: T371).

Because he had been regularly paid in cash by Mr. Shah for his contracting work on the home, Lucas knew Mr. Shah both kept cash on hand, and stored it on the second floor (Syed: T381-85). Lucas repeatedly and specifically demanded this reserve of him, by requesting at gunpoint "the whole fucking money" and "the other money" (Syed: T392). Mr. Shah, turning to his wife, asked her to bring the assailants a briefcase (Syed: T394). Lucas beat Mr. Shah until he gave his wife a number—the combination to open the briefcase's lock—and opened it to reveal documents, including the family's passports, drivers' licenses, credit cards, and large store of cash (Zariah: T307-08; Syed Jr.: T373; Syed: T388-92). Because Mr. Shah preferred not to

7

use banks (Zariah: T317), this briefcase stored the family's entire life savings, saved over the course of fifteen years of hard work (Syed: T392).

Mr. Shah's children pleaded with their assailants, begging them to leave some of the family's hard-earned money so that they could survive (Zariah: T309; Rida: T352; Syed: T395-96). Mr. Shah, for his part, asked the robbers to at least leave the family passports and, in a desperate bid to reason with the attackers, even offered to leave the country and return to Pakistan (Syed: T395-96). Still displaying firearms, the attackers promised to return the passports and other identifying information by mail, but emptied the briefcase of its cards and cash. They then bound the entire family with duct tape and, with the "jackpot" in hand (Syed: 395), exited the home and fled in a maroon Kia sedan (Zariah: T311; Rida: T353-57; Syed Jr.: T374; Syed: T397-98). Mrs. Shah was ultimately able to break the tape binding her, and call the police (Zariah: T313).

Hours later, New York City Police officer Khandakar Abdullah, on patrol with his partner, Officer Landau, in east Brooklyn (Abdullah: T498), observed defendant driving a maroon Kia while speaking on a cellular phone (Abdullah: T500). After detaining defendant for this traffic violation, Officer Abdullah determined that defendant's license was suspended (Abulldah: T504). He asked defendant to return with Officer Landau to the Seventy-Fifth Precinct, and prepared to drive defendant's

car there himself (Abdullah: T509). Before doing so, Officer Abdullah executed a routine pat-down of defendant, during which he observed a suspicious bulge in defendant's front pocket, which the officer suspected could be a weapon (Abdullah: T505). Upon removal of the object that had created the bulge, Officer Abdullah discovered that it was "a large amount of cash," which had been folded for storage (Abdullah: T506). Once situated in the driver's seat of defendant's car, Officer Abdullah observed, in plain view, a folded black ski mask, a wallet, another reserve of folded dollar bills, and a driver's license and credit cards that belonged to Mr. Syed Shah (Abdullah: T506-09). After conducting a search and an inventory of property, the police found almost $7,400 on defendant's person and in his car (Abdullah: T542).

New York City Police officer MICHAEL INTERDONATI assumed custody of the confiscated property and, after reviewing Syed Shah's driver's license, contacted Mr. Shah and then the Nassau County Police Department (Interdonati: T586). Thereafter, Officer Interdonati requested that defendant's vehicle be held as a "crime scene" (Interdonati: T595). After codefendant Dexter Lucas arrived to claim the car—a maroon Kia—Interdonati escorted Lucas to an interview room (Interdonati: T596). Later, when Nassau County Police officers arrived, Interdonati escorted them, too, to the same room (Interdonati: T596-97).

9

After speaking with Detective Interdonati, and learning that the New York Police Department had detained an individual in possession of Mr. Shah's driver's license, Detective RUSS BASTONE went to the Seventy-Fifth Precinct (Bastone: T802-03).  After speaking with defendant and codefendant Dexter Lucas, Detective Bastone arrested the former and returned with him to Nassau County's Fifth Precinct (Bastone: T813-15).

Months later, Detective Bastone asked Rida, Zariah, and Syed Bukiari Shah to view a corporeal lineup (Bastone: T827-30).  The two remaining members of the Shah family were not asked to participate.  Mr. Syed Shah had informed Detective Bastone that he had never seen defendant unmasked, and therefore was not confident in his ability to recognize him (Bastone: T833).  And, Detective Bastone concluded that the Shah family's youngest son, Syed Hussein, had been too young at the time of the crime to participate in a lineup (id.).  At the lineup proceeding, Zariah Shah identified defendant as the first assailant, who had held a gun to her head and bound her and her children, from a corporeal lineup (Zariah: T314-15, T341).   Rida also independently selected defendant (Rida: T360).  Although he had seen defendant's face clearly on the afternoon of the crime (Syed Jr.: T377-78), Syed was "scared and nervous" when later asked to view a lineup of suspects, and declined to identify

anyone (id.).  Also, investigators conducted a buccal swabbing of all the Shahs, for use in genetic testing (Zariah: T316).

SYDNEY ESPANA, a forensic geneticist (Espana: T605, 608), conducted genetic tests on material left at the crime scene, including green plastic scraps (possibly the remnants of a surgical-style glove), duct-tape samples, and a black ski mask (Espana: T615).  She attempted to develop genetic profiles from each, to compare against profiles developed directly from buccal swabs of defendant and the victims (Espana: T615-16).  She developed a profile from a portion of material cut from around the eye holes of the black mask (Espana: T630), and concluded that defendant "can be included as a contributor to the mixture in the black ski mask" (Espana: T631).  During cross-examination at trial, defense counsel elicited testimony indicating that, though defendant could be "included" as a potential contributor to DNA on the mask, this is the "weakest" form of a match, and that many other individuals—even millions—could have contributed DNA to the mask (Espana: T643, 645-46).  MICHELLE EGERMANN, an expert in high-sensitivity DNA analysis (Egermann: T670), excluded both defendant and Lucas as contributors to DNA found on the green plastic scrap discussed above (Egermann: T682-83, 685).  Defendant was excluded also as a contributor to the genetic material that had been left on the duct tape (Espana T625-26).

Investigators discovered additional information linking defendant to the crime. ANITA DINIS-FORTIZA, an employee of Enterprise Holdings (Dinis-Fortiza: T488), found that the car in which defendant was apprehended had been rented, on the day of the crime, to the wife of codefendant Dexter Lucas (Dinis-Fortiza: T493-95). And, Detective JOSEPH NUZZO analyzed verified telephone records (Trawicki: T872-77), concluding that they showed a westward path, originating in South Floral Park on the date and time of the crime, steadily heading westward to the vicinity in which defendant was apprehended, and coming to rest near the Seventy-Fifth Precinct, before heading back eastward to the area of Nassau County's Fifth Precinct, at the exact time defendant returned there (Nuzzo: T902-19).

Defendant's Case

Defendant called no witnesses, and presented neither testimony nor exhibits, choosing to rely exclusively on cross-examination. Defense counsel orally moved for a trial order of dismissal, and succeeded in dismissing two counts of the indictment (T929-30). At the close of evidence, defense counsel admitted that the crime occurred largely as described by the people (T933), but vigorously disputed the sufficiency of the People's identification testimony (T935).

Verdict and Sentence

At the close of evidence, the jury convicted defendant of two counts each of robbery and burglary in the first degree,[4] one count of robbery in the second degree, four counts of assault in the second degree, and five of unlawful imprisonment, one for each victim (T1102-04).   Thereafter, the trial court sentenced defendant to serve, respectively, two determinate terms of twenty-five and fifteen years, four indeterminate terms of one-and-a-third to four years each, and five one-year, determinate terms of imprisonment, all to run concurrently (S8).   The court also assessed restitution by way of a civil judgment (S9).

---

[4]        This verdict reflects the dismissal of two first degree robbery counts (Counts Two and Four of the original indictment), charged under § 160.15(3) and (4), following trial counsel's partially successful motion for a trial order of dismissal (T929-30).

13

<u>POINT I</u>

CLAIMS OF ERROR STEMMING FROM ALLEGED PROSECUTORIAL MISCONDUCT ARE EITHER UNPRESERVED, MERITLESS, OR BOTH <u>(answering Points One and Two of defendant's brief).</u>

This Court should reject defendant's contention that the prosecutor's conduct deprived defendant of a fair trial. All but one of the arguments that defendant offers in support of his claim are unpreserved for appellate review as a matter of law because defendant failed to object to the statements he now claims are improper. In any event, those comments either represented fair commentary on the evidence or did not result in undue prejudice. Moreover, the one aspect of the prosecutor's conduct to which defendant did protest—the introduction of witnesses who were not on the witness list—did not deprive defendant of a fair trial. Each of those witnesses spoke about peripheral matters, and the evidence of defendant's guilt was overwhelming.

A.    <u>All Claims But One Are Unpreserved.</u>

In his brief, defendant specifically concedes that trial counsel failed to object to the majority of defendant's now-raised claims of error—the use of "inflammatory" language, the submission of DNA evidence, and the colorful descriptions of the defendant's case (Br. at 31). Because the defense did not object to those aspects of the prosecutor's conduct, defendant's claims regarding those actions of the prosecution are unpreserved for appellate review as a matter of law. C.P.L.

14

§ 470.05(2); see also People v. Rogers, 94 A.D.3d 1152, 1153 (2d Dept. 2012)

(unpreserved error related to summation not reviewable on appeal).

In only one case did defense counsel object to the prosecutor's conduct at trial:

counsel vigorously protested the introduction of several witnesses who did not appear

on the original witness list.[5]   Although defendant's claim about that aspect of the

prosecutor's conduct is preserved, the claim does not provide a basis for appellate

relief.   The use of witnesses who were not mentioned on the witness list did not

deprive defendant of a fair trial.   Because each witness spoke to peripheral matters,

such as the location of security cameras in the victims' neighborhood (T740), their

introduction did not alter the evidence in the case, and did not prevent counsel from

mounting a meaningful defense.   See People v. Finch, 57 A.D.2d 641, 641 (3d Dept.

1977).

B.     The Prosecutor's Comments Were Within the Bounds of Permissible
       Advocacy.

Respondent addresses each of defendant's unpreserved claims in turn.   As set

forth below, defendant's weak arguments about the alleged prosecutorial misconduct

cannot, whether examined alone or cumulatively, provide a basis for reversal.

---

[5]     The trial court noted trial counsel's diligent pursuit of objections to witnesses who had not
been mentioned in the witness list (T735-36).   Initially, the court overruled defense counsel's
objections to the presentation of witnesses not in the witness list.   But, when the prosecutor sought
to introduce additional witnesses that were not on the list, and defense counsel objected, the judge
resolved the situation to both parties' satisfaction by saying that he would limit further "surprise"
witnesses on a case-by-case basis (T752-53).   Defendant did not object to this resolution.

1.    *References by Both Attorneys to a "Horrific" "Home Invasion" Fell Well Within the Bounds of Permissible Advocacy, and Did Not Contravene the Court's Order.*

During voir dire, the trial court requested that, <u>during jury selection</u>, the People avoid the term "home invasion" when describing the charges against defendant. Specifically, the court stated:

> I'm going to direct both of you, I do not want to hear the term "home invasion" come out of anybody's mouth <u>during jury selection</u> on this case. . . .
>
> It can be called—to the extent that you are going to deal with the specifics of the case, which is very generally in a jury selection, I'm going to ask you both to avoid the terms "home invasion." I don't think that I think that the import of those terms is too inflammatory

(T25) (emphasis added). The People and defense counsel both followed the trial court's order to the letter. They were not, however, required to follow it any further, and also avoid using the phrase "home invasion" during the course of trial. After the first usage of the term, made early in the People's opening (T266), passed without incident, both attorneys could reasonably have concluded that the trial judge meant what he said, and prohibited use of the term "home invasion" during voir dire only.[6]

Regardless, use of the expression "home invasion" in this case is not prejudicial. "Home invasion" is a common synonym for violent burglary, occasionally

---

[6]    Although no order forbade counsel from using the term after jury selection, even the repeated violation of a court order forbidding mention of a specific issue rarely requires reversal. <u>See, e.g.</u>, <u>Adelson v. Hananel</u>, 428 Fed. Appx. 717, 718 (9th Cir. 2011).

16

even used by this Court as shorthand to describe such crimes. See People v. Mais, 71 A.D.3d 1163, 1165 (2d Dept. 2010); People v. Highsmith, 21 A.D.3d 1037, 1038 (2d Dept. 2005). The term here suggests matters solely within the record, and constitutes nothing more than a "fair commentary on the evidence." See People v. Guevara-Carrero, 92 A.D.3d 693, 694-95 (2d Dept. 2012); People v. Ashwal, 39 N.Y.2d 105, 109 (1976) (permitting commentary within "'the four corners of the evidence'") (citation omitted). As defense counsel conceded, "there was a home invasion"; the only question in the case was "the identification" (T933). Defense counsel repeated this concession in the presence of the jury during his own summation: "there is a horrific invasion, home invasion, burglary, robbery, call it what you'd like, but it's a home invasion," emphasizing again that the only issue was "identification." (T957). Mere characterization of events—though descriptive—is not unfairly inflammatory where firmly rooted in the record. See People v. Jones, 76 A.D.3d 716, 717 (2d Dept. 2010); People v. Green, 159 A.D.2d 325, 325 (2d Dept. 1990) ("The prosecutor's unobjected-to description of the crime as 'brutal' was not inflammatory" where "the evidence at trial showed that the complainant had been choked into unconsciousness"); People v. Robinson, 150 A.D.2d 812, 812 (2d Dept. 1989).

Similar logic prevents any finding of prejudice based on the prosecutor's brief description, in her opening statement, of the Shahs as a "poor, innocent family"

17

(T279).  Such a passing description does not merit reversal.  See People v. Graham, 169 A.D.2d 842, 842 (2d Dept. 1991); People v. Meredith, 128 A.D.2d 813, 814 (1987).  Nor can a similar isolated comment about the durability of memory in the face of tragedy (T275) be analogized to the prosecution "vouching" for a witness's credibility.  See People v. Evans, 78 A.D.3d 1074, 1074 (2d Dept. 2010) (no reversal where prosecutor did not offer her personal opinion of the witness's memory).

Defendant's authority to the contrary is squarely off point.  People v. Ashwal, on which defendant relies exclusively (Br. at 33), presents an extreme case in which the prosecution openly speculated in summation about the defendant's involvement in other, uncharged crimes.  See Ashwal, 39 N.Y.2d 109.  Here, as required by governing precedent, the People stayed plainly within "the four corners of the evidence," and defendant does not even bother to argue otherwise.  Id. at 109-10.  This is not a case where the prosecution praised, at some length, the virtues of its witnesses (People v. Smith, 288 A.D.2d 496, 497 [2d Dept. 2001]), or waxed poetic painting the victims as "so cute," "conscientious," and "respectful" (People v. Presha, 83 A.D.3d 1406, 1408 [4th Dept. 2011]).

Lastly, the trial court clearly charged the jurors to disregard sympathy and emotional influences when rendering their judgment (T1044).  Especially in light of this instruction, the "brief rhetorical flourishes" complained of cannot be harmful.

18

See People v. Miller, 8 A.D.3d 176, 177 (1st Dept. 2004). The jury is presumed to follow such instructions (see, e.g., People v. Berg, 59 NY 2d 294, 399-300 [1983]; People v. Johnson, 58 N.Y.2d 1102, 1103 [1983]), and defendant offers no reason to believe that this language, rather than the overwhelming evidence of defendant's guilt, compelled the jury's verdict. The law does not require a rhetorically sterile trial, devoid of oratory; it requires a fair one, conducted within "certain well-defined limits." Ashwal, 39 N.Y.2d at 109. This defendant received.

2.   *Isolated Commentary on the Merits of Defendant's Case, Though Colorful, Also Fell Within Accepted Limits.*

The People's response to the defense's closing, too, fell clearly within these "well-defined limits." Id. During closing, the People did refer to isolated arguments as "ridiculous"—the possibility that defendant's possession of a cellular phone was mere coincidence (T1006), the chance that a quirk of lighting meant that the vehicle in which defendant was apprehended was not the getaway car (T1011), and defendant's implication that the absence of latent fingerprints suggests innocence (T1032). But all these arguments were either collateral to the main case, spurious, or barely argued by trial counsel (see, e.g., T1010-11). Defendant indicates only one instance in which the prosecution "denigrated" the defendant's overall case—"The evidence is insurmountable. Mr. Lemke grasps at straws with his arguments but you know they hold no water" (T1032)—and this, too, was minor (Br. at 35).

19

The casual use of a single metaphor, however mixed, cannot create prejudice, especially considering the overwhelming evidence of defendant's guilt. See People v. Galloway, 54 N.Y.2d 396, 399 (1981); People v. Allen, 121 A.D.2d 453, 454 (1986). Defendant's authorities draw on those rare cases where the prosecution denigrates the adversary's case throughout proceedings, and as part of an overall strategy characterized by one-sided impropriety and incivility. The prosecution in People v. Clark, for example, implied the defendant's participation in an uncharged crime, called her own witness a liar ("Pinocchio"), suggested the same witness's involvement in past crimes, vouched for the credibility of other witnesses *and*, on several occasions, claimed that defense counsel was "blowing smoke." Clark, 195 A.D.2d 988, 990 (4th Dept. 1993). Similar cases in the Second Department also reflect reversal only on a record thoroughly permeated by error. See People v. Torres, 111 A.D.2d 885, 886-87 (2d Dept. 1985) (prosecution referred to defense counsel as a "doomsday sham" and "suggested that the jury would be subject to scorn and ridicule if they acquitted defendant").

Nothing in this case even approximates the type of conduct described above, and therefore does not require reversal. Localized, colorful commentary on the merits of a defendant's case does "not exceed the broad bounds of rhetorical comment

20

permissible in closing argument," <u>Allen</u>, 121 A.D.2d at 454, and cannot justify defendant's request for relief.

     3.     *DNA Evidence Was Relevant, and Carefully Limited to Minimize Prejudice.*

Despite defendant's current protestations, introduced DNA evidence was relevant, and properly admitted to link defendant to the crime. Because defendant was included as a potential contributor to genetic material left on a black mask left at the crime scene, DNA evidence foreclosed the argument that defendant could not possibly have worn, used, or interacted with material used during the crime and found on his person. The DNA evidence therefore tended to increase the likelihood that defendant committed this crime, a proposition that is axiomatically relevant. <u>People v. Lewis</u>, 69 N.Y.2d 321, 325 (1987) ("Evidence is relevant if it has any 'tendency in reason to prove any material fact'") (citation omitted). In the prosecutor's words, "DNA evidence would only have been . . . significant if [defendant] had been excluded from the mask[,] but he wasn't[,] and the reason I presented the DNA testimony to you was to show you he can't be excluded" (T1027). The People's presentation of testimony on DNA evidence—along with testimony showing that no usable fingerprints were taken from the crime scene—also served to demonstrate to the jury that "the police department did a good job," and explored every possible avenue for identifying, scientifically, the perpetrator (T1025).

21

Moreover, the People accurately represented the probative value of the DNA testimony, and defense counsel zealously cross-examined presenting experts to ensure that the jury did not view DNA evidence as certain proof of defendant's involvement (Espana: T645-46). At no point during the trial did the prosecution state or imply that DNA evidence unequivocally identified defendant as the perpetrator (Br. at 26-28). To the contrary, even in summation the People acknowledged that no genetic material tied defendant directly to the crime (T1026). This presentation completely forecloses any risk that the jury overestimated the evidence's tendency to inculpate defendant. So limited, the testimony was necessarily more probative than prejudicial. See People v. Scarola, 71 N.Y.2d 769, 777 (1988).

Defendant attempts to avoid this conclusion, citing a trial court decision holding that DNA records indicating a partial match between crime scene data and one of sixty-four unindicted individuals would likely not be admissible during the trial of a genetically excluded defendant. People v. Days, 31 Misc.3d 586, 593 (Sup. Ct. Westchester County 2011) ("Remote evidence of a third party's culpability is inadmissible when its probative value is outweighed by the risk of undue prejudice to the opposing party."). On that basis, the trial court in Days quashed the defendant's attempt to subpoena DNA records. Id. Although defendant attempts to present Days as applicable to this case, Days (as well as defendant's argument) is wildly off

22

point. In <u>Days</u>, the defendant, Selwyn Days, had already been excluded as a contributor to a mixed DNA profile found on a knife left at the crime scene. <u>Id.</u> at 592-93. Knowing who the mixed profile could potentially implicate would, "in the best case scenario," only allow Days to "point the proverbial finger at one or more specific individuals." <u>Id.</u> at 593. But because Days had already been excluded, it would have no bearing on his guilt or innocence, and therefore was irrelevant and possibly prejudicial. <u>Id.</u> Here, on the other hand, defendant cannot be excluded from a genetic profile linked to the crime. The holding in <u>Days</u> is wholly silent on the critical question that follows from that fact: whether partial-match DNA evidence is admissible against an *included* defendant.

Curiously, defendant does not cite any of the several cases that answer this question in the affirmative. In <u>People v. Moore</u>, the Third Department permitted introduction of DNA evidence that was used exclusively for identification, even though it suggested something less than a precise match. <u>Moore</u>, 194 A.D.2d 32, 34 (3d Dept. 1993) (one in 24,000 people could also match defendant's profile). Similarly, both the Third Department and, on collateral review, Essex County Court sustained a rape conviction premised partially on DNA evidence that matched the defendant to sperm left on the victim's clothes, but could only include him as a *potential* match with DNA taken during a vaginal swab. <u>People v. Fuller</u>, 2012 WL

23

2053715, at *4-6 (Essex County Ct. June 8, 2012) (analyzing partial genetic match testimony in an ineffective-assistance-of-counsel appeal); see also People v. Fuller, 50 A.D.3d 1171, 1176 (3d Dept. 2008).[7] Together, these cases show that partial DNA evidence should be admissible and go to the jury, which can then assess what weight to assign to the information. Because DNA evidence in this case tended to increase the likelihood of defendant's guilt, and was explained to the jury with appropriate limitations, the material was properly admitted.

C.    Any Error Was Harmless.

Even if the prosecutor's statements and conduct were ill-advised, any error was harmless. See People v. Weaver, 183 A.D.2d 797, 798 (2d Dept. 1992) People v. Bosmond, 154 A.D.2d 689, 689-90 (2d Dept. 1989). Defendant was clearly identified by two of the victims, each of whom observed him in broad daylight. Zariah Shah saw defendant unmasked just as he forced himself into her house (Zariah: T301), and identified defendant clearly at a lineup conducted four months later (Zariah: T314-15, T341). Mrs. Shah's only daughter, Rida, testified that she clearly saw defendant's eyes

---

[7]    A third court suggested that evidence indicating a lower probability match—demonstrating, for example, that one in every 100,000 individuals could also match the defendant's profile—should go to the jury, who can then use the number to evaluate the weight of the evidence. People v. Mohit, 153 Misc.2d 22, 26, 36 (Westchester County Ct. 1992). Of course, the holding of the Westchester County Court does not bind the Second Department. See N.Y. Jur. 2d Courts § 218 (1997). Regardless, the better rule in the instant case is, as in Mohit, to allow the jury to weigh the evidence after being apprised of its limitations. Because the jury was so informed, repeatedly and by both counsel, unfair prejudice cannot possibly have resulted.

and the lower half of his face (Rida: T349, 365-66).  Based on her memory of seeing defendant in the robbery, Rida identified defendant at the same lineup (Rida: T360). Moreover, about five hours after the robbery occurred, defendant was apprehended with proceeds of the crime (e.g., the driver's license and wallet of one of the robbery victims, and $7,000) in a vehicle that matched description of the getaway car (Abdullah: T506-09).

*     *     *     *     *

In conclusion, this Court should reject defendant's contention that the prosecutor's conduct deprived him of a fair trial.   All but one of defendant's arguments is unpreserved for appellate review as a matter of law.   In event, the prosecutor's remarks were within the broad bounds of permissible advocacy.  To the extent that error occurred, it was harmless.

25

POINT II

TWO VICTIMS CREDIBLY IDENTIFIED DEFENDANT, AND DEFENDANT'S UNPRESERVED CLAIM THAT THE PEOPLE IMPROPERLY BOLSTERED THIS TESTIMONY IS MERITLESS (answering Point Four of defendant's brief).

This Court should also reject defendant's unpersuasive claim that police witnesses improperly bolstered identification testimony. As with the arguments discussed in Point I, this claim is also concededly unpreserved, as defendant registered no objection to the allegedly prejudicial testimony (Br. at 44, 52). Accordingly, this claim should be dismissed out of hand. People v. Smith, 95 A.D.3d 1145, 1146 (2d Dept. 2012). Nevertheless, respondent addresses this claim on the merits after first reviewing the substance of the People's identification testimony.

Defendant was clearly identified by two of the victims, each of whom observed him in broad daylight. Zariah Shah saw defendant unmasked just as he forced himself into her house (Zariah: T301), and identified defendant clearly at a lineup conducted four months later (Zariah: T314-15, T341). Mrs. Shah's only daughter, Rida, testified that she clearly saw defendant's eyes and the lower half of his face (Rida: T349, 365-66). Based on this memory, Mrs. Shah identified defendant at the same lineup (Rida: T360). A third member of the Shah family, Syed Bukiari Shah, also saw defendant unmasked, but was too afraid to identify defendant at a lineup (Syed Jr.: T377-78).

The jury clearly credited the victims' accounts, and defendant's attempt to undermine these identifications by the casual rehashing of failed trial arguments goes amiss. Zariah Shah confidently identified defendant from a lineup—"at first sight I recognized him . . . I told [police] this is the first person who entered my house" (Zariah: T341)—and specifically rejected trial counsel's attempt, now repeated on appeal, to mischaracterize and impeach her testimony (Br. at 50). Though defendant belatedly highlights minor inconsistencies in her testimony, such as whether defendant had no facial hair or a "light goatee" (compare Zariah: T334 and Bastone: T851 with Abdullah: T566), these trivialities cannot undermine an otherwise fair identification, especially in light of physical evidence corroborating defendant's involvement and tying him to the crime, such as defendant's presence, hours after the crime occurred, in a car that matched the description of the getaway vehicle, and his possession of the proceeds of the robbery (e.g., the driver's license and wallet of one of the robbery victims, and $7,000).

The identification testimony was presented free of any attempt by law enforcement officials to bolster witness credibility. Impermissible bolstering occurs when a witness offers "testimony that [an identifying] witness had previously made a similar identification." People v. Trowbridge, 305 N.Y. 471, 475 (1953). Here, no witness offered any testimony fitting this description. Instead, the record

demonstrates that the People repeatedly cautioned law enforcement personnel *against* bolstering, telling Detective Bastone, for example, "don't tell us anything that [the identifying witness] said to you" (Bastone: T827, 829, 830). Other officers' testimony simply passed without any hint as to what an identifying witness may have said (Giambrone: T702-12; Higgins: T771-76). Perhaps aware of this fatal shortcoming, defendant directs his objections, instead, to law enforcement officers' descriptions of the conduct of the lineup proceeding (Br. at 51-52). But "'testimony describing the lineup procedure and stating that the victim viewed a lineup in which defendant was included'" does not, without more, constitute bolstering. People v. Rumph, 93 A.D.3d 1346, 1348 (4th Dept. 2012) (quoting People v. James, 262 A.D.2d 139, 139 [1st Dept. 1999]). Officers may describe the fair conduct of a lineup without creating a bolstering effect. People v. Chisholm, 174 A.D.2d 629, 630 (2d Dept. 1991); People v. Moore, 159 A.D.2d 521, 522 (2d Dept. 1990).

And, contrary to defendant's suggestion, testimony concerning one complainant's general anxiety at participating in a lineup is not comparable to testimony suggesting that a victim had an "extreme physical reaction upon seeing the defendant." People v. Zanfordino, 78 A.D.2d 558, 558 (2d Dept. 1980). In this case, no witness implied that any victims' emotional reaction to participating in a lineup was due, specifically, to seeing the defendant (Syed Jr.: T378). Rather, Detective Higgins

28

suggested that Syed Bukiari Shah was simply "very nervous being there, being part of that situation." (Higgins: T774-75). Because defendant cannot indicate any testimony that transgressed beyond mere description of the lineup procedure, this claim must be dismissed too. Rumph, 93 A.D.3d at 1348.

In any event, even if error occurred, it would also be harmless given the strength of identification testimony. See People v. Johnson, 57 N.Y.2d 969, 970-82 (1982). Zariah Shah's "unhesitating and unequivocal identification" is so "solidly credible" that any bolstering could not possibly have artificially enhanced its probative value. Id. This is so even if Mrs. Shah's identification evidences "some discrepancies" when compared with defendant's actual appearance. Id. Moreover, evidence apart from the victims' identification strongly tied defendant to the crimes. About five hours after the crime occurred, defendant was found driving a car that matched the description of the getaway vehicle, and was in possession of proceeds of the crime (e.g., the driver's license and wallet of one of the robbery victims, and $7,000) and a ski mask similar to one worn by a perpetrator that contained DNA consistent with his own.

In conclusion, defendant's arguments, which are wholly unpreserved, fail to distinguish between the permissible testimony introduced in this case, which allowed the jury to trust the circumstances in which Rida and Zariah Shah identified

29

defendant, and impermissible testimony, which would have merely vouched for or restated the witnesses' identifications.  But the record demonstrates that the People and trial counsel both appreciated this distinction, as the People stayed within the bounds of permissible advocacy, and trial counsel declined to raise the spurious objections now advanced on appeal.  Moreover, the strong evidence of identity and the overwhelming proof of his guilt rendered any alleged bolstering error harmless. Accordingly, defendant's claims regarding bolstering, which are unpreserved, should be rejected by this Court.

## POINT III

DEFENDANT'S CONTENTIONS REGARDING INTRODUCTORY REMARKS THAT THE COURT MADE DURING VOIR DIRE IS UNPRESERVED AND WITHOUT MERIT (answering Point Five of defendant's brief).

This Court should reject defendant's claim that introductory remarks by the trial court made during jury selection deprived him of a fair trial. The claim is unpreserved and without merit.

In support of his unpersuasive claim that the trial court's introductory remarks, made during voir dire, constituted error, defendant contends that the following description shifted the burden of proof, and gave the impression that the jury could convict on something short of reasonable doubt (Br. at 55-57):

> Now the purpose of a trial is for a jury to decide, on the basis of evidence presented in the courtroom, whether a person who is accused of a crime by the government is guilty or not guilty of that crime. In a trial, it is the jury's responsibility to evaluate . . . what, if anything, took place on a particular time and place in question. The jury is, therefore, also known as the judges of the facts

(T36). However, defendant's claim of error is unpreserved for review, as trial counsel did not object to this or any portion of the court's introductory remarks (id.). See C.P.L. § 470.05(2). Even if the Court were to review defendant's unpreserved claim in the interests of justice, it would find it to be without merit.

31

Following those initial comments to the prospective jury panel, the trial court, just three pages later, carefully instructed the panel on the "fundamental principle[]" that "you must find the defendant not guilty unless . . . you conclude that the People have proven defendant guilty beyond a reasonable doubt" (T39). Subsequently, no reasonable juror could have been left with the impression that the factual review power trumped the "fundamental" presumption of innocence.

Indeed, the court emphasized the People's burden of proof in its final instructions. Notably, the final instructions, unlike the preliminary remarks at issue, were addressed specifically to the actual jury, and not generally to prospective jurors. Moreover, the final instructions were made shortly before the jury began deliberations, and not, like the introductory remarks, ten days before deliberations commenced. Clearly, the final instructions, given after twenty-eight witnesses testified, and after both parties made opening and closing statements, were more fresh in the minds of the jurors than the remarks that the court made during jury selection.

Notably, defendant does not dispute that the court's final charge to the jury on reasonable doubt adequately conveyed the proper standard. Indeed, any quibble by defendant that the final instructions were wrong would be specious, and refuted by an examination of the final charge. For example, the court correctly told the jury:

> Throughout these proceedings the defendant is presumed to be innocent. As a result, you must find the

32

> defendant not guilty, unless on the evidence presented at
> this trial, you conclude that the People have proven the
> defendant guilty beyond a reasonable doubt. . . . The
> defendant is not required to prove that he is not guilty. In
> fact, the defendant is not required to prove or disprove
> anything. To the contrary, the People have the burden of
> proving the defendant guilty beyond a reasonable doubt.
>
> That means, before you can find the defendant
> guilty of any crime, the People must prove, beyond a
> reasonable doubt, every element of the crime, including
> that the defendant is the person who committed the crime.
>
> The burden of proof never shifts from the people
> to the defendant. If the People fail to satisfy their burden
> of proof, you must find the defendant not guilty

(T1041-42).   The court also issued a proper, thorough, instruction on reasonable

doubt, to which defendant made no objection (T1042-44).

Nonetheless, defendant attempts to avoid the conclusion that, read in its

entirety, the court's charge was adequate, by stating in a cursory paragraph that the

court's subsequent charge could not "salvage the illegality" of earlier instructions (Br.

at 60). Defendant's contention, however, ignores New York law, which clearly states

that "we do not consider the challenged sentence [in a jury instruction] alone and in a

vacuum but instead must read the instruction as a whole to determine if it was likely

to confuse the jury as to the proper burden of proof." People v. Fields, 87 N.Y.2d

821, 823 (1995). The Fields Court went on to hold harmless an instruction suggesting

some dilution of the burden of proof, where the contested instruction was preceded

33

by "extensive, accurate instructions on the burden of proof and the concept of reasonable doubt," which necessarily "safeguarded against [] an impermissible inference." Id.

The facts of this case are even milder. Here the court began by describing, to the prospective jurors, the unique role of the jury as the finder of facts (T36), then segued into a description of how the jury must carefully apply the law to those facts (id.), and concluding by describing the "fundamental principles" that the jury must consider in that process (T39-40). It is abundantly clear that the court merely progressed from describing the role of the facts to the role of the law, mirroring the behavior the actual jury itself was later asked to follow, within the confines of the legal presumption of innocence. No juror could possibly have been misled by this clear presentation, especially considering that this explanation represented the court's initial remarks to prospective jurors, not the closing charge made before the actual jury, and that the final instructions clearly and accurately described the People's burden.

Defendant's rule would require judges to repeat the phrase "reasonable doubt" in every sentence describing the jury's role. But that is not the law; reviewing courts must not review a "challenged sentence alone," but rather must examine the sentence within the context of the totality of the court's instructions. Fields, 87 N.Y.2d at 823. The Court of Appeals has repeated this maxim in several recent cases. See People v.

34

Lewie, 17 N.Y.3d 348, 363 (2011); People v. Smith, 16 N.Y.3d 786, 788 (2011);

People v. Umali, 10 N.Y.3d 417, 426-27 (2008); see also People v. Simmons, 66

A.D.3d 292, 295-99 (1st Dept. 2009), aff'd, 15 N.Y.3d 728, 729 (2010). Nevertheless,

defendant's cited authorities discuss predominantly cases that lack curative

instructions (Br. at 60). See, e.g., People v Bacon, 84 A.D.2d 680, 680-81 (4th Dept.

1981) (in case hinging on the credibility of witnesses, no reasonable doubt instruction

given). Those authorities are squarely off point, and nonsensical when applied to the

trial court's clearly proper introductory remarks and final instructions in this case.

In conclusion, defendant's claim regarding the introductory remarks made

during voir dire to a panel of prospective jurors provided no basis for reversal. The

claim is unpreserved. Moreover, the claim is without merit, considering the totality of

the court's instructions, which demonstrates that the court accurately instructed the

jury on the nature of reasonable doubt. This Court should accordingly deny

defendant's spurious, unpreserved claim.

## POINT IV

## DEFENDANT RECEIVED EFFECTIVE ASSISTANCE OF TRIAL COUNSEL (answering Point Three of defendant's brief).

Lastly, this Court should reject defendant's claim that he was deprived of effective assistance of trial counsel.   Defense counsel rendered meaningful representation throughout the court proceedings.   Confronted with an extremely difficult case, counsel formulated and consistently utilized a strategy designed to maximize the slim possibility that the jury would acquit despite the overwhelming evidence of defendant's guilt.   Counsel also requested and secured the dismissal of two counts from the indictment, vigorously cross-examined police witnesses on the limits of forensic testimony, and questioned the strength of the People's identification testimony.   The record clearly demonstrates that defendant received a fair trial, and that he was convicted due to the strength of the People's case, not any alleged lapse in defense counsel's judgment.

Under federal law, before a defendant can gain relief based on the ineffective assistance of trial counsel, he must demonstrate (1) that trial counsel's performance fell below the constitutional baseline, and (2) that defendant was prejudiced as a result. Strickland v. Washington, 466 U.S. 668, 687 (1984).   Prejudice in the federal context requires proof that, "'but for counsel's unprofessional errors, the result of the proceeding would have been different.'"   Harrington v. Richter, 562 U.S. ___, ___

36

(2011), 131 S.Ct. 770, 787-88 (2011) (quoting <u>Strickland</u>, 466 U.S. at 694). New York law treats these interrelated questions together: here, "prejudice is examined more generally in the context of whether defendant received 'meaningful representation'." <u>People v. Benevento</u>, 91 N.Y.2d 708, 713 (1998); <u>see also</u> <u>People v. Caban</u>, 5 N.Y.3d 143, 152 (2005). A showing of prejudice is "significant but not indispensable," and will merit reversal on something less than the comparatively stringent <u>Strickland</u> standard. <u>See</u> <u>People v. Stultz</u>, 2 N.Y.3d 277, 283-84 (2004).[8]

The critical question under New York law, then, is whether defendant received a "fair trial," or if he was deprived of that guarantee by the "'egregious and prejudicial'" errors of his counsel. <u>People v. Cummings</u>, 16 N.Y.3d 784, 785 (2011) (citation omitted). When evaluating prejudice, courts must carefully "avoid confusing 'true ineffectiveness with mere losing tactics and according undue significance to retrospective analysis.'" <u>Benevento</u>, 91 N.Y.2d at 712 (quoting <u>People v. Baldi</u>, 54 N.Y.2d 137, 146 [1981]). Here, "tak[ing] into account the fairness of the trial process as a whole and the totality of the representation," it is clear that defendant received a fair trial. <u>People v. Ennis</u>, 11 N.Y.3d 403, 412 (2008).

---

[8]     A determination that defendant is provided with meaningful representation under the New York state standard necessarily includes a determination that the representation passed federal constitutional muster as well. <u>Caban</u>, 5 N.Y.3d at 155.

37

A.    <u>Counsel Admirably Defended a Difficult Case</u>

Trial counsel in this case zealously and effectively defended a very difficult case, and his performance must be judged without regard to the eventual result. <u>Benevento</u>, 91 N.Y.2d at 712-13.   Counsel conducted an effective voir dire proceeding, removing jurors who indicated that they could not be impartial in a home-invasion trial (T87).   Against overwhelming identification testimony, and physical evidence tying defendant to the scene of the crime—such as defendant's possession of the victim's wallet, and driving a car that matched the appearance of the getaway vehicle, within hours after the crime occurred—counsel nonetheless won the dismissal of two counts of his client's indictment (T929), and ensured that the jury understood the limits of forensic evidence introduced by the People (Espana: T640-49).   Counsel also identified, and attempted to exploit, minor discrepancies in identification testimony, such as the question of whether defendant had visible facial hair on the night of the crime.   (See Zariah: T334; Bastone: T851; Abdullah: T566). Defendant's summation, too, wisely focused on the question of defendant's identification, rather than the nature of the crime itself, a decision that, given the disturbing facts of the case, likely gave him the best possible chance of persuading the jury (T987, 994).

Critically, defendant does not attack counsel's theory of the case—defending on the basis of identification—or his formulation of a trial strategy to put that theory to use. Nor does he suggest a line of exculpatory evidence or argumentation that counsel missed entirely. Instead, defendant challenges minor decisions, such as the lack of objection on specific points, or the decision to limit cross-examination. To prove ineffectiveness on those facts is a heavy burden, Ennis, 11 N.Y.3d at 412, and defendant has not carried it.

B.   Failure to Make Meritless Objections Does Not Demonstrate Ineffectiveness.

The failure to object to the prosecutor's remarks at trial cannot be error where such remarks were proper (see Points I and II, supra). "A defendant is not denied effective assistance of trial counsel merely because counsel does not make a motion or argument that has little or no chance of success." People v. Stultz, 2 N.Y.3d 277, 287 (2004). Even if timely objection would have been appropriate, defendant cannot demonstrate that the failure to make such objections constituted "'egregious and prejudicial'" error, sufficient to require reversal. Cummings, 16 N.Y.3d at 785 (citation omitted).

For example, counsel's failure to object to the "inflammatory" expression, "home invasion," could well have been strategy. As explained at pp. 38-39, supra, trial counsel largely conceded the facts of the crime, and its horrific nature, preferring

39

to defend instead on the theory that no matter how terrifying the crime, defendant did not commit it (T987, 994). Repeated objection to any characterization of the crime could have undermined this theory, and risked turning the jury against defendant. See People v. Zimmerman, 309 A.D.2d 824, 824 (2d Dept. 2003). Even if the objection would have been sustained—something that is not entirely clear, given that the court did not forbid the expression's use during the case in chief (see supra at pp. 16-17)— defendant has shown neither the absence of a reasonable justification for failing to object, nor that this failure tended to tip the trial towards guilt. See People v. Cass, 18 N.Y.3d 553, 564 (2012) (no prejudice despite defense counsel's failure to object to characterization of his client as a "predator"); see also People v. Wiltshire, 96 A.D.3d 1227, 1229 (3d Dept. 2012) (counsel effective despite failure to object to conceded misconduct).

Other contentions concerning alleged misconduct may be dismissed because, simply, counsel cannot be ineffective for failing to make meritless objections. See, e.g., People v. Lopez, 96 A.D.3d 1621, 1623 (4th Dept. 2012) (failure to object to summation not ineffective where prosecution's commentary was proper). Even improper commentary by the prosecution—such as calling the defense's case a "distraction," or "nonsense"—does not, by virtue of the defense's failure to object, translate to ineffectiveness. Lopez, 96 A.D.3d at 1622. Any alleged misconduct here,

40

such as the prosecutor's suggestion that the defense "grasps at straws" (T1032), falls well short of the facts of Lopez. Similarly, where testimony does not have a bolstering effect (see Point II, supra), defense counsel cannot be held ineffective for failing to object to such testimony on the basis that it constituted impermissible bolstering. See generally People v. Bernardez, 85 A.D.3d 936, 938 (2d Dept. 2011); see also People v. Terry, 85 A.D.3d 1485, 1488 (3d Dept. 2011).

C.    Counsel's Effective Response to Two Issues Forecloses Any Claim that His Representation Was Constitutionally Deficient.

Counsel's handling of the People's forensic evidence demonstrates counsel's effectiveness, rather than any alleged constitutional infirmity (Br. at 43-44). As discussed in Point I, supra, DNA evidence was relevant, and properly introduced, and the People carefully explained the limits of forensic genetic evidence, never suggesting that it conclusively proved defendant's guilt. See supra at pp. 21-24. During closing, the prosecutor explained that she "presented the DNA testimony to you was to show you [defendant] can't be excluded" (T1027)—not that he must be included—and to prove that "the police department did a good job" (T1025), by exploring all scientific avenues that could have potentially exculpated an innocent man. Any residual possibility that the jury could have overread this evidence, though, was dissipated by counsel's lengthy cross-examination of the People's expert witness (Espana: T643-49), eliciting the admission that a wide portion of the population could have also matched

41

DNA left at the crime scene (Espana: T646).   Given that this critical issue was "vigorously and fully explored," it becomes that much more difficult for defendant to claim his attorney was "so incompetent as to require a reversal." People v. Stubbs, 56 A.D.2d 897, 897 (2d Dept. 1977).   Defendant essentially asks this Court to imagine how much farther counsel could have, but did not, press the issue.   This is precisely the kind of hindsight judgment that courts should avoid for fear of "'attaching undue significance to retrospective analysis.'"   Benevento, 91 N.Y.2d at 712 (citation omitted).

This logic also dooms defendant's claim, made almost in passing, that his trial counsel did not more aggressively pursue objections concerning the People's "surprise witnesses" (Br. at 42-43).   As argued in Point I, these witnesses testified to largely peripheral matters.   For example, Dwight Davis, whose testimony spanned all of four pages (Davis: T716-19), sufficed to demonstrate nothing more than the location of two cameras positioned near the victims' house (T740).   Moreover, defendant fails, without explanation, to cite an extensive colloquy occasioned by trial counsel's objection to the People's use of witnesses whose names did not appear on the initial witness list (T740-43).   Following counsel's objections—which showed that trial counsel was aggressively advocating on defendant's behalf—the trial court threatened the People with mistrial if the People produced a "surprise" witness that offered

42

either material or damaging testimony, or presented a potential conflict of interest (T742). Bearing this episode in mind, defendant's current argument concerning counsel's reaction to the People's use of "surprise" witnesses reduces to mere quibbling over the words trial counsel could have used in an objection (Br. at 43). But the purpose of an ineffective-assistance claim is not to allow the defendant to belatedly micromanage objections. Benevento, 91 N.Y.2d at 712 ("The Constitution guarantees the accused a fair trial, not necessarily a perfect one."). And, in any event, defendant has utterly failed to argue, let alone establish, that counsel's failure to use defendant's preferred language so infected the trial as to cast doubt on "the totality of the representation." Ennis, 11 N.Y.3d at 412.

D. Undeveloped Minor Points Do Not Merit Reversal.

Respondent will address two final, unpersuasive, points. First, defendant questions counsel's decision to limit the cross-examination of several witnesses, but does not suggest what, if anything, would have been elicited from the missed examinations (Br. 41-42). This represents at most a disagreement over trial strategy, not error, and certainly not prejudicial error. Defense counsel could reasonably have expected that prolonged and fruitless cross-examination could strain the jury's patience, and run the risk of producing confusing or even harmful testimony. See People v. Flores, 160 A.D.2d 1020, 1022 (2d Dept. 1990). In light of counsel's

43

"vigorous, effective cross-examination of the People's other witnesses," and his "consistent defense" throughout, counsel's minimal cross of peripheral witnesses cannot rise to the level of ineffective assistance of counsel. People v. Hook, 80 A.D.3d 881, 883-84 (3d Dept. 2011).

Lastly, and again as if in passing, defendant suggests still another basis for trial counsel's alleged ineffectiveness: his failure to move for dismissal on speedy-trial grounds (Br. 40-41). To the extent that these isolated sentences in defendant's brief represent a freestanding claim, any argument concerning a violation of the speedy-trial statute would rely on material dehors the record and, therefore, cannot be considered until developed by the trial court. People v. Lebrun, 234 A.D.2d 392, 393 (2d Dept. 1996); People v. Wooten, 283 A.D.2d 931, 932 (4th Dept. 2001). And regardless, contrary to defendant's contention, counsel's explanation for why he did not pursue a speedy-trial claim was legitimate trial conduct, and did not demonstrate that counsel took a position adverse to his client. Defendant's cited authority, People v. Betsch, demonstrates the distinction. Betsch, 286 A.D.2d 887, 887 (4th Dept. 2001). In Betsch, counsel contemporaneously stated his opposition to a pro se motion brought by defendant, thereby directly opposing his client's pending motion. Id. at 887. Nothing of the sort happened here. Instead, counsel did nothing more than explain his basis for declining to support defendant's earlier pro se speedy trial motion,

44

substantially after that motion had been both filed and withdrawn (T241).   The Fourth Department approved of substantially similar conduct in People v. Viscomi, a companion case decided with and prominently cited in Betsch, holding that counsel's mere failure to support his client's pro se motion is not ineffective, because counsel "'has no duty to participate in a baseless pro se motion.'"   Viscomi, 286 A.D.2d 886, 886 (4th Dept. 2001) (citation omitted).   Because counsel merely "'attempted to clarify the circumstances surrounding'" defendant's pro se motion, and "'did not argue in opposition to the defendant's motion, become a witness against him, or make any statements which were adverse to him,'" counsel rendered effective assistance, and this last pellet in defendant's scattershot brief must, too, be set aside.   Id. at 886.

*      *      *      *      *

The record clearly demonstrates that trial counsel rendered capable assistance—which included counsel making a motion for a trial order of dismissal that resulted in two charges being dismissed—and that defendant was convicted only due to the overwhelming strength of the People's case.   To conclude otherwise would be to overturn, merely on counsel's failure to make meritless objections, the result of a fairly conducted trial.   That is not the law and, especially considering the many ways in which counsel zealously represented his client's best interests in the face of such

45

difficult facts, it cannot be the result.  This claim too should be dismissed and the verdict affirmed.

## CONCLUSION

### THE JUDGMENT OF CONVICTION SHOULD BE AFFIRMED.

Dated:  Mineola, New York
       October 3, 2012

Respectfully submitted,

Kathleen M. Rice
District Attorney, Nassau County
Attorney for Respondent
262 Old Country Road
Mineola, New York 11501

Andrea M. DiGregorio
Ames C. Grawert
  Assistant District Attorneys
  of Counsel

47

## CERTIFICATE OF COMPLIANCE WITH 22 NYCRR § 670.10.3(f)

AMES C. GRAWERT does hereby certify as follows: This brief was prepared by computer; the body of the brief is double-spaced and utilizes a proportionally-spaced typeface (Garamond) of 14-point size; the footnotes are single-spaced and utilize the same typeface and 12-point size; and, according to the word count of the word processing system used (Microsoft Word 2010), the brief contains 10,445 words, exclusive of any pages containing the table of contents, proof of service, and certificate of compliance.

Dated: Mineola, New York
       October 3, 2012

                                  AMES C. GRAWERT
                                  Assistant District Attorney