UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
TROY TOTESAU,

                         Petitioner,

          - against -                                    **MEMORANDUM & ORDER**
                                                          19-CV-6992 (PKC)

WILLIAM LEE, *Superintendent, Eastern New York*
*Correctional Facility*,

                         Respondent.
------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

Petitioner Troy Totesau, proceeding *pro se*, filed a petition for a writ of *habeas corpus*

pursuant to 28 U.S.C. § 2254, which the Court received on December 10, 2019.  (Petition ("Pet."),

Dkt. 1, at ECF[1] 1.)  Petitioner challenges his multiple convictions following a jury trial in the

Supreme Court of New York, Nassau County (the "Trial Court") in connection with a home-

invasion robbery, as well as his total sentence of twenty-five years' imprisonment followed by

five-years' post-release supervision.  For the reasons set forth herein, the petition is denied.

## BACKGROUND

I.      Facts[2]

        A.      **The Shah Family Residence**

In the summer of 2009, Syed Shah (the "Father"), a taxi driver, and his wife (the "Mother"),

lived in a two-story house in South Floral Park, New York with their twelve-year-old son (the

"Older Son"), eight-year-old daughter (the "Daughter"), and three-year-old son (the "Younger

---

[1] "ECF" refers to page numbers generated by the Court's electronic filing system, CM/ECF, and not the document's internal pagination.

[2] The Court accepts facts found by the state courts as true unless rebutted by clear and convincing evidence.  *Lancaster v. Capra*, No. 20-CV-1678 (WFK) (LB), 2021 WL 1946329, at *3 (E.D.N.Y. May 13, 2021).

Son"). (R.[3] at 299–301, 349–50, 369–70, 382–83, 388.) In the home, the family kept a briefcase containing their important possessions: passports and travel documents, credit cards, documents relating to property in their native Pakistan, jewelry, the Father's 20-year-old, expired driver's license (which he kept for sentimental reasons) and a DVD of the funeral of the Father's mother. (R. at 319–20, 398–99.) Because the Father did not believe in banks, the family also kept $75,000 in cash in the briefcase—cash that the Father had earned and saved from 15 years of taxi fares, amounting to their entire life savings. (R. at 320, 395, 397.)

The family did not normally have guests or visitors to their home, but they did have male construction workers in and out of the house for a period of eight to twelve days shortly before August 2009, when sheet-rock and other construction work was being done at the house. (R. at 302, 363, 379, 383–84.) The Father's friend introduced him to Dexter Lucas, nicknamed "Big Guy" (R. at 384, 409), and the Father hired Lucas to perform the sheet-rock work (R. at 384–85, 406). The two arranged for a daily payment schedule: Lucas would purchase whatever supplies he needed during the day, and the Father would reimburse Lucas around 3:00 p.m. (R. at 384–87.) To get Lucas's money, the Father would go upstairs to his bedroom, take cash from the briefcase, walk back downstairs, and hand the cash to Lucas. (R. at 387–89.) The amounts varied each time, but could be as much as $200 or $1,000 for a single day. (R. at 389.)

At one point during construction, the Father and Lucas had an argument during which the Father criticized Lucas's work, telling Lucas that the sheet rock on one of the walls was not straight. (R. at 363, 385.) The Daughter witnessed this argument. (R. at 364.) Although the Father was unhappy with the crooked sheet rock on the one wall, he decided to drop the issue. (R.

---

[3] "R." refers to the trial transcript. (Dkts. 7–10.) All page references to the trial transcript are to pagination generated by the electronic court filing (CM/ECF) system, rather than the transcript's internal pagination.

at 385.)  Lucas came by the family's residence only once more to speak with the Father about the issue.  (R. at 363–64.)

Over the course of the project, each member of the Shah family met Lucas.  The Mother stayed home during the day, so she was present during the construction and would occasionally cook lunch for Lucas.  (R. at 385–86.)  The three children met Lucas on the occasions when Lucas's crew did not finish their work before the children came home from school.  (R. at 364, 379–80, 386.)

### B.       The Robbery

At approximately 12:05 p.m. on August 13, 2009, the Father was sleeping upstairs while the Mother and the three children were downstairs, when a "skinny," light-skinned black woman came to the Shahs' door with a black binder.  (R. at 302–03, 334, 349–50, 358, 365, 371, 387.) The Mother answered the door, accompanied by her two sons.  (R. at 334.)  Behind the woman was a man whom the Mother did not recognize.  (R. at 303–04, 335.)  The man was a medium-skinned black man with no facial hair and a medium build.  (R. at 336–37.)  He was approximately 5'10" or 6'0" tall and was wearing black sweatpants and a black sweatshirt.  (R. at 302–03, 334–37, 339, 359–60, 365–68.)  Another man, who was approximately 6'1" tall and wearing a black sweat jacket and black jeans, stood with his back turned towards the house near a four-door car, described variously as maroon, burgundy, "reddish, purple," "red or reddish, like, a little purple kind of," which was parked in the street outside the Shahs' home and which the Mother did not recognize.  (R. at 303–04, 327, 357–58, 360, 367–68, 371–72, 374, 400.)

The woman said that she worked for the government and was conducting a survey about the house's occupants.  (R. at 304, 371.)  As she spoke with the Mother, the man at the door (the "First Gunman") pulled out a black gun (similar to a police service weapon), struck the Mother in the head with it, and shoved her to the floor, while he and the woman ("Female Perpetrator")

forcibly entered the home.  (R. at 304–05, 318, 335, 352, 372–73, 405.)  The Mother screamed in

terror, fearing for her and her children's lives.  (R. at 339, 372.)  As the First Gunman and the

Female Perpetrator entered the residence, the second man who had been standing near the car (the

"Second Gunman") hurried toward the Shahs' home from the street and, now wearing a mask and

green surgical gloves and armed with a black gun, ran into the home and up the stairs.  (R. at 305,

318–19, 321, 340, 374, 391–92, 405.)

       The First Gunman—who, though initially unmasked while standing at the front door, had

also donned a black ski mask[4] and green or blue-green surgical gloves—again struck the Mother

with the gun on her shoulder, and instructed both the Mother and her two sons to lie down on the

floor with their hands behind their back.  (R. at 305–06, 318–19, 339–40, 351–52, 360, 366, 372–

73, 378.)  From an adjacent room, the Daughter heard her Mother scream, prompting the Daughter

to close the door to the room.  (R. at 306, 350–51, 364, 366, 373.)  The First Gunman kicked the

door in, grabbed the Daughter, and dragged her by her t-shirt, ripping it in the process, to the living

room with her mother and two brothers.  (R. at 306–07, 340, 351, 353, 366, 373–74.)  The First

Gunman had his gun out the entire time.  (R. at 306, 351.)

       As the First Gunman and the Female Perpetrator—who,  unlike the two male gunmen, wore

neither a mask nor gloves—corralled the four family members downstairs, the Second Gunman

entered the master bedroom upstairs.  (R. at 319, 390, 404.)  Once inside, the Second Gunman

jumped on top of the Father, who was still asleep, and bound the Father's hands with duct tape.

---

[4] The Mother testified that although the First Gunman wore a mask, it contained "slits
where his eyes were, [and] I could see his eyes properly.  In fact, I could see his face properly."
*Id.* at 321.  The Daughter testified that she could see "part of, like, his whole eyes and, like, up to
here (indicating), up to his nose," and that "like, half—like his eyes and over here was showing
(indicating)," although her testimony varied about how much of the First Gunman's face remained
covered by the mask.  (R. at 353, 360, 366–69.)

(R. at 390–91.)  When the Father started asking about the well-being of his family and identity of his assailant, the Second Gunman duct-taped the Father's mouth shut and barked, "give me the fucking money."  (R. at 391.)  When the Father tried to look around, the Second Gunman pointed the gun at the Father and ordered him, "Don't look at me, motherfucker.  Don't look at me," and again demanded that the Father "give me the money.  Give me the money."  (R. at 392–93.)  Still atop the Father, the Second Gunman began striking the Father in the head, instructing the Father not to move and to turn over the money.  (R. at 392–93.)  The Father tried to escape, but could not free himself from under the weight of the Second Gunman.  (R. at 392.)

Back downstairs, the Female Perpetrator instructed the four family members not to cry, scream, or call the police, and told them that they would remain unharmed if they complied.  (R. at 307, 374–75.)  Meanwhile, the First Gunman headed upstairs and left the four other family members with the Female Perpetrator.  (R. at 307, 340, 374–75.)  The First Gunman entered the master bedroom and threatened the Father that if he did not provide the intruders with the money, they would "bring his whole family up" to the master bedroom and "shoot the asshole."  (R. at 393.)  The two gunmen pointed their weapons at the Father for emphasis.  (R. at 393–94.)

After three or four minutes, the First Gunman headed back downstairs, pointed his gun at the four family members, who were now crying in fear, and ordered them upstairs to the master bedroom.  (R. at 307–08, 340, 353, 366, 375, 394.)  As the family members entered the master bedroom, the Second Gunman remained atop the Father—still bound at the hands and feet with duct tape and with duct tape over his mouth—and held him at gunpoint on his own bed.  (R. at 308–09, 318, 354, 375.)  A small piece of the Second Gunman's surgical glove came off as he tried to control the Father.  (R. at 332.)

The gunmen lined up the four family members in a corner next to the bed, where the Father could see them.  (R. at 309, 353–54, 394.)  The Female Perpetrator stood in the bedroom doorway. (R. at 355, 395–96, 404.)  As the other family members looked on, the Second Gunman hit the Father with the gun in the Father's neck and head and yelled, "Where's the money?" and, "Give me the money; otherwise"—using the gun for emphasis—"that's it."  (R. at 309–10, 354–55, 375– 76, 394.)  As he spoke, the Mother realized she recognized his voice and his body structure: the Second Gunman was Dexter Lucas—the same person who had performed the sheet rock work on their family home.  (R. at 315–16.)

The Second Gunman pointed his gun at the Older Son and instructed the Father to "give me the money or else I'll shoot one of your kids."  (R. at 376.)  As the gunmen threatened the family, the Father told the Mother to locate the briefcase from underneath some pillows and give it to the assailants, because "life is more important than money."  (R. at 310, 355, 394–95, 397.) At this point, the Second Gunman instructed the three children to sit on the mattress next to their Father, still being held at gunpoint.  (R. at 310, 376.)

The Mother retrieved the briefcase from behind the pillows.  (R. at 397.)  The Father told the Mother the combination to the locked briefcase, but the Mother struggled to open it, causing the Second Gunman to hit the Father and accuse him of providing an incorrect combination.  (R. at 310–11, 355, 376.)  With her children still on the bed next to their bound and restrained Father being held at gunpoint, the Mother successfully unlocked the briefcase.  (R. at 311, 355, 376, 397– 98.)  The Female Perpetrator shouted, "jackpot!"  (R. at 311, 356, 376, 397–98.)

While the three intruders began by emptying cash from the briefcase into disposable plastic shopping bags, when they noticed that credit cards, jewelry, and passports were also inside, they decided to take the entire briefcase and all of its contents, including the items of personal

importance to the Shahs.  (R. at 311, 355–56, 376, 398–99.)  The Mother pleaded with the gunmen to leave her passport and offered to return to her country, while the Father pleaded for them to leave him documents relating to his property in Pakistan and the DVD of his mother's funeral.  (R. at 311–12, 398.)

When the Older Son stated that his Father had worked very hard for the money these assailants were stealing, the three intruders became "abusive," prompting the Mother to advise her Older Son that these three people were capable of shooting them.  (R. at 312.)  Before leaving, the gunmen bound the remaining family members' wrists with duct tape, and, while displaying a gun, one of the gunmen warned the family not to call the police.  (R. at 312–13, 356–57, 376–77, 396–97, 399–400.)  The gunman also told the family that they would receive their passports in the mail in three to four days.  (R. at 312, 357, 377, 400.)  The three intruders headed downstairs and left together with the briefcase, slamming the door as they exited.  (R. at 313, 341, 378, 400.)  Although bound by the tape, several family members could see onto the street through a bedroom window and observed the Female Perpetrator and the two gunmen enter the maroon car from earlier and speed away, with smoke emanating from the screeching tires.  (R. at 314, 341, 359–60, 378, 400–01.)

The robbery lasted about ten to twelve minutes.  (R. at 320, 335.)  After the intruders had escaped, the Mother and the three children were all crying.  (R. at 404–05.)  The Mother eventually managed to free herself by ripping the tape with her teeth.  (R. at 315, 378, 401.)  After she and the Father freed their children, the Father immediately called police.[5]  (R. at 315, 359, 401.)

---

[5] At trial, the prosecutors entered a recording of the 911 call into evidence and played it for the jury.  (*Id.* at 402–03.)

### C.      Police Response

Officers from the Nassau County Police Department ("NCPD") responded while the Father was still on the phone with the 911 operator.  (R. at 785, 787.)  Although she had freed herself from the restraints, the Mother still had duct tape on her arms.  (R. at 788.)  The Father had dried blood on his mouth and around his lips, disheveled hair, and sticky duct tape residue on his hands.  (R. at 791–92.)  Both parents appeared shaken and their children were crying.  (R. at 791, 843.)

The officers detected no signs of forced entry on the front door and were unable to recover any fingerprints from it.  (R. at 438, 445.)  They also examined the interior door which the First Gunman had kicked in to reach the Daughter but found no shoe prints or other markings of evidentiary value.  (R. at 445–46.)

In the master bedroom, NCPD officers collected a small, green piece of latex that came from a glove, as well as duct tape.  (R. at 431–32, 434.)  They also recovered other evidence: duct tape from the second-floor landing outside the bedroom as well as scissors used during the robbery from the first floor living room adjacent to the television stand.  (R. at 434–36.)

NCPD officers also took photographs of the crime scene.  (R. at 437.)  In addition, they collected a neighbor's surveillance video footage showing a red sedan on the street outside the family's residence traveling northbound, away from that residence at 12:26 p.m. that afternoon. (R. at 484–89, 719–21, 795, 801–02.)

### D.      Petitioner's Arrest

At approximately 5:00 p.m. on the evening of the robbery, New York City Police Department ("NYPD") officers in Brooklyn, unaware of the robbery investigation in nearby Nassau County, conducted an unrelated traffic stop of Petitioner at an intersection approximately fourteen miles from the family's residence in South Floral Park.  (R. at 503–06, 529, 555–58, 563–64, 579, 805–06, 808.)  Petitioner—a six-foot tall black male with a medium to heavy build—was

the sole occupant of a maroon, four-door Kia sedan with New Jersey license plate number YNR26X.  (R. at 504–06, 512, 570, 604.)  Alamo Car Rental records show that on July 25, 2009, an Alamo location in Manhattan rented a four-door, "medium red" Kia Amanti[6] with New Jersey license plate number YNR26X to Miriana Mitchell of Brooklyn, New York.  (R. at 494–96.) "Mitchell" was the last name of the card-holder for the Mastercard on file for the rental.  (R. at 497.)  New York City marriage records showed that Miriana[7] Mitchell had married Dexter M. Lucas nine and a half months prior to the robbery, and Lucas later identified Mitchell as his wife when he was arrested for the robbery.  (R. at 498–99, 823–24.)  Alamo's records showed that on August 13, 2009—the day of the robbery and the traffic stop—the rental vehicle had not yet been returned.  (R. at 497–98.)

During the traffic stop, Petitioner appeared nervous and perspired.  (R. at 568.)  The NYPD officers determined that Petitioner's driver's license had been suspended and arrested him.  (R. at 508–09, 573–74.)  During a search incident to that arrest, the officers discovered a large "bundle" of cash, folded in half, mostly $20 bills, in Petitioner's front pocket.  (R. at 509–11.)  As one officer entered the vehicle to prepare to drive it to the precinct, he noticed a ski mask in plain view, folded in the driver-side door pocket, which police considered a suspicious accessory for that hot day in mid-August.  (R. at 513–14, 577.)  Also in plain view in the vehicle's center console, the police discovered the Father's New York driver's license.  (R. at 513, 516–17, 539.)  Under the driver's license, the police observed a black wallet sitting atop approximately $4,000 in cash, mostly in $20 bills, folded in half like the cash in Petitioner's front pocket.  (R. at 517–19, 574, 577.)

---

[6] The trial transcript misspells the model name as "Amonte."  (R. at 494.)

[7] The trial transcript provides various spellings of Mitchell's first name.  A testifying police officer read the spelling of Mitchell's name from Lucas's arrest report as M-I-R-I-A-N-A.  (R. at 824.)

At the precinct in Brooklyn, NYPD officers counted all of the seized cash, both from Plaintiff's pocket and the center console, which amounted to $7,343, mostly in $20 bills.  (R. at 543–44, 546, 548, 550, 583.)  While processing Petitioner at the precinct, the police discovered six pawn shop receipts in his pockets, each issued to Petitioner.  (R. at 533–34, 537–38.)  The police also examined the contents of the black wallet found inside the car and discovered a Social Security card, another driver's license, a credit card, and a card for consumer goods retailer P.C. Richard & Sons, all in the Father's name.  (R. at 532–33, 539–40.)  Neither of the two driver's license photographs resembled Petitioner.  (R. at 543.)

When the officers informed Petitioner that they intended to impound the vehicle he had been driving, Petitioner requested, and the officers allowed him, to use his cell phone to call someone to pick up the vehicle in lieu of having it impounded.  (R. at 552–53.)  Some time later, Dexter Lucas arrived at the precinct and told the police he was there to pick up the car.  (R. at 553, 600–01.)

### E.    Identification and Lineups

On the night of Petitioner's arrest, NCPD officers came to the NYPD precinct in Brooklyn and viewed the car Petitioner had been driving preceding his arrest.  (R. at 553–54, 809, 812–13.) Based on its shape, size, color, style, and number of doors, the NCPD officers identified it as the same car recorded by the surveillance footage leaving the family's residence after the robbery.  (R. at 809–12.)

At some point after the robbery, both the Father and the Older Son realized that they recognized the Second Gunman as being Dexter Lucas, the man the Father hired to do the sheet rock work during the construction on the family's house.  (R. at 379–80, 396, 406.)  At a police lineup conducted in December 2009, both the Mother and Daughter identified Petitioner as the

10

First Gunman.[8]  (R. at 316–18, 342–45, 361–63.)  Both also made the same identification when testifying at trial.  (R. at 315, 358.)

Family members also identified items seized from Petitioner's vehicle upon his arrest.  The Mother, the Daughter, the Older Son, and the Father all identified the mask seized from Petitioner's vehicle as the mask which the First Gunman wore during the robbery.  (R. at 321–26, 361, 379, 406.)  The Father also identified items from the wallet seized from the center console of Petitioner's rented vehicle, *i.e.*, the Father's 20-year-old, expired driver's license, his Social Security card, and his P.C. Richards & Sons card, as items that had been in the family's briefcase that was stolen during the robbery.  (R. at 406–09.)

## F.    Cell Site Evidence

Sprint/Nextel records for Petitioner's cell phone[9] showed that on the afternoon of the robbery,[10] Petitioner received an inbound call at 12:05 p.m. and placed an outbound call at 12:36 p.m.  (R. at 889–90.)  No calls were made from or received by Petitioner's phone between 12:05 p.m. and 12:36 p.m. on that day.  (R. at 890, 911.)

---

[8] The Father did not participate in a lineup for Petitioner because he stated he did not see Petitioner unmasked.  (R. at 835.)  The police decided not to have the Younger Son participate in a lineup on account of his age.  (R. at 835.)  The Older Son participated in a lineup but, feeling scared and nervous, did not select anyone from the lineup.  (R. at 380–81.)

[9] Petitioner's name did not appear in Sprint/Nextel records as the registered account holder and there was no billing address associated with the account.  (R. at 878, 890, 892–93.)  However, testimony from a Sprint/Nextel representative indicated that the company did not verify the identity of the named account holder because this was a prepaid account.  (R. at 878–79, 881–83, 890–91.)  Other evidence linked Petitioner to this phone, including the records of Petitioner's voice-over-Internet-protocol account with YMAX Communications and cell site records showing the phone connected with cell towers close to the police precincts in Brooklyn and Nassau County at the same times that Petitioner was transported to those respective precincts by police following his arrest.  (R. at 863–72, 919–22.)

[10] The robbery occurred between approximately 12:05 p.m. and 12:26 p.m. on August 13, 2009.  (R. at 302–03, 334, 350, 365, 488–89, 720–21, 801–02.)

11

Sprint/Nextel cell site records showed that Petitioner's phone received inbound calls at 11:46 a.m. and 12:05 p.m. that connected to cell phone towers within a mile of the robbery location. (R. at 909.)  Those records showed that in the 20 minutes after the robbery, the phone made or received calls at 12:36 p.m., 12:48 p.m.,[11] 12:49 p.m., 12:54 p.m., 12:59 p.m., which connected to cell towers along a westward path from South Floral Park to Brooklyn.  (R. at 911–16.)  The records further showed that once at 4:52 p.m., twice at 4:57 p.m., and once each at 5:14 p.m., 5:22 p.m., and 5:27 p.m., the phone made or received calls and connected to a tower close to the site of Petitioner's arrest in Brooklyn by NYPD officers[12] for driving with a suspended license.  (R. at 573–74, 915–19.)

### G.    Forensic Evidence

The NCPD officers conducted fingerprint processing on several pieces of evidence recovered from the crime scene—multiple pieces of duct tape, a pair of scissors, and an envelope— but were unable to recover any identifiable latent fingerprints.  (R. at 447, 455, 477, 481.)

A forensic geneticist for the Nassau County Medical Examiner's Office, testified about DNA evidence in the case.  (R. at 609–10.)  First, the analyst testified that her DNA testing could not match neither Petitioner's DNA nor Lucas's DNA to either of the two pieces of duct tape recovered from the second floor of the family's home.  (R. at 629–30, 651–52, 654.)

Second, the NCPD DNA analyst testified that her office was unable to develop a DNA profile from the green piece of latex ripped from one of the assailant's gloves.  (R. at 626–28.)  A criminalist with the Office of the Chief Medical Examiner in New York City also testified about

---

[11] The 12:48 p.m. call was a "zero duration call," meaning that there was no connection and therefore the call was not mapped.  (R. at 912.)

[12] NYPD officers initiated the traffic stop in Brooklyn that led to Petitioner's arrest at approximately 5:00 p.m.  (R. at 503–04, 557–58, 563–64, 579, 808.)

her office's efforts concerning the same green piece of latex.  (R. at 666, 682–85.)  NCPD analysts asked their New York City counterparts to analyze this piece of latex using high-sensitivity DNA testing, a more advanced form of DNA testing that analyzes very small amounts of genetic material and that no other lab in the country conducts.  (R. at 674–76.)  The high-sensitivity DNA testing was able to exclude both Lucas and Petitioner as contributors to the DNA sample on one side of the green piece of latex, but the opposite side of the green piece of latex did not contain enough genetic material even for the high-sensitivity DNA testing.  (R. at 684–90, 692–93, 695.)

Finally, the NCPD DNA analyst testified that the DNA profile she developed from the ski mask seized during Petitioner's arrest showed that it contained genetic material from a minimum of two people, at least one of whom was male, and neither of whom was Lucas.  (R. at 636, 642–43.)  The NCPD analyst further testified that Petitioner "can be included as a contributor to the mixture in the black ski mask . . . . [In other words,] the alleles found in the DNA profile of [Petitioner] were found in the mixture that was found on the black ski mask."  (R. at 634–35.)  This meant that the DNA analysts were "not able to make a determination as to whether or not [Petitioner] alone came into contact with this mask."  (R. at 642.)

The NCPD DNA analyst conceded that, in addition to Petitioner, a large number of other individuals would be included as possible contributors to the DNA on the black ski mask: one in every 1.3 Caucasians, one in every 1.2 Hispanic people, one in every 1.3 Asian people, and—crucially, given that Petitioner is black—1 in every 1.6 black people would be included as possible contributors.  (R. at 636, 645.)  When defense counsel asked how many people on earth could be included as possible contributors if the world contained roughly six billion people[13] of whom half

---

[13] The global population numbered approximately seven billion people at the time of Petitioner's 2010 trial.  *See* United Nations, Dep't of Econ. & Social Affairs, Population Div., *World Population Prospects 2019, Volume I: Comprehensive Tables*, at 2 tbl.A.1 (2019),

were men,[14] the DNA analyst testified that approximately one and a half billion people would qualify as possible contributors.  (R. at 648–49, 655.)

## II.    Trial and Sentencing

Petitioner was indicted by a Nassau County grand jury with two counts of robbery in the first degree (counts 1–2), one count of robbery in the second degree (count 3), two counts of burglary in the first degree (counts 4–5), one count of burglary in the second degree (count 6), five counts of unlawful imprisonment in the second degree (counts 7–11), and four counts of attempted assault in the second degree (counts 12–15).  (R. at 1064–87.)

Prior to trial, the Trial Court ordered Petitioner's trial severed from Dexter Lucas's trial in light of potential *Bruton* issues.[15]  (Suppression Hearing Transcript ("Suppr'n Hrg. Tr."), Dkt. 7-9, at ECF 211.)  The Trial Court also held a suppression hearing on March 18, 2010, at which the Trial Court suppressed one statement Petitioner made to police following his arrest, but declined to suppress any other statements, any evidence seized as a result of Petitioner's arrest, or the results of the lineup.  (*Id.* at 209–10.)  During the hearing, Petitioner's pretrial counsel indicated that Petitioner had rejected an offer for him to enter a guilty plea in exchange for a sentence of twelve years' incarceration.  (*Id.* at 3–4.)

---

https://population.un.org/wpp/Publications/Files/WPP2019_Volume-I_Comprehensive-Tables.pdf (listing total global population for 2010 as 6,956,824).

[14] Men outnumbered women by a small but meaningful margin at the time of Petitioner's 2010 trial.  *See* United Nations, Dep't of Econ. & Social Affairs, Population Div., *World Population Prospects (2012 Rev.), Volume II: Demographic Profiles*, at 3, tbl.A.1 (2013), https://population.un.org/wpp/Publications/Files/WPP2012_Volume-II-Demographic-Profiles.pdf (showing between 106 and 108 male births for every 100 female births between 1950 and 2010).

[15] *Bruton v. United States*, 391 U.S. 123, 126 (1968) (holding that the Confrontation Clause bars the admission of co-defendant A's statement against co-defendant B, even if the jury is instructed not to consider the statement when deliberating as to co-defendant B).

In October 2010, after the suppression hearing, Petitioner's pretrial counsel withdrew, and Petitioner's trial counsel commenced representing him.  (*See* R. at 244.)  Petitioner's trial commenced seven weeks later on November 29, 2010.  (R. at 1.)  Immediately following the end of jury selection, trial counsel indicated that he had been reviewing case documents and attempting to interview witnesses concerning the potential for an alibi defense, but that he did not expect to file an alibi notice.  (R. at 236.)  The next day of trial, December 6, 2010, he explained that although Petitioner had filed a later-withdrawn *pro se* motion for speedy trial, trial counsel's research did not indicate that such a motion would succeed, especially in light of the adjournments granted, on consent, to allow Petitioner's counsel to receive certain records.  (R. at 242, 244–45.)

On December 10, 2010, the jury found Petitioner guilty on all counts.[16]  (R. at 1105–09.) On February 7, 2011, the Trial Court sentenced Petitioner to 25 years' imprisonment followed by five-years' post-release supervision for each of the first-degree robbery and first-degree burglary convictions, 15 years' imprisonment followed by five years' post-release supervision for the second-degree robbery conviction, one-and-a-third to four years' imprisonment for each of the four second-degree attempted assault convictions, and one year's imprisonment for each of the five counts of unlawful imprisonment, with all sentences to run concurrently.  (Dkt. 7-11, at ECF 1, 8.)

## III.    Post-Trial Proceedings in State Court

### A.    First Post-Conviction Motion

On or about November 8, 2011, while his direct appeal was still being briefed, Petitioner filed a *pro se* post-conviction motion with the Trial Court, seeking to vacate his convictions,

---

[16] In light of their guilty verdicts on both of the first-degree burglary charges (counts 4–5), the jury did not render a verdict on the lesser included charge of second-degree burglary (count 6). (R. at 1108.)

pursuant to New York Criminal Procedure Law ("NYCPL") § 440.10.[17]  (Petitioner's First Post-Conviction Motion ("Pet'r 1st Post-Conviction Mot."), Dkt. 7-15, at ECF 1–2, 56.)  The motion raised an array of claims relating to prosecutorial misconduct, ineffective assistance of trial counsel, and restitution.  (*Id.* at 6–55.)

On October 3, 2012, the Trial Court issued a written order denying Petitioner's motion.  (Order Denying Petitioner's First Post-Conviction Motion ("Order Denying 1st Post-Conviction Mot."), Dkt. 7-18, at ECF 5.)  The Trial Court found a dozen claims to be procedurally defaulted pursuant to NYCPL § 440.10(2)(b)[18] because the claims were record-based claims that could be decided on Petitioner's then-pending direct appeal.  (*Id.* at 3–4.)  The Trial Court separately rejected Petitioner's claim concerning a juror who allegedly saw Petitioner in handcuffs, finding that claim procedurally defaulted pursuant to NYCPL § 440.30(4)(b),[19] because Petitioner's motion contained insufficient sworn allegations to support the claim.  (*Id.* at 4.)  The Trial Court also rejected Petitioner's restitution claim, finding that the record supported the court's earlier restitution order.  (*Id.* at 4–5.)  The Trial Court did not explicitly adjudicate the remaining claims, although it did note that Petitioner's motion was "denied in its entirety."  (*Id.* at 5.)

Petitioner asked the New York Supreme Court's Appellate Division ("Appellate Division") for leave to appeal.  The Appellate Division denied his request on June 27, 2013.  (Dkt. 7-14, at

---

[17] NYCPL § 440.10 is New York's statute governing motions to vacate a judgement.

[18] According to NYCPL § 440.10(2)(b), "[t]he judgment is, at the time of the motion, appealable or pending on appeal, and sufficient facts appear on the record with respect to the ground or issue raised upon the motion to permit adequate review thereof upon such an appeal unless the issue raised upon such motion is ineffective assistance of counsel."

[19] NYCPL § 440.30(4)(b) provides that a court may deny a motion without a hearing if "[t]he motion is based upon the existence or occurrence of facts and the moving papers do not contain sworn allegations substantiating or tending to substantiate all the essential facts, as required by subdivision one."

ECF 1.)

**B.     Direct Appeal**

In July 2012, Petitioner's appellate counsel filed her main brief on appeal before the Appellate Division.  (Petitioner's Counseled Appellate Division Brief ("Pet'r App. Br."), Dkt. 7-1, at ECF 64.)  This brief raised five, sometimes-overlapping claims: (1) improper admission of DNA evidence; (2) multiple instances of prosecutorial misconduct (including some instances that cross-referenced other issues in the brief); (3) multiple instances of ineffective assistance of counsel (including some instances that cross-referenced other issues in the brief); (4) improper bolstering of the eyewitnesses' identification; and (5) jury instruction errors.  (*Id.* at 2–3.)  In a filing dated December 22, 2012, Petitioner submitted a *pro se* supplemental brief.  (Petitioner's *Pro Se* Brief ("Pet'r *Pro Se* Br."), Dkt. 7-3, at ECF 22.)  That brief raised three claims: (1) the Trial Court illegally imposed restitution; (2) Petitioner's conviction on two counts of robbery and two counts of burglary for the same conduct violated the Double Jeopardy Clause (and that Petitioner's trial counsel provided ineffective assistance for failing to raise this double jeopardy claim); and (3) the police lacked probable cause to justify a search of Petitioner and his vehicle, and therefore the search was unlawful.  (*Id.* at 2, 13.)  At the end of the discussion of his second claim, Petitioner alleged—without demarcating a new and separate claim—that the evidence was insufficient to convict him of the counts of robbery and burglary, given the absence of proof that Petitioner used or threatened to use a loaded and operable firearm during the commission of the crimes.  (*Id.* at 14–15.)

The Appellate Division rejected each of Petitioner's counseled and *pro se* claims in a written opinion issued December 26, 2013.  *People v. Totesau*, 977 N.Y.S.2d 364, 365 (App. Div. 2013).   First, the Appellate Division rejected Petitioner's search-and-seizure claim without discussion.  *Id.*  Second, it rejected Petitioner's sufficiency-of-the-evidence claim as "unpreserved

17

for appellate review," and further held that on the merits, the evidence "was legally sufficient to establish [Petitioner's] guilt of [robbery and burglary involving a dangerous instrument] beyond a reasonable doubt." *Id.* The Appellate Division also *sua sponte* determined that the "the verdict of guilt as to those crimes was not against the weight of the evidence." *Id.* Third, the Appellate Division rejected Petitioner's claims regarding both the DNA evidence and the improper bolstering as "unpreserved for appellate review, and in any event, without merit." *Id.* (citations omitted). Fourth, the Appellate Division rejected Petitioner's claims regarding improper prosecutorial argument in summation, finding the claims "unpreserved for appellate review." *Id.* at 366. The Appellate Division went on to explain that "while some of the comments would have been better left unsaid, the defendant was not deprived of a fair trial thereby, and any other error in this regard was harmless." *Id.* Fifth, the Appellate Division rejected Petitioner's restitution related claims as "unpreserved for appellate review, and in any event, without merit," particularly in light of the evidence before the Trial Court. *Id.* (citations omitted). Finally, the Appellate Division rejected Petitioner's "remaining contentions, including the remaining contentions raised in his supplemental pro se brief," as being "without merit." *Id.*

Petitioner asked the Court of Appeals of New York ("Court of Appeals") for leave to appeal. The Court of Appeals denied his request on August 28, 2014. *See People v. Totesau*, 18 N.E.3d 1148 (N.Y. 2014).

### C.    Petition for Writ of Error *Coram Nobis*

By papers dated August 17, 2015, Petitioner filed a petition for a writ of error *coram nobis* in the Appellate Division.  (Dkt. 7-29, at ECF 1–2, 8.)  He argued that his appellate counsel provided ineffective assistance on his direct appeal by failing to raise three claims: (1) the Trial Court failed to give preliminary instructions and admonishments during court recesses; (2) the Trial Court failed to inquire into whether a juror saw Petitioner in handcuffs; and (3) that Petitioner

received an overly harsh and excessive sentence.  (*Id.* at 3, 8.)

In a one-sentence order, the Appellate Division denied the petition on January 27, 2016.  *See People v. Totesau*, 23 N.Y.S.3d 589 (App. Div. 2016).  Petitioner sought leave to appeal from the Court of Appeals.  The Court of Appeals denied Petitioner's request on June 13, 2016.  *See People v. Totesau*, 61 N.E.3d 521 (N.Y. 2016).

### D.    Second Post-Conviction Motion

On or about June 10, 2016, Petitioner filed a second post-conviction motion before the Trial Court, pursuant to NYCPL § 440.10, seeking to vacate his convictions.  (Petitioner's Second Post-Conviction Motion ("Pet'r 2d Post-Conviction Mot."), Dkt. 7-19, at ECF 1, 16.)  Petitioner raised two claims.  First, Petitioner alleged that the admission of DNA evidence violated the Confrontation Clause because Petitioner was not able to cross-examine every analyst involved in each stage of the DNA testing.  (*Id.* at 2–3, 6–10.)  Second, Petitioner claimed that his trial counsel provided ineffective assistance by failing to raise the preceding Confrontation Clause objection, for failing to object to the prosecutor's misleading summation arguments about the DNA evidence, and for failing to object to the admission of the DNA evidence.  (*Id.* at 10–13.)

On February 28, 2017, the Trial Court denied Petitioner's second post-conviction motion in its entirety.  (Dkt. 7-21, at ECF 10.)  First, the Trial Court held that Petitioner had failed to support his motion with sworn allegations sufficient to support the motion.  (*Id.* at 5.)  Second, the Trial Court noted that the trial record conflicted with many of the allegations Petitioner did put forward.  (*Id.* at 5.)  Third, the Trial Court found that the Petitioner's Confrontation Clause right attached only to the NCPD DNA analyst who testified—and who Petitioner cross-examined—but not to any of her colleagues involved in the preliminary stages of processing the DNA evidence.  (*Id.* at 6.)  Fourth, the Trial Court held that Petitioner had procedurally defaulted his Confrontation

Clause claim pursuant to NYCPL § 440.10(3)(a)[20] because he could have raised the claim at trial and on appeal, but never did so.  (*Id.* at 6–7.)  Fifth, the Trial Court found that Petitioner's trial counsel's effective cross-examination of the NCPD DNA analyst meaningfully contributed to Petitioner's defense by undermining the DNA evidence's effectiveness.  (*Id.* at 7–8.)  Sixth, the Trial Court found that Petitioner had failed to demonstrate that his trial counsel provided ineffective assistance by failing to object to the prosecution's summation argument about the DNA evidence because Petitioner failed to allege sufficient examples of ineffectiveness and because the Appellate Division had already decided that the proof against Petitioner was overwhelming.  (*Id.* at 9.)  Finally, the Trial Court explained that NYCPL § 440.30(4)(d)[21] justified their denial of Petitioner's motion without a hearing, as Petitioner did not sufficiently support his claims with any documentary evidence nor sufficient affidavits.  (*Id.*)

For reasons not explained by the record, neither the prosecutors nor Trial Court served Petitioner with a copy of this order until March 2019—over two years after the Trial Court had issued its order.  (*Id.* at 1, 12.)  Petitioner, who by then had filed his third post-conviction motion, did not seek leave to appeal.  (Pet., Dkt. 1, at ECF 7–8.)

### E.    Third Post-Conviction Motion

On or about January 24, 2019, Petitioner filed a third post-conviction motion before the

---

[20] NYCPL § 440.10(3)(a) provides that a court may deny a motion to vacate a judgment when "[a]lthough facts in support of the ground or issue raised upon the motion could with due diligence by the defendant have readily been made to appear on the record in a manner providing adequate basis for review of such ground or issue upon an appeal from the judgment, the defendant unjustifiably failed to adduce such matter prior to sentence and the ground or issue in question was not subsequently determined upon appeal."

[21] NYCPL § 440.30(4)(d) provides that a court may deny a motion without conducting a hearing if "[a]n allegation of fact essential to support the motion (i) is contradicted by a court record or other official document, or is made solely by the defendant and is unsupported by any other affidavit or evidence, and (ii) under these and all the other circumstances attending the case, there is no reasonable possibility that such allegation is true."

Trial Court.  (Petitioner's Third Post-Conviction Motion ("Pet'r 3d Post-Conviction Mot."), Dkt. 7-25, at ECF 1–3, 14.)  Petitioner raised a single claim: that his pretrial and trial counsel provided ineffective assistance by failing to advise him of his maximum sentence exposure, and that had they done so, Petitioner would have accepted an offer to plead guilty in exchange for a sentence of twelve years' incarceration.  (*Id.* at 7–13.)

On June 14, 2019, the Trial Court rejected Petitioner's motion in its entirety.  (Order Denying Petitioner's Third Post-Conviction Motion ("Order Denying 3d Post-Conviction Mot."), Dkt. 7-28, at ECF 5–6.)  First, the Trial Court found Petitioner's claim procedurally barred pursuant to NYCPL § 440.10(3)(c)[22] because Petitioner did not raise this claim before in an earlier-filed post-conviction motion.  (*Id.* at 4–6.)  Second, the Trial Court rejected Petitioner's claim on its merits, finding Petitioner not credible and therefore rejecting his contention that he did not know his maximum sentencing exposure at the time he chose to reject the prosecution's twelve-year plea offer.  (*Id.* at 4–5.)

Petitioner asked the Appellate Division for leave to appeal.  The Appellate Division denied his request on October 18, 2019.  (Dkt. 7-24, at ECF 1.)

## IV.    Instant Federal Habeas Petition

On December 10, 2019, this Court received the instant *pro se* petition for a writ of *habeas corpus*, pursuant to 28 U.S.C. § 2254.  (Pet., Dkt. 1, at ECF 1.)  The petition raises four grounds for relief, each apparently implying a host of sub-claims.  The Court observes that the petition is not a model of clarity and does not always precisely describe the exact nature of Petitioner's claims. As a result, and because Petitioner proceeds *pro se* in this Court, the Court liberally construes his

---

[22] NYCPL § 440.10(3)(c) provides that a court may deny a motion to vacate a judgment when "[u]pon a previous motion made pursuant to this section, the defendant was in a position adequately to raise the ground or issue underlying the present motion but did not do so."

petition and interprets it to raise the strongest arguments its text suggests. *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (*per curiam*).

First, Petitioner raises a claim which he labels, "Denial of Effective Assistance of Trial Counsel and Prosecutorial Misconduct." (Pet., Dkt. 1, at ECF 5.) Petitioner describes the factual basis for the claim as follows: "Although having alerted the state trial court and the Appellate Division that Petitioner raised a Sixth and Fourteenth Amendment(s) [sic] violations [sic] of deficient and prejudicial performance of trial counsel, the state appellate court failed to even address this and all other claims raised." (*Id.*) The petition indicates that Petitioner raised this claim in both his direct appeal and in his first post-conviction motion. (*Id.* at 6.)

Second, Petitioner raises a claim labelled, "Improperly elicited DNA evidence." (*Id.* at 7.) Petitioner describes the factual basis for the claim as follows: "DNA evidence that prosecutor [sic] claimed was DNA evidence against Petitioner but which showed not that petitioner matched the DNA of the perpetrator but that petitioner and half a billion others could not be excluded on the basis of the DNA analysis. Sixth Amendment right to confrontation was violated when analyst testify [sic] to the conclusions others [sic]." (*Id.*) The petition indicates that Petitioner raised this claim in both his direct appeal and his second post-conviction motion. (*Id.* at 7–8.)

Third, Petitioner raises a claim which he labels, "Unreliable and unduly Suggestive identifications, deprived of a fair trial." (*Id.* at 8.) Petitioner describes the factual basis for the claim as follows: "Elicited [sic] improper testimony to bolster the identification testimony of the complainants, at alleged co-defendant (Dexter Lucas) [sic] trial contradicting factual records by same witnesses [sic]. Alleged co-defendant (Dexter Lucas) who went to trial after petitioner was acquitted by a separate jury [sic]." (*Id.*) The petition indicates that Petitioner raised this claim both on direct appeal and in his first post-conviction motion. (*Id.* at 9.)

Fourth, Petitioner raises a claim which he labels, "Defense counsel's failure to advise Petitioner about his sentence exposure, or to accept or reject the plea offer." (*Id.* at 10.)  Petitioner describes the factual basis for the claim as follows: "Petitioner was offered a cap of 12 years plea deal [sic].  What counsel did not tell defendant [sic] was that petitioner was eligible to be sentenced on the charges on indictment [sic] to twenty-five years behind bars plus 5 years post-release supervision." (*Id.* at 10.)  The petition indicates that Petitioner raised the claim in his third post-conviction motion, but not on direct appeal due to the ineffective assistance of his appellate counsel. (*Id.* at 10–11.)

## STANDARD OF REVIEW

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), an application for a writ of *habeas corpus* by a person in custody pursuant to a state court judgment may only be brought on the grounds that his or her custody is "in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  To obtain relief, a petitioner must show that the state court decision, having been "adjudicated on the merits in State court proceedings," is either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *see also Johnson v. Williams*, 568 U.S. 289, 292 (2013).

A state court's decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" the Supreme Court's result.  *Bell v. Cone*, 543 U.S. 447, 452–53 (2005) (internal citation and quotation marks omitted).  A state court's decision "involve[s] an

unreasonable application of" Supreme Court precedent if there is "no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).  In other words, a state court decision must be "more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  These standards are "'difficult to meet,' because the purpose of AEDPA is to ensure that federal habeas relief functions as a 'guard against extreme malfunctions in the state criminal justice systems,' and not as a means of error correction."  *Greene v. Fisher*, 565 U.S. 34, 43 (2011) (quoting *Harrington*, 562 U.S. at 102–03).  Importantly, "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,'" and "therefore cannot form the basis for habeas relief under AEDPA."  *Parker v. Matthews*, 567 U.S. 37, 48–49 (2012).

This Court may also grant *habeas* relief if the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(2).   "[S]tate-court factual determinations [are not] unreasonable 'merely because [a federal post-conviction court] would have reached a different conclusion in the first instance.'"  *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).

Rather, factual determinations made by the state court are "presumed to be correct."  28 U.S.C. § 2254(e)(1).  A petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  *Id.*  Even if "'[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review[,] that does not suffice to'" overturn a state court factual determination.  *Wood*, 558 U.S. at 301 (quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006)).  Rather, this Court may overturn a state court's factual determination only if the record cannot "plausibly be viewed" as consistent with the state court's fact-finding or if "a

reasonable factfinder must conclude" that the state court's decision was inconsistent with the record evidence.  *Rice*, 546 U.S. at 340–41.

However, this deferential review applies only "with respect to any claim that was adjudicated on the merits in State court proceedings."  28 U.S.C. § 2254(d).  "An 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.'"  *Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007) (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001)).  When multiple state courts consider a case—as frequently occurs when a trial court issues an initial decision, followed by an intermediate appellate court decision, and occasionally review by a state's highest court—the state court decision this Court reviews is generally the last decision in a case to explain its reasoning, even if a case later received review from a higher court.  *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

That said, a state court decision may constitute an adjudication on the merits even if there is no "opinion from the state court explaining the state court's reasoning."  *Harrington*, 562 U.S. at 98.  This is because "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Id.* at 99.  In fact, this "presumption . . . also appl[ies] when a state-court opinion addresses some but not all of a defendant's claims."  *Johnson v. Williams*, 568 U.S. 289, 298 (2013).

However, if a state court overlooks or otherwise fails to adjudicate a properly presented federal claim, a federal court must review that claim *de novo*, not using the deferential 28 U.S.C. § 2254(d) framework.  *See Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009).  Parsing a state court order for signs that the state court overlooked a federal claim involves a complicated analysis. *See, e.g.*, *Miller v. Warden, Sing Sing Corr. Facility*, No. 13-CV-4576 (BMC), 2018 WL 3518503,

at *4–7 (E.D.N.Y. July 20, 2018), *aff'd*, 803 F. App'x 493 (2d Cir. 2020) (summary order).  In the interest of conserving scarce judicial resources, courts faced with such a complicated analysis may assume without deciding that the less demanding *de novo* standard applies when the result is the same as applying the deferential § 2254(d) standard.  *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

## DISCUSSION

I.      **Ground One: Prosecutorial Misconduct and Ineffective Assistance of Counsel**

Petitioner's first claim consists of two unrelated sub-claims.[23]  (Pet., Dkt. 1, at ECF 5.) First, Petitioner raises the "prosecutorial misconduct" claims he brought on direct appeal and in his first post-conviction motion.  Second, Petitioner raises the ineffective assistance of counsel claims that he brought both on direct appeal and in his first post-conviction motion.

A.      **Prosecutorial Misconduct**

Petitioner raises multiple claims of prosecutorial misconduct: that prosecutors (1) failed to provide adequate notice to the defense of some of its trial witnesses; and (2) made inappropriate comments both at opening and summation.[24]  Each claim fails.

---

[23] Petitioner also puts forward an unexhausted claim that the Appellate Division failed to address his claims on direct appeal.  (Pet., Dkt. 1, at ECF 5.)  The Court exercises its discretion to address the claim, notwithstanding Petitioner's failure to exhaust.  *See* 28 U.S.C. § 2254(b)(2). Petitioner's claim must fail because the Appellate Division expressly held that Petitioner's "remaining contentions, including the remaining contentions raised in his supplemental pro se brief, are without merit."  *Totesau*, 977 N.Y.S.2d at 366.  This language suffices to demonstrate that "all of the issues before this court were adjudicated on the merits by the state court," even if they were not "addressed in detail by [the] state court."  *Howard v. Walker*, 406 F.3d 114, 122 (2d Cir. 2005).

[24] Petitioner raises other claims that might also be characterized as involving prosecutorial misconduct: claims relating to DNA evidence, and improper bolstering of witness credibility, and withholding exculpatory information concerning the eyewitnesses' testimony.  The Court discusses these claims in the relevant sections of this opinion.  *See* pt. II, *infra*; pt. III, *infra;* pt. III.B, *infra*.

1.    Discovery Claims

Petitioner first argues that prosecutors "ambushed" defense counsel with surprise witnesses not originally named on the prosecution's witness list.  (Pet'r App. Br., Dkt. 7-1, at ECF 36; *see also* R. at 735–36.)  This claim does not warrant federal *habeas* relief.

Federal law provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The Supreme Court "ha[s] stated many times that 'federal habeas corpus relief does not lie for errors of state law.'"  *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (*per curiam*) (quoting *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)).  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (*per curiam*) (quoting *Estelle*, 502 U.S. at 67–68).

Petitioner's claim concerning the failure to disclose potential witnesses sufficiently in advance of trial constitutes a state law claim not cognizable on federal *habeas* review.  "A criminal defendant has no constitutional right to a list of the prosecution's witnesses before trial begins." *Walker v. Brown*, No. 08-CV-1254 (BMC), 2009 WL 2030618, at *8 (E.D.N.Y. July 10, 2009); *see also United States v. Vilar*, 530 F. Supp. 2d 616, 637 (S.D.N.Y. 2008) (noting that prosecutors are "not *required* by the Constitution . . . to produce . . . a list of all witnesses [prosecutors] intend[] to call at trial").  Accordingly, the non-disclosure of witnesses cannot form the basis for *habeas* relief.

2.    Improper Comments in Jury Addresses

Petitioner also contends that the prosecutors made multiple improper comments in their opening statement and summation:

- "When [this type of crime] happens to you, as the family will tell you, you remember who does it to you.  You remember that face that you see."  (R. at 278.)

- During the robbery, the children "were brought up to the [Father's] room and those children saw something that they should never—that no child should ever have to see.  They saw a man with a gun on top of their mother beating him [sic] as his [sic] [F]ather lay helpless." (R. at 279.)

- After the robbery, police collected evidence "to try to get a clue as to who did this to this family, this poor, innocent family."  (R. at 282.)

- The evidence will paint "a horrifying, scary picture, one that's everyone's worst nightmare, one that you don't want to see, one that the Shah family never wanted to live through."  (R. at 290.)

- "And so in this case it's not just that [Petitioner] can be included in the DNA.  It's the fact that he was found with the mask that the DNA was on that he can't be excluded from."  (R. at 998–99.)

- Prosecutors characterized defense arguments as "ridiculous" and stated that defense counsel "grasps at straws with his arguments."  (R. at 1008, 1013, 1034.)

(Pet'r 2d Post-Conviction Mot., Dkt. 7-19, at ECF 19–20.)

Petitioner also focuses on the prosecution's repeated use, in both their opening statement and summation, of the term "home invasion" to describe the crime.  (Pet'r 2d Post-Conviction Mot., Dkt. 7-19, at ECF 19; *see* R. at 269, 271, 287–88, 998–1002, 1005, 1008–09, 1012–14, 1019, 1024, 1029, 1033, 1035.)  Although he finds fault with each of the prosecution's uses of the term, Petitioner singles out three individual sentences for heightened criticism:

- "[T]he Shah family was the victim of a violent gunpoint home invasion.  Their lives were changed forever and everybody's worst fear, a home invasion, became a reality, for not just [the Father] and [the Mother] but for their three small children."  (R. at 269.)

- "Everyone's worst nightmare is a home invasion."  (R. at 1014.)

- "He is guilty of that home invasion and must be held accountable."  (R. at 1035.)

(Pet'r 2d Post-Conviction Mot., Dkt. 7-19, at ECF 20.)

The Appellate Division held that "while some of the comments would have been better left unsaid, the defendant was not deprived of a fair trial thereby."  *Totesau*, 977 N.Y.S.2d at 366.  This

holding neither unreasonably applies clearly established Supreme Court precedent, nor is an unreasonable determination of the facts.

The Second Circuit has outlined four principles which together make up the clearly established Supreme Court precedent governing claims of improper prosecutorial comments during opening argument and summation:

> First, on federal habeas review, the relevant standard is "'the narrow one of due process, and not the broad exercise of supervisory power.'" *Darden* [*v. Wainwright*], 477 U.S. [168,] 180 [(1986)] (quoting [*Donnelly v.*] *DeChristoforo*, 416 U.S. [637,] 642 [(1974)]). Thus, while the State has a "duty to refrain from improper methods calculated to produce a wrongful conviction," *Berger* [*v. United States*], 295 U.S. [78,] 88 [(1935)], such methods will warrant habeas relief only if they "'so infected the trial with unfairness as to make the resulting conviction a denial of due process,'" *Darden*, 477 U.S. at 180 (quoting *DeChristoforo*, 416 U.S. at 643). The habeas court must consider the record as a whole when making this determination, because even a prosecutor's inappropriate or erroneous comments or conduct may not be sufficient to undermine the fairness of the proceedings when viewed in context. *See* [*United States v.*] *Young*, 470 U.S. [1,] 16–17 [(1985)]; *Darden*, 477 U.S. at 182 (applying *Young*); *see also DeChristoforo*, 416 U.S. at 647–48 (distinguishing between "ordinary trial error of a prosecutor" and the type of "egregious misconduct . . . [that] amount[s] to the denial of constitutional due process"). When reviewing such claims under the "unreasonable application prong" of [28 U.S.C.] § 2254(d)(1), the habeas court must keep in mind that this standard is a "very general one" that affords courts "leeway in reaching outcomes in case-by-case determinations." *Matthews* [*v. Parker*], [567 U.S. 37, 48 (2012)] (quotation marks and ellipses omitted).

*Jackson v. Conway*, 763 F.3d 115, 146 (2d Cir. 2014). This point bears reemphasis: the Second Circuit explicitly held that the preceding "principles [constitute the] 'clearly established' law governing prosecutorial misconduct claims" for purposes of 28 U.S.C. § 2254(d)(1). *Id.*; *cf. Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) ("Although an appellate panel may, in accordance with its usual law-of-the-circuit procedures, look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent, it may not canvass circuit decisions to determine whether a particular rule of law is so widely

accepted among the Federal Circuits that it would, if presented to this Court, be accepted as correct.") (internal citations omitted).

The Appellate Division did not unreasonably apply clearly established Supreme Court precedent nor did it unreasonably determine the facts by finding that the prosecution's comments did not amount to a due process violation. The evidence supports most of the prosecution's allegedly improper statements; the remaining comments were not so egregious as to violate due process.

Most of the prosecution's comments were supported by the record. For instance, multiple members of the family testified that they were victims of a robbery at gunpoint in their home by perpetrators who forced their way into the premises. Similarly, the prosecution's description of the beating of the Father in full view of his children, while graphic, precisely matched the testimony of multiple family members. There also was nothing improper about the prosecutors remarking that the victims, who described the crime in vivid detail, would "remember what they see." Nor was it inappropriate for the prosecutors to describe the crime using the terms "horrifying," "scary," "nightmare," and "worst fear," given the brutal nature of the crime and the victims' testimony that they feared for their lives and were terrified both during and after the robbery. For the same reason, the record supports the prosecution's assertion "that the Shah family never wanted to live through" a crime like this one again. (R. at 290.) By rejecting Petitioner's challenge to these comments, the Appellate Division did not unreasonably apply clearly established Supreme Court precedent nor unreasonably determine the facts.

The prosecution's remaining editorial comments assailing the defense's arguments do not amount to a due process violation. "There [is] really nothing wrong with [a] closing" argument which "denigrate[s] the defense as 'ridiculous.'" *Murray v. Griffin*, No. 17-CV-26 (BMC), 2017

WL 2817044, at *7–8 (E.D.N.Y. June 28, 2017).  Likewise, it is not "improper or excessive, without more, for a prosecutor to criticize defense arguments as merely being attempts to 'grasp at straws.'"  *United States v. Williams*, 690 F.3d 70, 75 (2d Cir. 2012).  The Appellate Division did not unreasonably reject Petitioner's arguments about these comments.

Nor did the prosecution err by arguing that Petitioner "is guilty of that home invasion and must be held accountable for it."  (R. at 1035.)  While prosecutors may not make "an impermissible 'safe streets' argument" by asking a jury to convict because the defendant is "a public safety risk," nothing prohibits the prosecution's use of the phrase "hold [the defendant] accountable" when prosecutors make "an argument aimed squarely at the defense's theory of the case."  *Hunter v. Chappius*, No. 15-CV-6423 (MAT), 2017 WL 5484159, at *9 (W.D.N.Y. Nov. 15, 2017).   In Petitioner's case, the prosecutors stated that Petitioner "must be held accountable for" his crimes as part of a direct response to the defense's theory of mistaken identity.  (R. at 1035.)  Given this context, the Appellate Division neither unreasonably applied clearly established Supreme Court precedent nor unreasonably determined the facts when it found this comment did not violate due process.

Statements that "no child should ever have to see" a family member being held down and beaten at gunpoint during an armed robbery and that the victims' "lives were changed forever" must be viewed in light of the of brutal crime described by the victim-witnesses in the record.  (R. at 268, 279.)  The prosecution's description of the victims as a "poor, innocent family" constitutes an isolated comment made against a backdrop of overwhelming evidence of guilt.  (R. at 282.)  The Appellate Division reasonably determined these comments did not render the trial fundamentally unfair.

B.    **Ineffective Assistance of Trial Counsel**

Petitioner raises multiple claims of ineffective assistance of counsel from both his direct appeal and his first post-conviction motion. (Pet., Dkt. 1, at ECF 5–7). As explained below, most of these claims are procedurally defaulted. The remaining claims do not entitle Petitioner to federal *habeas* relief.

A *habeas* petitioner "who claims ineffective assistance of counsel must prove (1) 'that counsel's representation fell below an objective standard of reasonableness,' and (2) that any such deficiency was 'prejudicial to the defense.'" *Garza v. Idaho*, 139 S. Ct. 738, 744 (2019) (quoting *Strickland v. Washington*, 466 U.S. 668, 687–688, 692 (1984)). The first prong requires a showing "that the attorney's error was 'so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1910 (2017) (quoting *Strickland*, 466 U.S. at 687). "Thus, '[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting *Strickland*, 466 U.S. at 686).

Although "[t]he first prong—constitutional deficiency—is necessarily linked to the practice and expectations of the legal community,'" *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010), "[t]he question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom," *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690). This "first prong sets a high bar" for claimants because courts must find that defense counsel "discharged his constitutional responsibility so long as his decisions fall within the 'wide range of professionally competent assistance.'" *Buck v. Davis*, 137 S. Ct. 759, 775 (2017) (quoting *Strickland*, 466 U.S. at 690). Put another way, "counsel should be 'strongly presumed to have rendered adequate

assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Burt v. Titlow*, 571 U.S. 12, 22–23 (2013) (quoting *Strickland*, 466 U.S. at 690). "[T]he burden to 'show that counsel's performance was deficient' rests squarely on the" claimant. *Id.* (quoting *Strickland*, 466 U.S. at 687).

"When an ineffective-assistance-of-counsel claim is presented in a federal habeas petition, a state prisoner faces additional burdens." *Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020). Namely, AEDPA allows federal *habeas* relief "only if the state court's rejection of [a petitioner's] claim of ineffective assistance of counsel was 'contrary to, or involved an unreasonable application of,' [governing Supreme Court precedent], or it rested 'on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Porter v. McCullum*, 558 U.S. 30, 39 (2009) (quoting 28 U.S.C. § 2254(d)). "The standards created by [AEDPA and the ineffective-assistance-of-counsel principles] are both highly deferential, and when the two apply in tandem, review is doubly so." *Premo v. Moore*, 562 U.S. 115, 122 (2011) (quoting *Richter*, 562 U.S. at 105) (internal citations and quotation marks omitted); *see also Pinholster*, 563 U.S. at 190 ("review of [a state court's ineffective-assistance-of-counsel] decision is thus doubly deferential" (internal quotation marks omitted)). Put another way, "[t]he question 'is not whether a federal court believes the state court's determination' [applying the principles of ineffective assistance of counsel] 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schiro v. Landrigan*, 550 U.S. 465, 473 (2007)); *see also Richter*, 562 U.S. at 105 ("[T]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied [the already] deferential standard.").

      1.    <u>Claims from the First Post-Conviction Motion</u>

Petitioner raised the largest set of ineffective assistance claims in his first post-conviction motion in state court.  (Pet'r 1st Post-Conviction Mot., Dkt. 7-15, at ECF 5–50.)  The Trial Court divided the claims into three categories: record-based claims, outside-the-record claims, and a restitution claim.  (Order Denying 1st Post-Conviction Mot., Dkt. 7-18, at ECF 3–5.)  Additionally, Petitioner raised other claims that the Trial Court did not explicitly address.

> a)   *Record-Based Claims*

The Trial Court began its decision by listing a dozen of Petitioner's claims that the Trial Court characterized as being grounded in the trial record:

> (1) defense counsel failed to set forth viable legal grounds to establish why the police acted without probable cause during the course of pre-trial hearings[;] (2) defense counsel failed to raise an issue of a *Batson*[25] violation during the course of jury selection[;] (3) defense counsel failed to object, during the course of the trial, to prosecutor's use of the term "home invasion" on three separate occasion[s], despite trial court's admonition to the prosecutor[;] (4) defense counsel, by asking the jury to "listen to the DA's opening statement," was asking jurors to accept the People's opening statement as the truth[;] (5) defense counsel failed to properly cross-examine the People's witnesses[;] (6) defense counsel did not properly address the issue of the unsworn testimony of a minor (eight year old) witness at the time of trial[;] (7) DNA evidence was wrongfully admitted during the course of the trial[;] (8) defense counsel failed to argue, in summation, that the People misrepresented, in the opening statement, that the certain trial testimony that would be presented[;] (9) defense counsel utilized the term "home invasion" during the course of summation, causing the defendant prejudice[;] (10) defense counsel never "readdressed" the contention that a juror had seen defendant in handcuffs[;] (11) defense counsel failed to adequately address the prosecutor's omission of witnesses' names from the People's witness list[;] and (12) defense counsel failed to properly object to the Court's jury charge.

_____

[25] *Batson v. Kentucky*, 476 U.S. 79, 86 (1986) ("Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure.").

(Order Denying 1st Post-Conviction Mot., Dkt. 7-18, at ECF 3.)[26]   Citing NYCPL § 440.10(2)(b),[27] the Trial Court denied each of these claims because they were record-based claims that had to be, but were not, raised on Petitioner's then-pending direct appeal.  (*Id.* at 3–4.) This holding suffices to bar this Court from reviewing these claims as part of a federal *habeas* petition.

"[A] federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule."  *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017).  "'To qualify as an "adequate" procedural ground,' capable of barring federal habeas review, 'a state rule must be "firmly established and regularly followed."'"  *Johnson v. Lee*, 578 U.S. 605, 608 (2016) (*per curiam*) (quoting *Walker v. Martin*, 562 U.S. 307, 316 (2011)).  NYCPL § 440.10(2)(b) constitutes just such an independent and adequate state procedural rule that operates to bar federal *habeas* relief.  *See Holland v. Irvin*, 45 F. App'x 17, 20–21 (2d Cir. 2002) (summary order); *Roberts v. Griffin*, No. 16-CV-5970 (ENV), 2019 WL 456179, at *10 (E.D.N.Y. Feb. 5, 2019) ("The Second Circuit has recognized CPL § 440.10(2)(b) to be an independent and adequate state law ground for decision and, therefore, as a bar to federal review").

The Trial Court explicitly rejected Petitioner's record-based claims of ineffective assistance of counsel because those claims should have been, but were not, raised on direct appeal.  (Order

---

[26] These ineffective assistance claims from Petitioner's first post-conviction motion are distinct from the ineffective assistance claims from his direct appeal that Petitioner includes as part of Ground One in the instant *habeas* petition.  The latter set of ineffective assistance claims, which partially overlap with the former, are discussed on the merits.  *See* pt. I.B.2, *infra*.

[27] *See* note 18, *supra*.

Denying 1st Post-Conviction Mot., Dkt. 7-18, at ECF 3–4.)  The Trial Court's order explicitly cited § 440.10(2)(b).  (*Id.* at 3–4.)  These claims are therefore procedurally defaulted.[28]

### *b)   Outside-the-Record Claims*

Next, the Trial Court addressed two of Petitioner's claims that were not record-based: "that a juror had seen the defendant wearing handcuffs in the midst of his trial,[[29]] and that defense counsel was ineffective because he was under stress at the time of the trial."  (Order Denying 1st Post-Conviction Mot., Dkt. 7-18, at ECF 4.)   Citing NYCPL § 440.30(4)(b),[30] the Trial Court rejected these claims because Petitioner had failed to submit "the proper sworn support for these contentions."  (*Id.* at 4.)  This Court rejects both of these claims because Petitioner cannot show that his trial counsel's actions or inactions prejudiced him.[31]

---

[28] Petitioner could overcome the procedural bar by either demonstrating that it will result in a fundamental miscarriage of justice, specifically the conviction of an actually innocent person, or showing good cause for the default and actual prejudice by non-review of the claim.  *See Harris*, 489 U.S. at 262; *Vargas v. Keane*, 86 F.3d 1273, 1280 (2d Cir. 1996).  However, Petitioner has neither demonstrated that he is actually innocent, nor shown cause "—and the Court's review of the record yields none—to excuse the procedural default."  *See Maples v. Thomas*, 565 U.S. 266, 280 (2012).

[29] The Trial Court's order does not make clear how it considered this claim different than the tenth claim in the Trial Court's bulleted list of record-based, procedurally defaulted claims.  (Order Denying 1st Post-Conviction Mot., Dkt. 7-18, at ECF 3.)

[30] *See* note 19, *supra*, defining NYCPL § 440.30(4)(b).  Decisions in this District reach different conclusions on whether NYCPL § 440.30(4)(b) constitutes an independent and adequate state procedural rule that bars federal *habeas* review.  *Compare Booker v. Ricks*, No. 02-CV-6456 (JG), 2006 WL 2239243, at *13 (E.D.N.Y. Aug. 4, 2006) (yes); *and Williams v. McGinnis*, No. 04-CV-1005 (NGG), 2006 WL 1317041, at *10 (E.D.N.Y. May 15, 2006) (yes); *with White v. Rock*, No. 10-CV-5163 (SJF), 2013 WL 1767784, at *31 (E.D.N.Y. Apr. 22, 2013) (no); *and Giraldo v. Bradt*, No. 11-CV-2001 (JFB), 2012 WL 3835112, at *7–9 (E.D.N.Y. Sept. 5, 2012) (no).  This Court declines to address the procedural default because the merits of the underlying claims are easily resolved against Petitioner.  *See Dunham v. Travis*, 313 F.3d 724, 729–30 (2d Cir. 2002) (citing *Lambrix v. Florida*, 520 U.S. 518, 523 (1997)).

[31] Given the uncertainty of whether the Trial Court's order constitutes an adjudication on the merits, the Court likewise declines to address the issue of whether the deferential 28 U.S.C. § 2254(d) framework applies and instead reviews these claims *de novo*.  *See Berghuis v.*

"To prevail on a Sixth Amendment claim alleging ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient and that his counsel's deficient performance prejudiced him." *Andrus v. Texas*, 140 S. Ct. 1875, 1881 (2020).  A claimant "raising such a claim can demonstrate prejudice by showing 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Lee v. United States*, 137 S. Ct. 1958, 1964 (2017) (quoting *Roe v. Flores–Ortega*, 528 U.S. 470, 482 (2000)).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Hinton v. Alabama*, 571 U.S. 263, 275 (2014) (quoting *Strickland*, 466 U.S. at 694).  "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Richter*, 562 U.S. at 104 (2011) (quoting *Strickland*, 466 U.S. at 693 ("some conceivable effect"); *id.* at 687 ("result is reliable")).

First, Petitioner alleges that "[d]uring a recess[,] [Petitioner] was observed by a juror in handcuffs."  (Pet'r 1st Post-Conviction Mot., Dkt. 7-15, at ECF 20.)  There is no reasonable probability that, had defense counsel further pursued this issue, the outcome of Petitioner's trial would have been different.  "A typical juror would not [be] influenced by glimpsing [a criminal defendant] in restraints.  Most jurors are aware that defendants may be incarcerated during trials." *United States v. Estevez*, No. 14-CR-191-1 (MPS), 2016 WL 2349099, at *6 (D. Conn. May 4, 2016) (collecting cases from the First, Fifth, Sixth, Eighth, and Tenth Circuits).  While it is conceivable that the juror who saw Petitioner in handcuffs was atypical—that is, that the juror's observation improperly affected this juror's decisions—and that further action by defense counsel

---

*Thompkins*, 560 U.S. 370, 390 (2010) (authorizing courts to apply *de novo* review when the result is the same as applying § 2254(d)).

might have eliminated any taint, this mere possibility is insufficient to undermine confidence in the trial's outcome. A single juror's brief glimpse of a criminal defendant in restraints, while regrettable, amounts to harmless error and does not warrant *habeas* relief. *See United States v. Matthews*, 545 F.3d 223, 228 n.5 (2d Cir. 2008); *Malik v. Kelly*, No. 97-CV-4543 (RR), 1999 WL 390604, at *6 n.2 (E.D.N.Y. Apr. 6, 1999); *Colson v. Mitchell*, 798 F. Supp. 966, 974–75 (E.D.N.Y. 1992). Defense counsel's failure to further inquire about the juror does not undermine confidence in the outcome of Petitioner's trial and there is no reasonable probability that such an inquiry would have resulted in a different outcome.

Second, Petitioner alleges that he suffered from ineffective assistance of counsel because (1) his pretrial defense counsel had previously been the subject of attorney discipline and (2) his trial defense counsel buckled under the pressure of a malpractice lawsuit and malpractice insurance coverage difficulties. (Pet'r 1st Post-Conviction Mot., Dkt. 7-15, at ECF 49–50.) Petitioner's claim fails because Petitioner does not allege how these facts affected counsel's performance during the course of Petitioner's case. Attorney discipline stemming from unrelated matters, without more,[32] does not warrant a finding of ineffectiveness by the same counsel in a *habeas* petitioner's separate case. *See, e.g.*, *Lopez v. United States*, 792 F. App'x 32, 36–37 (2d Cir. 2019) (summary order). Likewise, that an attorney is "frustrated and under stress . . . hardly amounts to incompetence" unless the claimant puts forward independent "evidence of acts or omissions" amounting to ineffective assistance. *Nova v. Artus*, No. 05-CV-8437 (NRB), 2007 WL 1988456, at *9 (S.D.N.Y. Jul. 6, 2007). Because Petitioner does not demonstrate how his attorney's prior

---

[32] The Second Circuit "recognize[s] two limited situations constituting per se ineffective assistance where the defendant need not show particularized prejudice: when counsel is either '(1) not duly licensed to practice law . . . or (2) implicated in the defendant's crimes." *Lobacz v. United States*, 764 F. App'x 1, 2–3 (2d Cir. 2019) (summary order) (quoting *United States v. Rondon*, 204 F.3d 376, 379–80 (2d Cir. 2000) (*per curiam*)). Neither is applicable here.

discipline or any related stress impacted counsel's performance, Petitioner cannot show that these extraneous issues undermine confidence in the outcome of Petitioner's trial or that, absent these extraneous issues, the result of the trial would have been different.

c)      <em>Restitution Claim</em>

Finally, Petitioner's first post-conviction motion also raised a claim related to his counsel's failure to object to the restitution order imposed on Petitioner or to request a restitution hearing. (Pet'r 1st Post-Conviction Mot., Dkt. 7-15, at ECF 54–55.)  The Trial Court rejected this claim on its merits.  (Order Denying 1st Post-Conviction Mot., Dkt. 7-18, at ECF 4–5.)  This claim is not cognizable on federal *habeas* review.

"Restitution orders cannot be challenged through a habeas petition because a 'monetary fine is not a sufficient restraint on liberty to meet the "in custody" requirement [of 28 U.S.C. § 2255],' even if raised in conjunction with a challenge to a sentence of imprisonment." *United States v. Boyd*, 407 F. App'x 559, 560 (2d Cir. 2011) (summary order) (quoting *Kaminski v. United States*, 339 F.3d 84, 87–88 (2d Cir. 2003)); *see also United States v. Rutigliano*, 887 F.3d 98, 104–05 (2d Cir. 2018).  This principle applies equally to claims brought by state prisoners under 28 U.S.C. § 2254.  *See Rojas v. Heath*, No. 11-CV-4322 (CS) (PED), 2012 WL 5878679, at *8 n.19 (S.D.N.Y. Oct. 18, 2012), *report and recommendation adopted*, 2012 WL 5878752 (S.D.N.Y. Nov. 16, 2012).

If successful, Petitioner's claim of ineffective assistance of counsel relating to his restitution order would affect only the validity of the restitution order, but would not impact his custody status.  Accordingly, this Court cannot review his restitution-related claim of ineffective assistance of counsel.

d)      <em>Unaddressed Claims</em>

39

Finally, Petitioner raised a host of claims of ineffective assistance of counsel in his first post-conviction motion that the Trial Court did not explicitly address.[33]  Petitioner alleged that his trial counsel failed to:

- call his investigator as a witness (Pet'r 1st Post-Conviction Mot., Dkt. 7-15, at ECF 12);

- call Petitioner's former defense attorney—who was present at the lineup—as a defense witness (id. at 15);

- object to mentions of the six pawn shop receipts found in Petitioner's possession at the time of his arrest (id. at 19);

- move to disqualify the trial judge for having a personal relationship with one of the prosecution's police witnesses (id. at 28);

- object to testimony from several police witnesses for improperly bolstering the eyewitnesses' identifications in the lineup (id. at 28–30);

- move to strike the entire testimony of NCPD's lead detective for the robbery, Detective Russ Bastone, in light of the leading questions, inflammatory testimony, and impermissible hearsay and bolstering (id. at 32–37);

- object to testimony that Dexter Lucas voluntarily returned to Nassau County with the police in order to assist with the investigation because that testimony implied that Lucas had information that exonerated himself, but implicated Petitioner (id. at 37);

- object to extensive hearsay testimony relaying "pedigree information"[34] (id. at 39–40);

- choose a workable defense theme that did not focus entirely on the discrepancy between Petitioner's facial hair and the witnesses' post-robbery descriptions of the First Gunman (id. at 44–45);

- object to the prosecution's summation comments:

---

[33] As explained above, see note 31, supra, the Court reviews these claims de novo, without the deference normally required by 28 U.S.C. § 2254(d).

[34] "Pedigree information" refers to an arrestee's personal information and data.  Rosa v. McCray, 396 F.3d 210 (2d Cir. 2005) ("Hair color—like eye color, skin tone, or other personal physical characteristics—is a common element of pedigree information.").  Pedigree information is obtained through "the sort of questions normally attendant to arrest and custody."  United States v. Rodriguez, 356 F.3d 254, 259 n.2 (2d Cir. 2004).

- o characterizing the manner in which members of the Shah family made their in-court identifications (id. at 43–44);
- o about facial hair (id. at 45);
- o expressing a personal belief that Petitioner was the First Gunman; (id. at 45);
- o that Dexter Lucas kept calling Petitioner at the Brooklyn police station (id. at 45);
- o referencing the size of the hole in the mask seized from Petitioner (id. at 45); and

- conduct any pretrial investigation (*id.* at 49–50).

None of these claims[35] warrants federal *habeas* relief because Petitioner's counsel provided reasonable representation.  *See Lee*, 137 S. Ct. at 1964; *see also Santone v. Fischer*, 689 F.3d 138, 153–54 (2d Cir. 2012).

### (1)    Not Calling Defense Witnesses

Defense counsel did not call any witnesses during the defense case.  Petitioner alleges that defense counsel unreasonably failed to call: (1) Petitioner's earlier pretrial counsel, who had attended and observed the Shah family's police lineup; and (2) an investigator hired by that earlier pretrial counsel, who had interviewed members of the Shah family about whether they could identify the First Gunman.  (Pet'r 1st Post-Conviction Mot., Dkt. 7-15, at ECF 12, 15.)  But neither witness would have contributed meaningfully to Petitioner's defense.  The prosecution's witnesses exhaustively testified about the lineup procedures on direct and cross-examination (R. at 704–13, 726–30, 759–83, 824–37.)  Petitioner does not explain what additional insight, if any, his pretrial counsel could have offered.  The defense investigator's testimony would have been equally fruitless, if not harmful to Petitioner's defense.  The defense investigator's conversation with the Shah family merely confirmed much of their trial testimony, except that, unlike at trial and the police lineup, the Older Son was able to identify Petitioner as the First Gunman during his conversation with the defense investigator.  (*Compare* R. 381, *with* Dkt. 7-15, at ECF 58–59.)

---

[35] The Court addresses the hearsay/bolstering matters in the relevant sections of this opinion.  *See* pt. III.A, *infra*.

Neither Petitioner's pretrial counsel's testimony nor the defense investigator's testimony would have aided Petitioner's defense, and Petitioner's trial counsel reasonably opted against calling either to the witness stand.

(2)   Pawn Shop Receipts

Petitioner also claims that his defense counsel should have objected to testimony that police found pawn shop receipts in Petitioner's pockets upon his arrest.  (Pet'r 1st Post-Conviction Mot., Dkt. 7-15, at ECF 19.)  Those pawn shop receipts, Petitioner contends, were irrelevant because they were never linked to the robbery.  (*Id.*)  But pawn slips can be relevant to a case even when not linked to a charged crime.  *See, e.g.*, *United States v. Henderson*, 320 F.3d 92, 102 (1st Cir. 2003) (demonstrating that defendant had enough cash in the days following a drug sale—enough to redeem a watch he had pawned seven and a half months earlier); *United States v. Gutierrez-Cisneros*, 171 F. App'x 173, 174 (9th Cir. 2006) (using un-redeemed pawn tickets to impeach a drug trafficking defendant's testimony that he did not need money); *Peterson v. Warren*, No. 13-CV-4250 (JLL), 2018 WL 3054680, at *13, 15 (D.N.J. Jun. 20, 2018) (proving a financial motive for murder); *Hardaway v. Yarborough*, No. 02-CV-1463 JF (PR), 2006 WL 3190673, at *16 (N.D. Cal. Nov. 2, 2006) (establishing the time-frame for a sexual assault based on the time-stamps on a pawn ticket); *People v. Jackson*, 2012 IL App (1st) 103072-U, ¶¶ 15–18 (Ill. App. Ct. 2012) (suggesting a burglary defendant stole items in order to pawn them later); *State v. Seitter*, 900 P.2d 1381, 1384 (Idaho Ct. App. 1994) (showing defendant's dominion over methamphetamine seized from the same room in which defendant's pawn slips were located), *rev'd on unrelated grounds*, 900 P.2d 1367 (Idaho 1995).

In this case, the pawn slips seized from Petitioner suggested that he may have pawned items stolen from the robbery.[36]  Although the existence of Petitioner's pawn slips, without more, would likely be insufficient to persuade the jury of any particular fact, "[n]onconclusive evidence should still be admitted if it makes a proposition more probable than not; factors which make evidence less than conclusive affect only weight, not admissibility."  *United States v. Schultz*, 333 F.3d 393, 416 (2d Cir. 2003) (quoting *SEC v. Singer*, 786 F. Supp. 1158, 1166 (S.D.N.Y. 1992)).  Because the Trial Court likely would have overruled any objection to the admission of the pawn shop receipts, Petitioner's counsel was not ineffective for failing to object to this evidence.  *See Lafler v. Cooper*, 566 U.S. 156, 167 (2012) (finding that trial counsel cannot be ineffective for failing to raise meritless arguments); *see also United States v. Fusco*, 560 F. App'x 43, 46 (2d Cir. 2014) (summary order).  Furthermore, even assuming *arguendo* that counsel should have objected, Petitioner cannot demonstrate any harm or prejudice resulting from the failure to do so.  *See Harrington*, 562 U.S. at 104 ("Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'") (quoting *Strickland*, 466 U.S. at 693).

### (3)     Disqualification of Trial Judge

Next, Petitioner claims that his trial counsel should have moved to disqualify the trial judge because the judge stated on the record that he had a personal relationship with two of the prosecution's police witnesses.  (Pet'r 1st Post-Conviction Mot., Dkt. 7-15, at ECF 28.)  However, the record belies Petitioner's description of the judge's on-the-record statement.  The judge's statement came as he was criticizing the prosecutors for failing to announce witnesses' names at the start of trial:

---

[36] Though either the prosecution or defense could have sought to determine what items Petitioner may have pawned, the record does not indicate whether either side did so, and does not reflect that either side sought to introduce evidence on this issue at trial.

> You [prosecutors] need to provide [defense] counsel with an educated opportunity to anticipate witnesses who are going to be offered against him in order to adequately prepare and to tell these potential jurors when we were picking them, I know Detective Byrne, I know Detective Nash.  Detective Nash and I are best friends, we're Lodge brothers, we're whatever we are.  We have missed that opportunity.

(R. at 743–44.)  The context of the judge's statement makes clear that he was speaking hypothetically as a potential juror who might know a police witness, and was not saying that he himself knew or had personal relationships with these witnesses.  Thus, Petitioner's defense counsel was not ineffective for failing to seek to disqualify the trial judge based on any relationship with a witness.

(4)   Leading Questions

According to Petitioner, defense counsel should have objected to leading questions posed to NCPD's lead detective for the robbery.  (Pet'r 1st Post-Conviction Mot., Dkt. 7-15, at ECF 32–37.)  Petitioner cannot demonstrate this failure amounts to ineffective assistance.  First, Petitioner does not identify any impermissibly leading questions, so the Court is unable to determine whether any of these questions were objectionable.  *Cf. Leveille v. Ercole*, No. 05-CV-5602 (ARR), 2006 WL 3257233, at *7 (E.D.N.Y. Nov. 9, 2006) ("[M]any of the questions petitioner complains of were not actually leading.  The failure to make fruitless objections cannot be deemed constitutionally deficient.").  Even if prosecutors did pose some leading questions, "[t]he decision of a trial attorney to object to individual questions may be attributed to trial tactics, which a habeas court may not second-guess."  *Id.*  Given that any leading questions "could have easily been corrected by simply rephrasing the question[s]," *Davidson v. Cunningham*, No. 16-CV-1125 (JFB), 2017 WL 3738560, at *22 (E.D.N.Y. Aug. 29, 2017), the Court cannot find that defense counsel's failure to object to purportedly leading questions was ineffective, as opposed to making a tactical

decision not to waste the Trial Court's and jury's time with meritless or futile objections.  This type of strategic decision does not render defense counsel ineffective.

(5)     Pedigree Information

Petitioner also contends that his defense counsel should have objected to a NCPD detective's recitation of pedigree information for Petitioner and Dexter Lucas that was provided to the detective by a colleague who had collected it from the two men at the time of their arrests. However, Petitioner's counsel did object to the detective reporting the pedigree information he had received second-hand on hearsay grounds.  (Pet'r 1st Post-Conviction Mot., Dkt. 7-15, at ECF 39–40.)  Defense counsel's decision not to persist in that objection did not rise to the level of ineffective assistance.

Failure to make a hearsay objection is not ineffective assistance when counsel makes a strategic decision to withhold the objection.  *See Singleton v. Davis*, 308 F. App'x 560, 562 (2d Cir. 2009) (summary order).  In this case, Petitioner's counsel used a successful hearsay objection to force the prosecution to concede that the NCPD detective had learned of the pedigree information second-hand, which could have led the jurors to question the accuracy or reliability of that information.  (R. at 821–22.)  It was therefore reasonable for Petitioner's counsel to conclude that further objection was unnecessary and/or unwise.  *See Maxwell v. Greiner*, No. 04-CV-4477 (CBA), 2008 WL 2039528, at *11 (E.D.N.Y. May 12, 2008) ("[W]hen his objection was sustained and the judge gave his [implementing] instruction, counsel could have reasonably determined that further objections to the propriety of the judge's [implementing] instruction would do more practical harm than good under the circumstances.").  Petitioner's counsel obviously knew that the prosecutors could have simply called the detective's colleague as a witness to testify as to the pedigree information, which might have aggravated the judge or jury, as well as prolonged the trial

(while Petitioner remained in custody (R. at 1112)), all for little or no gain.  This strategic decision does not amount to ineffectiveness.

To the extent that Petitioner argues that his trial counsel should have objected to the admission of any pedigree information, such an objection would have been futile.  New York law permits the introduction of "certain pedigree information" when used "to show . . . some connection . . . regardless of how tenuous" between a criminal defendant and another set of data. *People v. Patterson*, 68 N.E.3d 1242, 1248 (N.Y. 2016).  At trial, the prosecution introduced Petitioner's pedigree information to link him to the cell phone account registered in another person's name and to the rental car Petitioner was driving when he was arrested.  Under these circumstances, defense counsel could not have successfully objected to the admission of Petitioner's pedigree information and therefore counsel was not ineffective for failing to seek to do so.  *Cf. United States v. Davis*, 687 F. App'x. 75, 78–79 (2d Cir. 2017) (rejecting a challenge to the admission of pedigree information and holding that pedigree information "is not protected by Miranda.") (summary order).

(6)     Inflammatory Witness Testimony

Petitioner contends that defense counsel should have objected to the "inflammatory" testimony of a police witness, Detective Russ Bastone, describing one of the victims as "our witness."  (Pet'r 1st Post-Conviction Mot., Dkt. 7-15, at ECF 33–34; R. at 800.)  This innocent choice of words had no "possibility of 'inflam[ing] the jurors' prejudice against [Petitioner]." *Maize v. Nassau Health Care Corp.*, No. 05-CV-4920 (ETB), 2012 WL 139261, at *3 (E.D.N.Y. Jan. 18, 2012) (quoting *United States v. Devery*, 935 F. Supp. 393, 408 (1996)), nor would it cause them to "decide [Petitioner's] case on the basis of their emotions," *United States v. Mejia*, 376 F. Supp. 2d 460, 463 (S.D.N.Y. 2005).  Because the Trial Court would have properly overruled an

46

objection to this phrase, Petitioner's counsel was not ineffective for failing to make this objection. *Lafler*, 566 U.S. at 167.   Furthermore, Petitioner has not demonstrated any prejudice from the failure to object. *Harrington,* 562 U.S. at 104.

(7)   Hearsay from Google Maps

Petitioner also contends that defense counsel should have objected to the admission of hearsay information from Google Maps, showing the distance and driving time between the robbery location in South Floral Park and the site of Petitioner's arrest in Brooklyn.  (R. at 805–06.)  Any such objection would have been fruitless because New York courts may take judicial notice of drive times and distances provided by Google Maps.  *See 2437 Valentine Assocs. v. Valverde*, 139 N.Y.S.3d 522 (table), 2021 WL 609890, at *3 n.3 (Civ. Ct. Feb. 12, 2021); *see also Connor v. City of New York*, 958 N.Y.S.2d 306 (table), 2010 WL 4008542, at *2 (Sup. Ct. Aug. 23, 2010) (collecting cases).  Trial counsel's strategic decision to forego a frivolous hearsay objection does not amount to ineffective assistance.

(8)   Speculative Testimony

Defense counsel, Petitioner argues, should also have objected to the lead NCPD detective's "speculative" testimony about the direction the robbery perpetrators headed as they fled the scene. (Pet'r 1st Post-Conviction Mot., Dkt. 7-15, at ECF 33–34.)  The Court disagrees because testimony setting forth the feasibility of the prosecution's theory of the case does not amount to speculative testimony, and counsel does not provide ineffective assistance by failing to object to it.  *See Bierenbaum v. Graham*, 607 F.3d 36, 56–57 (2d Cir. 2010).

(9)   Misleading Testimony

Petitioner also contends that his defense counsel inappropriately failed to object to the lead NCPD detective's testimony that, on the night of Petitioner's arrest in Brooklyn, Dexter Lucas

47

"went back voluntarily [to Nassau County] to assist in the investigation [of the robbery]."[37]  (Pet'r 1st Post-Conviction Mot., Dkt. 7-15, at ECF 37; R. at 815.)  Petitioner contends that this testimony implied that Lucas had important information implicating Petitioner in the robbery.  But the proper remedy for ambiguous testimony from the direct examination of a prosecution witness is not to strike the testimony, but to allow defense counsel to clarify any ambiguity on cross-examination, *cf. United States v. Petrillo*, 237 F.3d 119, 124 (2d Cir. 2000) ("Equivocations by a witness during direct examination that may lead the jury to draw incorrect inferences can be clarified on cross-examination."), *abrogated on other grounds*, *Crawford v. Washington*, 541 U.S. 36, 64 (2004), and/or to argue in summation that no such inference can or should be made.  Any attempt to strike the testimony would have been rejected in favor of allowing defense counsel to explore the matter on cross-examination.

### (10)    Prosecution's Summation Arguments

Petitioner argues that his defense counsel should have objected to several of the prosecution's summation comments.  (Pet'r 1st Post-Conviction Mot., Dkt. 7-15, at ECF 43–45.) Because none of these comments were improper, defense counsel was not ineffective for failing to object.

Petitioner contends that his trial counsel should have objected to the prosecution;s mischaracterization of the mannerisms of the Shah family members when they identified Petitioner at trial.  (Pet'r 1st Post-Conviction Mot., Dkt. 7-15, at ECF 43–44.)  Nothing in the trial record contradicts the prosecution's summation descriptions.  (R. at 314–15, 361–63, 1014–17.)  Any objection by defense counsel would have been overruled as meritless.

---

[37] Lucas did not testify at Petitioner's trial, nor did any police witness testify about any post-arrest statement by Lucas implicating Petitioner in the crime.

Next, Petitioner asserts that his trial counsel should have objected to the prosecution's discussion of facial hair at summation.  (Pet'r 1st Post-Conviction Mot., Dkt. 7-15, at ECF 45.)  However, the prosecutors were responding to a defense argument that Petitioner's facial hair demonstrates that he did not commit the robbery.  (R. at 1019–21.)  Prosecutors are permitted to respond to defense arguments in summation.  *See, e.g.*, *United States v. Gansman*, 657 F.3d 85, 96 (2d Cir. 2011).  Thus, any objection to the prosecution's comments about Petitioner's facial hair would have been unsuccessful, and the failure to object was not ineffective.

Petitioner further contends that his trial counsel improperly failed to object to the prosecution's statements about their belief in Petitioner's guilt.  (Pet'r 1st Post-Conviction Mot., Dkt. 7-15, at ECF 45.)  While Petitioner is correct that prosecutors may not express a personal belief in the guilt or innocence of a criminal defendant, *see Bellamy v. City of New York*, 914 F.3d 727, 763 (2d Cir. 2019), they are entitled to "'broad latitude' . . . in suggesting inferences from the evidence in closing," *United States v. Londono-Tabarez*, 121 F. App'x 882, 885 (2d Cir. 2005) (summary order) (quoting *United States v. Myerson*, 18 F.3d 153, 163 (2d Cir. 1994)).  Prosecutors may "marshal[] the evidence [they] believe[] support[s] [their] version of events and, following the evidence, support[s] [a defendant's] guilt."  *Gadsden v. Lee*, No. 12-CV-4204, 2013 WL 3938500, at *9 (E.D.N.Y. July 30, 2013).  Put another way, it is "entirely appropriate" for prosecutors to argue a criminal defendant's guilt when their "statements comment[] directly on the evidence."  *Mitchell v. Rock*, No. 11-CV-2642, 2013 WL 4041545, at *12 (E.D.N.Y. Aug. 9, 2013).  Use of first-person pronouns can indicate problematic comments, but are not necessarily improper.  *See United States v. Herredia*, 153 F. App'x 50, 54 (2d Cir. 2005) (summary order) (upholding prosecutors' summation argument despite twenty-two uses of "I").  Here, the prosecutors did not suggest that the jurors find Petitioner guilty because the prosecutors believed him to be guilty.  *Cf.*

*Bellamy*, 914 F.3d at 763 (noting the inappropriate nature of prosecutors' statement, "I know who committed the murder.").  Rather, the prosecutors argued to the jury that Petitioner committed the robbery based on the evidence adduced at trial—*e.g.*, the testimony of the Shah family, cellphone records, video evidence of the maroon car at the crime scene, and possession of the Shah family's personal items—and appropriate inferences to be drawn from that evidence, such as the fact that the August heat likely influenced Petitioner's wardrobe choices, to make that point.  (R. at 998–99, 1021–22.)  Defense counsel could not have successfully objected to these arguments, and thus counsel was not ineffective for failing to object.

For the same reason, the Court must reject Petitioner's argument that his defense counsel should have objected to the prosecution's summation argument that Dexter Lucas repeatedly called Petitioner while he was being processed at the Brooklyn police station.  Prosecutors "'ha[ve] broad latitude in the inferences [they] may reasonably suggest to the jury during summation,' as long as those inferences are reasonable 'in light of the evidence presented at trial.'"  *United States v. Sanchez*, 623 F. App'x 35, 42 n.3 (2d Cir. 2015) (summary order) (quoting *United States v. Cohen*, 427 F.3d 164, 170 (2d Cir. 2005)).  The evidence presented at trial showed that Petitioner received multiple calls following his arrest in Brooklyn for driving with a suspended license.  (R. at 552–53, 915–22.)  The evidence also demonstrated Dexter Lucas arrived at the police precinct in Brooklyn and told the police that he was there to retrieve Petitioner's car.  (R. at 553, 600–01.)  It was proper for the prosecutors to argue to the jurors that, based on this evidence, they could infer that Lucas was the one who had placed many of the calls to Petitioner while he was in the precinct. The Trial Court properly could have overruled any defense objection to this argument.

Petitioner fares no better with his argument that defense counsel should have objected to the prosecution's argument that a large hole in the ski mask made it easy for the robbery victims

to identify its wearer.  Prosecutors stated that the "[f]amily told you this was the mask [the First Gunman] was wearing and [Petitioner] was found with it.  Look at the size of that hole (indicating).  You can see the face" of the wearer.  (R. at 1034.)  Petitioner contends that this hole was the cutout that DNA analysts made in the mask *after the robbery* in order to facilitate DNA testing.  (Pet'r 1st Post-Conviction Mot., Dkt. 7-15, at ECF 45.)  The Court disagrees.  Evidence in the record shows that the robbery victims could still see the face of the First Gunman, even while he wore the mask (R. at 321, 352–53, 360), and there is no evidence in the record to support Petitioner's claim that the hole was created after the robbery.  Because the trial evidence supported the prosecution's argument that the hole in the mask, which was present during the robbery, allowed the Shah family to identify its wearer despite wearing the mask, it was not ineffective for defense counsel not to have objected to that argument.

### (11)    Theme of the Defense

Petitioner contends that his trial counsel should not have focused the defense on the identity of the First Gunman.  (Pet'r 1st Post-Conviction Mot., Dkt. 7-15, at ECF 44–45.)  Because trial counsel made a reasonable choice to center the defense on the First Gunman's identity, that decision cannot amount to ineffective assistance.

When an attorney reasonably opts to present a defense centered on the theory that another person—not the attorney's client—committed the charged crime, that attorney does not render ineffective assistance merely because the defense was unsuccessful or because another approach might also have been reasonable.  *See Ramos v. Phillips*, No. 05-CV-23 (ARR), 2005 WL 1541046, at *7 (E.D.N.Y. Jun. 30, 2005).

Petitioner's trial counsel reasonably focused Petitioner's defense on the possibility that Petitioner was not the First Gunman, which was the prosecution's theory of the case.  The identity

of the First Gunman was not a foregone conclusion.  Two of the robbery victims were unable to identify Petitioner as the First Gunman and a third was too young to attempt an identification.  The First Gunman wore a mask, allowing for a plausible argument that the identifications of the Mother and Daughter were flawed.  The Mother's erroneous identification of a person in Petitioner's lineup as Dexter Lucas gave additional ammunition to defense counsel to discredit her identification.  In addition, DNA evidence linking Petitioner to the robbery was inconclusive.  Other evidence linking Petitioner to the robbery, such as the cell site records, suffered from their own infirmities, including the fact that Petitioner's cell phone was not registered in his name.  While ultimately unsuccessful, defense counsel made a reasonable choice to present a defense centered around persuading jurors that they could not be confident beyond a reasonable doubt that Petitioner was the First Gunman.  This strategic choice does not amount to ineffective assistance.

(12)    Pretrial Investigation

Petitioner also contends that his trial counsel provided ineffective assistance for failure to conduct any pretrial investigation.  (Pet'r 1st Post-Conviction Mot., Dkt. 7-15, at ECF 49–50.)  The Court disagrees.

"Failure to conduct adequate pretrial investigations may serve as the basis for ineffective assistance of counsel claims."  *Dollison v. Nassau Cnty.*, No. 17-CV-2804 (JFB), 2019 WL 3531522, at *9 (E.D.N.Y. Aug. 2, 2019).  Defense "counsel has a duty to make reasonable investigations, and a decision not to investigate will be reasonable only 'to the extent that reasonable professional judgments support the limitations on investigation.'"  *Gersten v. Senkowski*, 426 F.3d 588, 607 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690–91).  However, "a petitioner has the 'burden of providing the court sufficiently precise information, that is, a comprehensive showing as to what the investigation would have produced.'"  *Heron v. Griffin*, No.

18-CV-00004 (JFB), 2019 WL 1050011, at *13 (E.D.N.Y. Mar. 15, 2019) (quoting *Taylor v. Poole*, No. 07-CV-6318 (RJH) (GWG), 2009 WL 2634724, at *14 (S.D.N.Y. Aug. 27, 2009), *report and recommendation adopted*, 2011 WL 3809887 (S.D.N.Y. Aug. 26, 2011). "[A] petitioner must do more than make vague, conclusory, or speculative claims as to what evidence could have been produced by further investigation." *Wood v. Artus*, 15-CV-4602 (SJF), 2020 WL 3256848, at *9 (E.D.N.Y. Jun. 15, 2020) (quoting *Taylor*, 2009 WL 2634724, at *14).

Petitioner makes only a conclusory statement that his trial counsel conducted no pretrial investigation[38] without explaining what such an investigation would have discovered and how that investigation would have impacted Petitioner's trial. "Thus, [Petitioner] has 'failed to establish that counsel's performance was deficient' because his 'bald assertion that counsel should have conducted a more thorough pretrial investigation fails to overcome the presumption that counsel acted reasonably.'" *Yannai v. United States*, 346 F. Supp. 3d 336, 348 (E.D.N.Y. 2018) (quoting *Boyd v. Hawk*, 965 F. Supp. 443, 451–52 (S.D.N.Y. 1997)), *aff'd with clerical correction*, 791 F.3d 226, 247 (2d Cir. 2015).

\*    \*    \*

In sum, none of the arguments that Petitioner raised in any of his § 440 motions warrant federal *habeas* relief either because they were denied based on an adequate and independent state procedural rule or are without merit.

2.    Claims from the Direct Appeal

---

[38] Petitioner also ignores that his pretrial counsel conducted an investigation by sending an investigator to interview the witnesses to the robbery.  (Dkt. 7-15, at ECF 58–59.)

53

Petitioner also raised claims for ineffective assistance of counsel in his counseled brief before the Appellate Division on direct appeal.   (Pet'r App. Br., Dkt. 7-1, at ECF 40–47.) Specifically, Petitioner argued that his counsel provided ineffective assistance by

- arguing against Petitioner's pro se motion for a speedy trial (id. at 42);

- allowing the prosecutors to use the term "home invasion" (id. at 43);

- conducting limited or no cross-examination of multiple prosecution witnesses, including the Father, the Older Son, the representative from Alamo Rental Car, and various police officers with limited roles in the investigation (id. at 43–44);

- failing to request the exclusion of witnesses as a sanction for the prosecution's discovery violations (id. at 44–45);

- failing to object to improper prosecutorial comments in opening (id. at 43, 45) and summation (id. at 46–47);

- failing to object to the admission of DNA evidence (id. at 45–46); and

- failing to object to improper bolstering testimony (id. at 46).

In his supplemental, *pro se* brief, Petitioner added an additional claim that his counsel provided ineffective assistance by failing to contend that his convictions on two counts of robbery and two counts of burglary violated the Double Jeopardy Clause.  (Pet'r *Pro Se* Br., Dkt. 7-3, at ECF 12–14.)

The Appellate Division rejected all of these claims.  *People v. Totesau*, 977 N.Y.S.2d 364, 365–66 (App. Div. 2013).   This Court likewise rejects these claims[39] because the Appellate Division's decision did not unreasonably apply clearly established Supreme Court precedent nor did it unreasonably determine the facts.

---

[39] The Court previously discussed the prosecution's use of the phrase "home invasion" in addressing Petitioner's improper prosecutorial argument claim.  *See* pt. I.A.2, *supra*.  The Court discusses the DNA evidence and the bolstering issues in the relevant sections of this opinion.  *See* pt. II, *infra*; pt. III, *infra*.

a)      *Opposing Petitioner's Pro Se Speedy Trial Motion*

Petitioner first contends that his counsel was *per se* ineffective for "opposing" Petitioner's request to move for a speedy trial.  (Pet'r App. Br., Dkt. 7-1, at ECF 42.)  There is New York state caselaw to support the proposition that a defense attorney who "take[s] a position that [is] adverse to that of his client['s *pro se* motion]" provides ineffective assistance.  *See People v. Betsch*, 730 N.Y.S.2d 645, 646 (App. Div. 2001).  Assuming without deciding that is what happened here,[40] this claim does not entitle Petitioner to federal *habeas* relief because there is no corresponding "clearly established Federal law, as established by the United States Supreme Court," 28 U.S.C. § 2254(d), to the same effect.

To the extent Petitioner contends that his trial counsel provided ineffective assistance for failing to file a separate, counseled motion for a speedy trial, Petitioner has failed to demonstrate ineffectiveness.  Under New York law, courts adjudicating a speedy trial motion or a due process claim for prompt prosecution will weigh five factors:

> (1) the extent of the delay; (2) the reason for the delay; (3) the nature of the underlying charge; (4) whether or not there has been an extended period of pretrial incarceration; and (5) whether or not there is any indication that the defense has been impaired by reason of the delay.

*People v. Decker*, 912 N.E.2d 1041, 1042 (N.Y. 2009) (quoting *People v. Taranovich*, 335 N.E.2d 303, 306 (N.Y. 1975)).  With regard to the first factor, the length of the delay is not as critical as the reasons underlying that delay: New York courts have even sanctioned decades-long delays under appropriate circumstances.  *See, e.g.*, *People v. Wing Keung Tsang*, 728 N.Y.S.2d 436, 436–

---

[40] New York caselaw also supports the proposition that an attorney does not provide ineffective assistance by merely "attempt[ing] to clarify the circumstances surrounding" a criminal defendant's *pro se* motion without "argu[ing] in opposition to" it.  *People v. Viscomi*, 730 N.Y.S.2d 478 (Mem), 479 (App. Div. 2001).  The Court takes no position on whether Petitioner's trial counsel's actions more closely resemble *Betsch* or *Viscomi*.

37 (App. Div. 2001) (twenty years); *People v. LaRocca*, 568 N.Y.S.2d 431, 431–32 (App. Div. 1991) (seventeen years); *People v. Hoff*, 487 N.Y.S.2d 851, 852–53 (App. Div. 1985) (twenty-five years).  As to the second factor, a criminal defendant's "own request to locate a witness" or "his [own] request for records" weighs against granting a motion for speedy trial or prompt prosecution. *People v. McCummings*, 610 N.Y.S.2d 634, 635 (App. Div. 1994) (witnesses); *People v. Allen*, 610 N.Y.S.2d 40, 97 (App. Div. 1994) (records).  "[H]ome invasion robbery" qualifies as a "very serious" charge for purposes of the third factor in the test for a speedy trial violation.  *See People v. Delgado*, 77 N.Y.S.3d 36, 37 (App. Div. 2018).  A ten-month period of pretrial incarceration is "not substantial" when analyzing the fourth factor, *People v. Carrillo*, 594 N.Y.S.2d 902, 903 (App. Div. 1993), and courts routinely approve longer periods when the circumstances warrant, *see, e.g.*, *People v. Anderson*, 981 N.Y.S.2d 200, 203 (App. Div. 2014) (seventeen months); *People v. Parris*, 965 N.Y.S.2d 125, 126 (App. Div. 2013) (thirty-three months); *People v. Johnson*, 953 N.Y.S.2d 598, 598 (App. Div. 2012) (thirty-one months); *People v. Morobel*, 709 N.Y.S.2d 743, 743–44 (App. Div. 2000) (eighteen months); *People v. Dexter*, 688 N.Y.S.2d 289, 291 (App. Div. 1999) (nineteen months).

In Petitioner's case, all five factors weighed against a motion for speedy trial or prompt prosecution.  By December 6, 2010—when Petitioner's trial counsel stated on the record that he would not move for speedy trial—nearly fifteen months had passed since Petitioner's arrest on August 13, 2009.  (R. at 536.)  Trial counsel indicated he needed time to review additional records and interview witnesses, making the defense the source of the delay.  Prosecutors had filed serious charges, including first-degree robbery stemming from an armed home invasion, against Petitioner. As to the period of pretrial incarceration, the record reflects only that Petitioner had been incarcerated "for more than six months" (R. at 244), which would weigh against a successful

motion.  Even if the Court assumes, despite the record's silence on this point, that Petitioner had remained incarcerated since his arrest, fifteen months pretrial incarceration is within the range of acceptable time frames New York courts will allow in light of the other factors.  Finally, the delay, which was requested by Petitioner's trial counsel in order to review documents and interview witnesses, would have assisted, not impaired, Petitioner's defense.

Trial counsel further stated on the record that he did not believe a speedy trial motion could succeed.  (R. at 244–45.)  This Court agrees.  Defense counsel's strategic judgment to forego filing a hopeless motion does not amount to ineffective assistance.  *See Lafler*, 566 U.S. at 167; *see also Fusco*, 560 F. App'x at 46.  The Appellate Division did not unreasonably reject this claim.

<em>b)</em>  <em>Cross-Examination of Prosecution Witnesses</em>

Petitioner also faults his counsel for failing to cross-examine multiple prosecution witnesses.  (Pet'r App. Br., Dkt. 7-1, at ECF 43–44.)  This claim does not entitle Petitioner to federal *habeas* relief.  Counsel's primary defense was that prosecutors could not prove the identity of the First Gunman.  Given that defense, there was no need for extensive cross-examination of most of the prosecution's witnesses.  As discussed below, the Appellate Division did not unreasonably apply clearly established Supreme Court precedent nor unreasonably determine the facts by finding that trial counsel's minimal cross-examination of certain prosecution witnesses constituted a reasonable strategic decision.

The testimony of the Father and the Older Son on direct examination centered on Dexter Lucas' connection to the family and on the details of the robbery.  (R. at 370–80, 382–409.) Petitioner's defense focused on the identity of the First Gunman; trial counsel had no need to cross-examine either the Father or the Older Son about either Dexter Lucas or the details of the robbery. The critical point for Petitioner's defense—a point actually established by prosecutors—was that

neither the Father nor the Son was able to identify Petitioner as the First Gunman.  (R. at 380–81, 835.)  Trial counsel would have no incentive to impeach or discredit either witness on this point.

The Alamo Car Rental representative's testimony did not directly link Petitioner to the robbery.  (R. at 494–98.)  In light of the strained, tenuous connection that that testimony drew between Petitioner and the robbery, defense counsel also had no need to attack the car rental paper trail.

Most of the challenged police testimony merely concerned background information about the lineup procedures or supplied testimony concerning the chain-of-custody of various pieces of evidence.  (R. at 656–59, 703–14, 758–83.)    Because trial counsel's defense centered around questioning the victims' identifications of Petitioner as the First Gunman—not errors in the investigation or even the adequacy of the police lineup procedures—Petitioner's defense would not have benefitted from cross-examination on these topics.

Two police officers who responded to the scene of the robbery testified only to their interactions with the victims and their observations at the scene.  (R. at 732–34, 786–88.)  With a defense focused on the identity of the First Gunman and not on whether a robbery had occurred at all, Petitioner's defense would have gained nothing from cross-examination of these police witnesses.

The victims' neighbor testified only about the operation and location of the cameras he maintained on his property.  (R. at 718–21.)   His brief testimony offered no viable ground for cross-examination.

Thus, the Appellate Division's apparent rejection of Petitioner's claim that his trial counsel's limited cross-examinations of these witnesses fell within the wide range of appropriate strategic decisions does not support federal *habeas* relief.

### c)  Exclusion of Prosecution Witnesses

Petitioner further argues that his trial counsel should have attempted to preclude several prosecution witnesses from testifying because the prosecutors had failed to provide adequate notice.  (Pet'r App. Br., Dkt. 7-1, at ECF 44–45.)  This argument ignores the fact that defense counsel did argue against allowing these witnesses to testify.  In his application to the Trial Court, Petitioner's counsel explained that he would suffer prejudice from being unable to prepare for these witnesses in light of the late notice, and asked the Trial Court to exclude the witnesses.  (R. at 748–52.)  Then defense counsel made an alternate request in the event the Trial Court rejected the defense's request for exclusion, *i.e.*, that the Trial Court strictly regulate the timing of the testimony of these witnesses in order to allow defense counsel the maximum amount of time to prepare.  (R. at 751–52.)  The Trial Court adopted the defense's alternate request with respect to these witnesses.  (R. at 754–55.)  The Court cannot find that the Appellate Division's determination that trial counsel's efforts constituted adequate, competent representation unreasonable.  Furthermore, Petitioner fails to meet his burden to show that the Trial Court's decision caused him any harm.  *Harrington*, 562 U.S. at 104 ("Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'")

### d)  Double Jeopardy

Finally, Petitioner contends that his trial counsel improperly failed to challenge multiplicitous counts of the indictment.  (Pet'r *Pro Se* Br., Dkt. 7-3, at ECF 6–10.)  Specifically, Petitioner contends that Counts One and Two were multiplicitous with one another, as were Counts Four and Five.  The Appellate Division rejected this claim.  By doing so, the Appellate Division neither unreasonably applied clearly established Supreme Court precedent nor unreasonably determined the facts.

The Double Jeopardy Clause prohibits "any person" from "be[ing] subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Among other things, this provision prohibits prosecutors from punishing or attempting to punish a criminal defendant more than once for the same offense. *See Witte v. United States*, 515 U.S. 389, 396 (1995). To determine whether a criminal defendant has been punished twice for the same offense, courts ask whether each statutory provision requires proof of a fact which the other does not. *See Rutledge v. United States*, 517 U.S. 292, 297 (1996) (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)).

Neither Counts One and Two of the indictment, nor Counts Four and Five of the indictment, constituted multiplicitous charges that violated the Double Jeopardy Clause. Accordingly, trial counsel was not ineffective for failing to raise a double jeopardy objection. The Appellate Division's holding to that effect did not exceed the limits of reasonableness.

Counts One and Two of the indictment were not multiplicitous. Count One charged Petitioner with robbery in the first degree and required proof that Petitioner used or threatened to use a dangerous instrument in the course of the robbery. (R. at 1066.) Although Count Two also charged Petitioner with robbery in the first degree, it required proof that Petitioner displayed what appeared to be a firearm during the course of the robbery. (R. at 1068.) Count One did not require proof that Petitioner displayed a firearm, while Count Two did not require proof that Petitioner used a dangerous instrument. *Compare* N.Y. Penal L. § 160.15(3) (dangerous instrument), *with id.* § 160.15(4) (display of firearm).

Likewise, Counts Four and Five of the indictment were not multiplicitous. Count Four charged burglary in the first degree and required proof that Petitioner used or threatened to use a dangerous instrument. (R. at 1072.) Count Five charged burglary in the first degree and required

60

proof that Petitioner displayed what appeared to be a firearm.  (R. at 1074–75.)  Count Four did not require proof that Petitioner displayed what appeared to be a firearm, while Count Five did not require proof that Petitioner used or threatened to use a dangerous instrument.  *Compare* N.Y. Penal L. § 140.30(3) (dangerous instrument), *with id.* § 140.30(4) (display of firearm).

In sum, neither Counts One and Two nor Counts Four and Five contained multiplicitous counts in violation of the Double Jeopardy Clause.  Any objection on that ground would have failed, and counsel was not ineffective for failing to raise this meritless objection.  *See Lafler*, 566 at 167; *see also Fusco*, 560 F. App'x at 46.  Accordingly, the Appellate Division neither unreasonably applied clearly established Supreme Court precedent nor unreasonably determined the facts by rejecting this claim.

## II.     Ground Two: DNA Evidence

Petitioner's second ground for relief contains five separate sub-claims.  Each relates to the DNA evidence admitted at Petitioner's trial.  (Pet'r App. Br., Dkt. 7-1, at ECF 21–30; Petition, Dkt. 1, at ECF 7.)  First, Petitioner argues that the Trial Court should not have admitted any DNA evidence in light of the inconclusive results.  Second, Petitioner alleges that his trial counsel provided ineffective assistance by failing to move to exclude the DNA evidence.  Third, Petitioner contends that prosecutors mischaracterized the DNA evidence on summation.  Fourth, Petitioner argues that the Confrontation Clause prohibits admission of the DNA evidence absent an opportunity for Petitioner to cross-examine every analyst involved in each step of the DNA evidence processing.  Finally, Petitioner contends that his counsel provided ineffective assistance by failing to raise the preceding Confrontation Clause argument at trial.  None of these arguments entitles Petitioner to relief.

### A.     Admission of DNA Evidence

Petitioner first argues that the prosecution should not have attempted to introduce irrelevant DNA evidence.  As an initial matter, this raises a state law evidence claim which is not cognizable under federal *habeas* review.  *Tyrell v. Lee*, No. 11-CV-3348 (CS) (LMS), 2015 WL 9666334, at *8 (S.D.N.Y. Dec. 14, 2015) ("[W]hether evidence is inadmissible on relevancy grounds is a question of state law.")*; see Scrimo v. Lee*, 935 F.3d 103, 114 (2d Cir. 2019) (holding that federal courts may not grant *habeas* relief for errors of state law, including erroneous rulings applying state evidence law).  However, federal courts may "review an error of state evidentiary law to assess whether the error deprived the petitioner of his due process right to a fundamentally fair trial."  *Freeman v. Kadien*, 684 F.3d 30, 35 (2d Cir. 2012); *see also Vincent v. Bennett*, 54 F. App'x 714, 717 (2d Cir. 2003) (summary order) (citing *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)).  A state law evidence violation becomes a federal constitutional violation if "the evidence was . . . 'so extremely unfair that its admission violate[d] fundamental conceptions of justice.'"  *Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (2010)); *see also Freeman*, 684 F.3d at 35 (quoting *Dowling*, 493 U.S. at 353).  Only a narrow set of evidentiary violations fit within this category.  *See Evans v. Fischer*, 712 F.3d 125, 134 (2d Cir. 2013) (discussing *Dowling*, 493 U.S. at 352 and *McGuire*, 502 U.S. at 72–73).

While a due process challenge is cognizable, this Court cannot say that the Appellate Division unreasonably applied clearly established Supreme Court precedent or unreasonably determined the facts by failing to find that the admission of the DNA evidence rendered Petitioner's trial fundamentally unfair.  First, the DNA test results were relevant to the prosecution's case in that they precluded Petitioner from arguing that the government investigators had failed to conduct DNA testing on the mask and that such testing potentially would have exonerated him.  Second, the weight of the other evidence of Petitioner's guilt—the robbery

victims' identifications both at the lineup and at trial of Petitioner as the First Gunman; the robbery victims' in-court identifications of the ski mask seized from Petitioner's vehicle as the mask worn by the First Gunman; the Father's identification of documents seized from the car Petitioner drove; the cash seized both from that vehicle and Petitioner's jacket pocket; the investigators' identification of the Kia Amanti in which Petitioner was arrested as the same car captured on video fleeing the robbery scene; the cell site evidence showing Petitioner near the victims' residence at the time of the robbery; Petitioner's link to Dexter Lucas based on Petitioner asking Lucas to retrieve the Kia Amanti from the precinct (coupled with Lucas's own links to the robbery and to the registered renter of the car)—was substantial, such that any error in admitting the DNA evidence was harmless. *McPhillips v. New York*, No. 17-CV-1471 (JFB), 2019 WL 102095, at *5 (E.D.N.Y. Jan. 4, 2019) (denying *habeas* petition after affirming Appellate Division's holding that despite the improperly admitted testimony, the error was harmless "because the evidence of defendant's guilt was overwhelming and there was no significant probability that the error contributed to his convictions" (citing *People v. McPhillips*, 133 A.D.3d 785 (N.Y. App. Div. 2015)). Because the Appellate Division did not unreasonably reject Petitioner's claim, the claim does not warrant *habeas* relief.

**B.    Ineffective Assistance of Counsel: Admission of DNA Evidence**

Petitioner contends that his counsel was ineffective for failing to move to exclude the DNA evidence, which showed that Petitioner could not be excluded as a potential contributor, but also could not definitively be matched, to DNA evidence found on the ski mask seized from the vehicle Petitioner drove immediately preceding his arrest. The Trial Court rejected this claim. (Order Denying Petitioner's Second Post-Conviction Motion ("Order Denying 2d Post-Conviction Mot."), Dkt. 7-21, at ECF 7–8.) Its decision did not unreasonably apply clearly established Supreme Court precedent nor did it unreasonably determine the facts.

63

New York courts routinely permit the admission of less-than-conclusive DNA evidence. *See People v. Nance*, 52 N.Y.S.3d 589, 592 (App. Div. 2017) ("[T]he fact that defendant could not be excluded as a contributor to the DNA recovered from the handgun is admissible."); *People v. Schouenborg*, 840 N.Y.S.2d 807, 808 (App. Div. 2007) (rejecting challenge to admissibility of DNA evidence showing "that the complainant could not be excluded as being a contributor to the pattern found in the sample"); *People v. Watley*, 667 N.Y.S.2d 376, 376 (App. Div. 1997) (rejecting challenge to admissibility of DNA evidence where "the only truly accurate impression to be drawn from the DNA testing was that neither the [defendant] [n]or the victim can be excluded as being a contributor to the overall [genetic] pattern found in the samples"); *see also People v. Lipford*, 11 N.Y.S.3d 763, 765 (App. Div. 2015) (listing inconclusive DNA evidence as a factor contributing to the corroboration of accomplice testimony); *People v. Roosevelt*, 3 N.Y.S.3d 544, 547 (App. Div. 2015) (finding an unrelated suppression error to be harmless in part due to evidence showing that defendant "could not be excluded as a contributor to DNA recovered from the gun"). Furthermore, as discussed, even though inconclusive, the DNA test results had probative value, if only to rebut the suggestion that no tests were run or that such tests exonerated Petitioner.

Thus, defense counsel was not ineffective for failing to raise this meritless objection, *see Lafler*, 566 U.S. at 167; *see also Fusco*, 560 F. App'x at 46, and the Trial Court did not unreasonably uphold trial counsel's strategic decision not to challenge the admission of that evidence.

### C.    Prosecution's Summation Comments About the DNA Evidence

Petitioner next argues that the prosecution's comments during summation mischaracterized the DNA evidence.  The Appellate Division rejected this claim.  *Totesau*, 977 N.Y.S.2d at 365–66.  Because the state courts did not unreasonably apply clearly established Supreme Court

precedent and did not unreasonably determine the facts, this Court upholds the state courts' decisions.

As discussed earlier, *see part* I.A.2, *supra*, even a prosecution's improper summation comments will not warrant reversal unless they also violate due process—that is, unless the comments amount to egregious misconduct that taints the entire trial with unfairness. *See Jackson*, 763 F.3d at 146 (applying clearly established Supreme Court precedent). Additionally, even egregious comments that would warrant reversal on direct appeal still will not entitle a federal *habeas* petitioner to relief unless the state court's ruling unreasonably denied the petitioner's due process claim. *Parker v. Matthews*, 567 U.S. 37, 47–48 (2012)*.* Among other things, courts must consider whether the prosecution's comments mischaracterized or misstated the evidence in the record. *See Griggs v. Lempke*, 797 F. App'x 612, 616–17 (2d Cir. 2020) (summary order) (applying *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).

The prosecution's discussion of the DNA evidence neither mischaracterized nor misstated the record. The evidence at trial illustrated that the DNA profile developed from the ski mask seized during Petitioner's arrest showed that the mask contained genetic material from a minimum of two people, at least one of whom was male, and neither of whom was Lucas. (R. at 636, 642–43, 650, 654–55.) The Nassau County Medical Examiner's Office DNA analyst testified that Petitioner "can be included as a contributor to the mixture in the black ski mask . . . . [In other words,] the alleles found in the DNA profile of [Petitioner] were found in the mixture that was found on the black ski mask." (R. at 635–36.) The prosecution's summation comments reflected, rather than misstated, the inconclusive nature of the DNA evidence. The prosecution repeatedly mentioned that Petitioner "can be included" or "can't be excluded" as a contributor to the DNA

found on the mask, while Dexter Lucas could be eliminated.  (R. at 998–99, 1001, 1013, 1028–29, 1034.)

Petitioner expressed particular concern about the prosecution's allegation that Petitioner's "alleles" were "all over" the black ski mask.  But prosecutors never said that.  The closest they came was the argument that: "[Petitioner]'s alleles, the area of wear in the mask.  He's present at every location."  (R. at 1029.)  This accurately reflected the testimony of the DNA analyst:

> We did a direct comparison of the alleles that were found for each of the locations on the ski mask area of wear and the DNA alleles were again to the locations for [Petitioner] and we saw that the alleles that were present on the buccal swab were also present on the ski mask area of wear.

(R. at 642.)

Because the prosecution's summation accurately described the DNA evidence adduced at trial, the Appellate Division's finding was not unreasonable.  Accordingly, Petitioner is not entitled to *habeas* relief based on this claim.

### D.      Confrontation Clause

Petitioner further contends that he suffered a Confrontation Clause violation when the prosecution introduced DNA evidence without allowing Petitioner to cross-examine every individual involved with the processing of that evidence.  The Trial Court rejected this argument, finding that (1) Petitioner had procedurally defaulted his claim and (2) the claim failed on its merits.[41]  (Order Denying 2d Post-Conviction Mot., Dkt. 7-21, at ECF 5–7.)  This Court rejects the claim both because the claim is procedurally defaulted, and the Trial Court did not

---

[41] Petitioner did not appeal the Trial Court's decision.  (Pet., Dkt. 1, at ECF 8.)  That failure renders the claim unexhausted.  *See LaRosa v. Kirkpatrixk*, No. 15-CV-07008 (JMA), 2019 WL 1458252, at *12 (E.D.N.Y. Mar. 31, 2019).  The Court exercises its discretion to review the claim, notwithstanding Petitioner's failure to exhaust his state court remedies.  *See* 28 U.S.C. § 2254(b)(2).

unreasonably determine that the introduction of the DNA evidence did not violate the Confrontation Clause.

1.   Procedural Default

First, the Court rejects Petitioner's Confrontation Clause claim because he has procedurally defaulted that claim in state court.  "[A] federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule."  *Davila*, 137 S. Ct. at 2064.  "'To qualify as an adequate procedural ground,' capable of barring federal habeas review, 'a state rule must be firmly established and regularly followed.'"  *Johnson*, 578 U.S. at 608 (quoting *Walker v. Martin*, 562 U.S. 307, 316 (2011)).  NYCPL § 440.10(3)(a) constitutes just such an independent and adequate state procedural rule which operates to bar federal *habeas* relief.  *See Rivera v. Griffin*, No. 15-CV-2657 (EK), 2020 WL 5848643, at *12 (E.D.N.Y. Sept. 30, 2020).

In addition to denying the claim on its merits, the Trial Court rejected the claim pursuant to NYCPL § 440.10(3)(a).  (Order Denying 2d Post-Conviction Mot., Dkt. 7-21, at ECF 6–7.)  Although the court also addressed and rejected the claim's merits, the Trial Court's alternative holding does not permit Petitioner to escape the procedural default.  *See Galdamez v. Keane*, 394 F.3d 68, 77 (2d Cir. 2005).  Because Petitioner's procedural default bars *habeas* relief, the Court rejects Petitioner's Confrontation Clause claim.

2.   Merits

Second, even if Petitioner had not procedurally defaulted his Confrontation Clause claim, his arguments would not entitle him to relief because the Trial Court's decision finding no Confrontation Clause violation neither unreasonably applied clearly established Supreme Court precedent nor unreasonably determined the facts.

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend VI.  Known as the Confrontation Clause, this constitutional provision generally prohibits the use of testimonial statements against a criminal defendant unless that defendant has an opportunity to cross-examine the maker of the statement. *See Crawford v. Washington*, 541 U.S. 36, 68–69 (2004); *see also Whorton v. Bockting*, 549 U.S. 406, 413 (2007) ("[O]ur opinion in *Crawford* . . . held that '[t]estimonial statements of witnesses absent from trial' are admissible 'only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine [the witness].'" (quoting *Crawford*, 541 U.S. at 59)).  Statements are "testimonial" when their "primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution." *Ohio v. Clark*, 576 U.S. 237, 244 (2015) (citing *Davis v. Washington*, 547 U.S. 813, 822 (2006)).  "[W]hen a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the primary purpose of the [statement] by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the [statement] occurs." *Michigan v. Bryant*, 562 U.S. 344, 370 (2011).

As relevant here, the Confrontation Clause applies to the out-of-court statements of expert witnesses conducting scientific analysis of forensic evidence.  For instance, an affidavit of a state laboratory analyst, swearing that the analyst chemically tested a particular substance and found it to contain a prohibited narcotic, constitutes a testimonial statement such that the affidavit may not be admitted into evidence absent an opportunity for the criminal defendant to cross-examine the analyst. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 (2009).  These affidavits constitute testimonial statements because they "are incontrovertibly a 'solemn declaration or affirmation made for the purpose of establishing or proving some fact,'" *id.* (quoting *Crawford*,

541 U.S. at 51), and because "the affidavits [were] 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,'" *id.* (quoting *Crawford*, 541 U.S. at 52).  A signed statement attesting to an analysis of the blood-alcohol content of a defendant's blood sample likewise qualifies as a testimonial statement to which the Confrontation Clause applies.  *See Bullcoming v. New Mexico*, 564 U.S. 647, 663–65 (2011).  These statements are "'formalized' in a signed document," *id.* at 665 (quoting *Davis*, 547 U.S. at 837 n.2), which was "created solely for an 'evidentiary purpose' [and] made in aid of a police investigation," *id.* at 664 (quoting *Melendez-Diaz*, 557 U.S. at 311).

However, not everyone "whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case." *Melendez-Diaz*, 557 U.S. at 311 n.1.  This is especially true with regard to DNA evidence.  In a recent federal *habeas* decision, the Second Circuit characterized clearly established Supreme Court precedent[42] as follows: "The Supreme Court has never held that the Confrontation Clause requires an opportunity to cross examine each lab analyst involved in the process of generating a DNA profile and comparing it with another, nor has it held that uncertified, unsworn notations of the sort at issue here are testimonial." *Washington v. Griffin*, 876 F.3d 395, 407 (2d Cir. 2017).  A plurality of the Supreme Court has noted that "in many labs, numerous technicians work on each DNA profile.  When the work of a lab is divided up in such a way, it is likely that the sole purpose of each technician is simply to perform his or her task in accordance with accepted procedures." *Williams v. Illinois*, 567 U.S. 50, 85 (2012) (plurality opinion)

---

[42] A lower court may, "in accordance with its usual law-of-the-circuit procedures, look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

(citations omitted).[43]   Given this primary purpose, the analysts' notes and written materials concerning their preliminary role in the DNA analysis would not constitute testimonial statements to which the Confrontation Clause applied.  *See Clark*, 576 U.S. at 244; *Bryant*, 562 U.S. at 370.

When analyzing Confrontation Clause claims brought against DNA evidence, decisions in this district have held that the clearly established Supreme Court precedent[44] governing these claims entitles a criminal defendant to cross-examine only one person: the DNA analyst who actually rendered an expert opinion concerning the DNA testing.  *See Beckham v. Miller*, 366 F. Supp. 3d 379, 385 (E.D.N.Y. 2019) ("By having the opportunity to cross-examine the criminalist who performed the final step of linking [petitioner's] DNA to the crime scene DNA evidence— the only accusatory step of the entire testing process and the step most helpful to criminal prosecution—[petitioner's] right to confrontation was satisfied."); *Pitre v. Griffin*, No. 16-CV-6258 (BMC), 2016 WL 7442653, at *9 (E.D.N.Y. Dec. 26, 2016) ("Here, petitioner had the opportunity to cross-examine the only expert that expressed an opinion to the jury tying the victim's DNA to petitioner's clothing . . . . At this point in the development of the law on the right to confrontation over DNA testing, no Supreme Court precedent requires more.")  One decision

---

[43] The Second Circuit has suggested that the 4-1-4 split decision in *Williams* means that *Williams* contains no holding that can constitute clearly established Supreme Court precedent for federal *habeas* purposes.  *See Garlick v. Lee*, 1 F.4th 122, 133 (2d Cir. 2021).  But that does not make *Williams* entirely inapplicable to Petitioner's case.  To the contrary, the absence of a holding in *Williams* underscores the Second Circuit's conclusion in *Washington*, 876 F.3d at 407, that no clearly established Supreme Court precedent requires the live testimony of every analyst involved in the processing of DNA evidence.  If a plurality of the Supreme Court suggests that the Confrontation Clause does *not* require such live testimony, then this suggests that no clearly established Supreme Court precedent holds that the Confrontation Clause *does* require such live testimony.  *Cf. Edwards v. Goord*, 362 F. App'x 195, 199 (2d Cir. 2010) (summary order) (holding that a fractured Supreme Court decision does not constitute clearly established Supreme Court precedent sufficient to justify federal *habeas* relief).

[44] Again, this is a permissible use of lower court precedent.  *See Rodgers*, 569 U.S. at 64.

went so far as to explain that it is this expert analysis—not the preliminary steps, such as the physical manipulation of evidence, application of chemicals, recording of readings, etc.—that "amount[s] to the performance of a DNA test." *Sanders v. Fischer*, No. 16-CV-4832 (MKB), 2021 WL 3373127, at *8 (E.D.N.Y. Aug. 3, 2021).

Petitioner cannot show that the Trial Court unreasonably rejected Petitioner's Confrontation Clause claim. Petitioner contends that NCPD's DNA analyst could not properly have testified to the steps other analysts undertook to process the evidence for DNA testing and that the prosecution was required to produce each of those analysts for cross-examination. This claim cannot succeed because, as the Second Circuit has explained, no clearly established Supreme Court precedent has created the Confrontation Clause principle that Petitioner seeks to apply here. *See Washington*, 876 F.3d at 407. In Petitioner's case, the Confrontation Clause right to cross-examination attached to only a single person[45]—the NCPD DNA analyst. Prosecutors produced her at trial, giving Petitioner's defense counsel an opportunity to cross-examine her. (R. at 644.) "At this point in the development of the law on the right to confrontation over DNA testing, no Supreme Court precedent requires more." *Pitre*, 2016 WL 7442653, at *9. The Trial Court's holding to that effect did not unreasonably apply clearly established Supreme Court precedent.

However, Petitioner goes further, arguing that even if the Confrontation Clause entitles him to cross-examine only the individual who rendered an expert opinion concerning the DNA comparisons, the NCPD DNA analyst who testified was not that individual. According to Petitioner, the testifying analyst played no role in the DNA analysis and merely regurgitated the

---

[45] Petitioner does not challenge any of the DNA evidence presented during the testimony of the New York City DNA analyst. Therefore, this Court has no occasion to analyze whether Petitioner's Confrontation Clause right of cross-examination attached to her or to any other analysts in New York City's Office of the Chief Medical Examiner.

results of others to the jury.  The Court disagrees.  The NCPD DNA analyst testified that her "duties include all aspects of DNA testing, evidence examination, [and] reporting writings and findings."  (R. at 610.)  Critically, she expressed her expert opinion that Dexter Lucas could not have been a contributor to the DNA found on the ski mask and that Petitioner could not be excluded, but could not be definitively matched.  (R. at 635.)  Because she—and not some other analyst—compared the DNA profiles and offered her expert opinion about their consistency or inconsistency, the Trial Court did not unreasonably determine the facts when it decided that the NCPD DNA analyst was the appropriate person to testify (and sit for cross-examination) concerning the DNA evidence in Petitioner's case.

In sum, no clearly established Supreme Court precedent holds that the Confrontation Clause entitles a criminal defendant to cross-examine each analyst involved in the preliminary stages of forensic evidence processing.  "*Williams* leaves this area of the law muddled, and AEDPA requires reasonable clarity if habeas relief is to be granted."  *Pitre*, 2016 WL 7442653, at *9.  Additionally, evidence in the record supports the Trial Court's determination that the NCPD DNA analyst was the appropriate official for Petitioner to cross-examine concerning the DNA evidence.  Because the Trial Court neither unreasonably applied clearly established Supreme Court precedent nor unreasonably determined the facts, this Court must reject Petitioner's Confrontation Clause claim with respect to the DNA analysis.

### E.   Ineffective Assistance of Counsel: Confrontation Clause

Finally, Petitioner contends that his trial counsel provided ineffective assistance by failing to raise the preceding Confrontation Clause objection.[46]  The Trial Court rejected this claim,

---

[46] The Court proceeds without deciding whether Petitioner's claim is procedurally defaulted.  In addition to rejecting this claim on the merits, the Trial Court rejected this claim pursuant to NYCPL § 440.30(4)(d).  (Order Denying 2d Post-Conviction Mot., Dkt. 7-21, at ECF 9.)  District courts in this circuit disagree on whether a state court's reliance on this provision of

finding that trial counsel performed effectively with regard to the DNA evidence.  (Order Denying 2d Post-Conviction Mot., Dkt. 7-21, at ECF 7–8.)  This Court denies Petitioner's claim because he suffered no prejudice from trial counsel's failure to raise a Confrontation Clause objection to the NCPD DNA analyst's testimony.[47]

As previously discussed, "[t]o prevail on a Sixth Amendment claim alleging ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient and that his counsel's deficient performance prejudiced him[,]" *Andrus v. Texas*, 140 S. Ct. 1875, 1881 (2020), and a claimant "raising such a claim can demonstrate prejudice by showing 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Lee*, 137 S. Ct. at 1964 (quoting *Roe v. Flores–Ortega*, 528 U.S. 470, 482 (2000)).

Petitioner cannot demonstrate any such prejudice.  The testimony of the NCPD DNA analyst—the only witness to whom Petitioner contends his Confrontation Clause claim applies—demonstrated merely that Petitioner was among over a billion people who could have deposited their DNA on the ski mask found with Petitioner upon his arrest.  While the analyst's testimony

---

New York law constitutes an independent and adequate state procedural ground that bars federal *habeas* review.  *See Errington v. Warden, Bedford Hills Corr. Facility*, 17-CV-258 (EAW), 2019 WL 3556683, at *6 & n.3 (W.D.N.Y. Aug. 5, 2019).  Courts are free to sidestep a complicated procedural default analysis when they are able to straightforwardly resolve the merits of the underlying claim against a *habeas* petitioner.  *See Dunham v. Travis*, 313 F.3d 724, 729–30 (2d Cir. 2002) (citing *Lambrix v. Florida*, 520 U.S. 518, 523 (1997)).  The Court opts to address the merits of this claim, notwithstanding the possibility that Petitioner has procedurally defaulted this claim.

[47] The Court conducts a *de novo* prejudice analysis without using the deferential framework of 28 U.S.C. § 2254 because when, as here, a state "[c]ourt d[oes] not reach the prejudice issue" in a claim for ineffective assistance of counsel, a federal court choosing to resolve the case on the prejudice prong of the ineffective assistance framework must "examine de novo whether [the claimant's] defense was constitutionally prejudiced by trial counsel's conduct."  *Garner v. Lee*, 908 F.3d 845, 861 (2d Cir. 2018).

also excluded Dexter Lucas from that population, this was a relatively minor point in the prosecution's case, considering that police found the mask in the vehicle Petitioner was driving. The Court also considers the wealth of additional evidence against Petitioner that would have remained unaffected by any Confrontation Clause claim: the robbery victims' identifications, both at the lineup and at trial, of Petitioner as the First Gunman; the robbery victims' in-court identifications of the ski mask seized from Petitioner's vehicle as the mask worn by the First Gunman; the Father's identifying documents; the cash seized from the car Petitioner drove; the investigators' identification of the Kia Amanti in which Petitioner was arrested as the same car captured on video fleeing the robbery scene; the cell site evidence showing Petitioner near the victims' residence at the time of the robbery; Petitioner's link to Dexter Lucas based on Petitioner asking Lucas to retrieve the Kia Amanti from the police precinct (coupled with Lucas' own links to the robbery and to the registered renter of the car).  Given the minimal impact of the DNA testimony and the strength of the remaining evidence, Petitioner cannot show that he suffered any prejudice.

*     *     *

In sum, Petitioner is not entitled to *habeas* relief based on any of his DNA-related arguments.

## III.    Ground Three: Identifications and Bolstering

Petitioner's third ground appears to allege two separate sub-claims: first, that the prosecution elicited improper testimony to bolster the eyewitnesses' identifications of Petitioner as the First Gunman, and second, that the prosecution violated *Brady v. Maryland*,[48] given the

---

[48] *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

74

discrepancies between the victims' testimony at Petitioner's trial compared with their testimony at Dexter Lucas's subsequent trial.  (Pet., Dkt. 1, at ECF 8–10.)  Neither claim entitles Petitioner to *habeas* relief.

### A.    Bolstering

In Petitioner's counseled brief on direct appeal, Petitioner argued that the prosecution improperly bolstered the eyewitness identification testimony by presenting additional testimony from (1) police officers present at the lineup, who described the lineup procedures, and (2) both police officers and participants in the lineup, who described the fear and palpitation the eyewitnesses felt and exhibited during the lineup.  (Pet'r App. Br., Dkt. 7-1, at ECF 48–56.)  The Appellate Division explicitly rejected this claim, finding it "unpreserved for appellate review, and, in any event, without merit."  *Totesau*, 977 N.Y.S.2d at 366.  This Court rejects this claim because "bolstering" errors constitute state law violations that are not cognizable on federal *habeas* review.[49]  *See Ramos v. Lee*, No. 19-CV-1125 (JS), 2021 WL 3269237, at *13 (E.D.N.Y. July 30, 2021) (collecting cases); *Hernandez v. Superintendent of Clinton Corr. Facility*, No. 19-CV-5832 (BMC), 2019 WL 6716738, at *4 (E.D.N.Y. Dec. 10, 2019) (collecting cases); *Delancey v. Lee*, No. 15-CV-891 (RRM) (CLP), 2019 WL 9051134, at *22 (E.D.N.Y. Nov. 4, 2019) (collecting cases), *report and recommendation adopted*, 2020 WL 3084285 (E.D.N.Y. June 10, 2020); *Vasquez v. LaClair*, No. 13-CV-7136 (AMD), 2018 WL 3193205, at *7 (E.D.N.Y. June 28, 2018) (collecting cases).

---

[49] If the claim were cognizable on federal *habeas* review as a general matter, the claim would nonetheless not be reviewable in Petitioner's case because he procedurally defaulted the claim by failing to preserve it for appellate review.  *See, e.g.*, *Newmark v. Keyser*, No. 19-CV-3611 (BMC), 2020 WL 4719914, at *7 (E.D.N.Y. Aug. 13, 2020).

In Petitioner's first post-conviction motion, Petitioner argued that his trial counsel was ineffective for failing to make any "bolstering" objections to certain police testimony.  (Pet'r 1st Post-Conviction Mot., Dkt. 7-15, at ECF 28–30, 34, 37.)  The Trial Court did not explicitly address any claims related to bolstering.[50]  (*See* Order Denying 1st Post-Conviction Mot., Dkt. 7-18.)  The Court rejects Petitioner's argument because any bolstering objections would have failed, and Petitioner's counsel cannot be ineffective for failing to make meritless objections.  *See Lafler*, 566 U.S. at 167; *see also Fusco*, 560 F. App'x at 46.

Under New York law, "[h]earsay, of course, is an out-of-court statement admitted for the truth of the matter asserted, and the hearsay rule generally prohibits the introduction of such statements at [a criminal] trial."  *People v. Slade*, 170 N.E.3d 1189, 1198 (N.Y. 2021) (internal citations omitted).  New York's hearsay rule also prohibits so-called "bolstering," defined[51] as "the testimony of a third party (typically, a police officer) to the effect that the witness identified a defendant as the perpetrator on some prior occasion."  *People v. Spicola*, 947 N.E.2d 620, 626 (N.Y. 2011) (quoting *People v. Buie*, 658 N.E.2d 192, 197 (N.Y. 1995)).  However, no prohibited bolstering occurs when police merely describe the lineup process and procedures without repeating the identification of the eyewitness.  *See People v. Rumpf*, 940 N.Y.S.2d 769, 771 (App. Div. 2012); *People v. Tucker*, 807 N.Y.S.2d 85, 86 (App. Div. 2006).  Likewise, no improper bolstering occurs when a police witness describes an eyewitness's account of the crime provided to police shortly after the crime's commission because the eyewitness's hearsay statement is "admitted not for the

---

[50] Accordingly, the Court assumes without deciding that it must apply *de novo* review rather than the deferential framework of 28 U.S.C. § 2254(d).  *See* note 47, *supra*.

[51] A second, unrelated form of "bolstering" consists of "the fortification of a witness's testimony and credibility through the use of a prior consistent statement."  *Spicola*, 947 N.E.2d at 626.  This type of bolstering is not at issue here.

truth or accuracy of the prior description, but as 'evidence that assists the jury in evaluating the [eye]witness's opportunity to observe at the time of the crime, and the reliability of her memory.'" *People v. Smith*, 5 N.E.3d 972, 974 (N.Y. 2013) (quoting *People v. Huertas*, 553 N.E.2d 992, 996 (N.Y. 1990)).  Finally, when a police witness explains the investigative steps he or she took in response to receiving information from a fellow officer, the witness's repetition of the fellow officer's hearsay statement does not violate either the hearsay or bolstering rules.  *See People v. Gates*, 829 N.Y.S.2d 330, 331 (App. Div. 2007); *People v. Tanksley*, 685 N.Y.S.2d 86, 87 (App. Div. 1999).

Petitioner's first argument is that his trial counsel should have objected to a detective's testimony reciting what he learned from other police officers upon responding to the robbery.  An objection on the grounds of improper hearsay or improper bolstering would have failed because the detective's knowledge of what he learned from other officers provided context for the jury to understand why the detective undertook the subsequent steps in the police investigation.  *Gates*, 829 N.Y.S.2d at 331; *see also Vasquez v. Morton*, No. 18-CV-05502 (JPO) (RWL), 2019 WL 12336230, at *10 (S.D.N.Y. Oct. 9, 2019), *report and recommendation adopted*, 2021 WL 2156977 (S.D.N.Y. May 27, 2021).

Petitioner also contends that his defense counsel should have raised an objection to the same detective's testimony that one of the female victims had told police that she observed, through an upstairs window, the perpetrators' flight from the residence.  Any objection on the ground of improper hearsay or improper bolstering would have failed because the female victim's hearsay statement provided context for the detective's non-hearsay testimony that he looked through the same window and was able to confirm the line-of-sight that that window provided.

Finally, Petitioner contends that his trial counsel should have objected, on the ground of improper bolstering, to the testimony of multiple police officers describing the lineup procedures. No such objection could have succeeded.  First, the officers' testimony did not repeat the victims' identification.   Second, the officers' testimony largely—and permissibly—described the lineup process and procedures.   Third, to the extent Petitioner claims that police officers and participants in the lineup testified at trial about the fear and palpitation the eyewitnesses felt and exhibited during the lineup (Pet'r Counseled App. Div. Br., Dkt. 7-1, at ECF 48–56), counsel's failure to object does not constitute ineffective assistance of counsel.   Petitioner cites to *People v. Zanfordino*, 432 N.Y.S.2d 15 (App. Div. 1980) for this proposition, however, it is distinguishable in two important ways. First, as to the officer's testimony, the testimony did not relate to the Older Son's "extreme physical reaction upon seeing the defendant," *id.*, at 15, rather, the son's nervousness at "being part of that situation" (R. at 776–77).   Second, even if testimony regarding the Older Son's fear and nervousness can be considered improper bolstering, Petitioner's claim still fails because "the evidence of identity is so strong that there is no serious issue upon the point." *People v. Caserta*, 19 N.Y.2d 18, 21 (1966); *People v. Johnson*, 57 N.Y.2d 969, 970–82 (1982); *cf. Zanfordino*, 432 N.Y.S.2d at 15 ("Because we cannot say that the evidence of identity is so strong that there is no serious issue upon the point, the defendant must have a new trial" (internal citations and quotation marks omitted)).   As discussed at length above, the lineup identifications of both the Mother and Daughter (R. at 316–18, 342–45, 361–63), along with police finding Petitioner in a car matching the description of the vehicle at the crime scene in possession with the Father's driving license (R. at 504–17), all served as a sufficient basis for the state courts to conclude "that there [was] no significant probability . . . in the particular case that the jury would have acquitted the defendant had it not been for the error or errors which occurred," *Johnson*, 57

N.Y.2d at 970 (internal alterations omitted) (citing *People v Crimmins*, 36 NY2d 230, 242 (N.Y. 1975). Given "the challenged testimony was harmless in light of the overwhelming evidence of the petitioner's guilt," counsel's failure to object does not constitute ineffective assistance of counsel. *Santana v. Capra*, 284 F. Supp. 3d 525, 543 (S.D.N.Y. Jan. 11, 2018).

In sum, while Petitioner faults his trial counsel for failing to raise hearsay and bolstering objections to these portions of the police witnesses' testimony, the objections would not have succeeded, and trial counsel therefore was not ineffective for failing to raise these meritless objections. *See Lafler*, 566 U.S. at 167 ("Because the objection upon which his ineffective-assistance-of-counsel claim was premised was meritless, [Petitioner] could not demonstrate an error entitling him to relief."). The Court accordingly rejects Petitioner's bolstering-related claims of ineffective assistance.

### B.    Brady Claim

In his first post-conviction motion, Petitioner argued that due to discrepancies between the victims' testimony at Petitioner's trial, compared with their testimony at Dexter Lucas's subsequent trial (especially concerning the victims' identification of Petitioner),[52] the transcripts of Lucas's trial constituted exculpatory evidence that the prosecution withheld in violation of *Brady*. (Pet'r 1st Post-Conviction Mot., Dkt. 7-15, at ECF 51–55.) The Trial Court did not explicitly address this claim in denying Petitioner's first post-conviction motion.[53] (*See* Order

---

[52] Given the records from Dexter Lucas's trial were sealed at the time of Petitioner's post-conviction motion, (*see* State's 1st Post-Conviction Opp'n, Dkt. 7-16, at ECF 47), the specific discrepancies between the testimony at both trials is unclear, (*see* Pet'r 1st Post-Conviction Mot., Dkt. 7-15, at ECF 51–52). Petitioner fails to provide any specific instances and does not set forth how he learned about the alleged discrepancies. (*See* Pet'r 1st Post-Conviction Mot., Dkt. 7-15, at ECF 51–52).

[53] Accordingly, the Court assumes without deciding that it must apply *de novo* review rather than the deferential framework of 28 U.S.C. § 2254(d). *See* note 47, *supra*.

Denying 1st Post-Conviction Mot., Dkt. 7-18.)  However, because Lucas's trial occurred after Petitioner's trial concluded—and therefore after the prosecution's disclosure obligations had ended—the Court rejects this claim.

The prosecution "violates the Constitution's Due Process Clause 'if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment.'" *Turner v. United States*, 137 S. Ct. 1885, 1888 (2017) (emphasis removed) (quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012)).  Prosecutors must disclose *Brady* material "in a manner that gives the defendant a reasonable opportunity either to use the evidence in the trial or to use the information to obtain evidence for use in the trial."  *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007).  However, "[t]he Supreme Court has held that post-conviction defendants do not have a constitutional right to disclosure of exculpatory evidence in the way that pre-conviction defendants do pursuant to [*Brady*]."  *Pierre v. Doorley*, 830 F. App'x 58, 59 (2d Cir. 2020) (summary order) (citing *Dist. Atty's Office for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 69 (2009)).  The natural consequence of this holding is that *Brady* does not apply to statements that did not exist until after a criminal defendant's trial.  *See United States v. Santos*, 486 F. App'x 133, 135 n.1 (2d Cir. 2012).

There is no dispute that Dexter Lucas's trial occurred after Petitioner's own trial.  (Pet'r 1st Post-Conviction Mot., Dkt. 7-15, at ECF 51; State's 1st Post-Conviction Opp'n, Dkt. 7-16, at ECF 46–47.)  Accordingly, the testimony from Lucas's trial cannot constitute *Brady* material because it did not exist at the time of Petitioner's trial.  Because the prosecution's *Brady* obligations ceased following Petitioner's conviction, the Court rejects Petitioner's *Brady* claim.[54]

## IV.    Ground Four: Ineffective Assistance of Counsel (Plea Offer)

---

[54] Furthermore, there is nothing in the record to suggest that the prosecution, prior to Petitioner's trial, had or withheld statements that were identical or similar to the victims' testimony at Lucas's trial that Petitioner argues is *Brady* material.

Petitioner's final ground for relief concerns the allegedly ineffective advice he received from his pretrial and trial counsel, who, according to Petitioner, both failed to advise him of his total sentencing exposure should he be found guilty at trial and failed to advise him to accept an offer that he plead guilty in exchange for a sentence of twelve years' incarceration.  (Pet., Dkt. 1, at ECF 10–11.)  Petitioner brought this claim in his third post-conviction motion.  (Pet'r 3d Post-Conviction Mot., Dkt. 7-25, at ECF 9–13.)  The Trial Court found the claim barred by NYCPL § 440.10(3)(c) and also rejected the claim on its merits.  (Order Denying 3d Post-Conviction Mot., Dkt. 7-28, at ECF 4–5.)  This Court rejects this claim as procedurally defaulted.  Were the claim not procedurally defaulted, the claim would fail on the merits.

## A.   Procedural Default

"[A] federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule."  *Davila*, 137 S. Ct. at 2064.  "'To qualify as an adequate procedural ground,' capable of barring federal habeas review, 'a state rule must be firmly established and regularly followed.'"  *Johnson v. Lee*, 578 U.S. at 608 (quoting *Walker v. Martin*, 562 U.S. 307, 316 (2011)).  As discussed, NYCPL § 440.10(3)(c) constitutes an independent and adequate state procedural rule sufficient to bar federal *habeas* review.  *See Murden v. Artuz*, 497 F.3d 178, 192 (2d Cir. 2007).

The Trial Court's decision rejecting Petitioner's claim explicitly relied on this provision of New York law to reject Petitioner's claim.  (Order Denying 3d Post-Conviction Mot., Dkt. 7-28, at ECF 4–8.)  Therefore, this Court must likewise reject this claim as procedurally defaulted.

Petitioner offers three counter-arguments to this conclusion: (1) the Trial Court did not clearly and expressly rely on the state procedural rule; (2) the ineffective assistance of Petitioner's appellate counsel constitutes cause excusing the default and that Petitioner suffered prejudice as a

result; and (3) this Court should ignore the procedural default because the Trial Court engaged in an "exorbitant application," *Whitley v. Ercole*, 642 F.3d 278, 287 (2d Cir. 2011) (internal quotation marks omitted), of a state procedural rule (Pet'r Reply Br., Dkt. 11, at 12–14; Pet., Dkt. 1, at ECF 10).  None are persuasive.

1.   <u>Clear and Express Invocation of the State Procedural Rule</u>

First, Petitioner contends that the Trial Court did not invoke the state procedural rule with sufficient clarity to bar this Court's consideration of his claim.  (Pet'r Reply Br., Dkt. 11, at ECF 12–13.)  This Court disagrees.

"[F]or th[e] procedural default rule to apply, the state court must have 'clearly and expressly state[d] that its judgment rest[ed] on a state procedural bar.'  In other words, 'it must be clear from the face of the opinion' that the state court's decision rest[ed] on a state procedural bar." *Garner v. Lee*, 908 F.3d 845, 859 (2d Cir. 2018) (quoting *Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 118 (2d Cir. 2015) (emphasis removed).

No ambiguity is present here.   The Trial Court expressly referenced NYCPL § 440.10(3)(c).  (Order Denying 3d Post-Conviction Mot., Dkt. 7-28, at ECF 4.)  Additionally, the Trial Court explained that Petitioner "could have raised the issue set forth in this [third post-conviction motion] on the second [post-conviction motion] but failed to do so."  (*Id.* at 5.)  The Trial Court's caselaw citation following that sentence references an Appellate Division decision that itself affirms a Trial Court's "deni[al] [of a] defendant's [post-conviction] motion alleging ineffective assistance of counsel, on the ground that [the] defendant had filed a previous [post-conviction] motion and could have raised the issues set forth in the second application on the first but failed to do so." *People v. Dominguez*, 685 N.Y.S.2d 14, 15 (App. Div. 1999) (citing NYCPL § 440.10(3)(c)).

The Trial Court's alternative merits holding does not alter this analysis.  "[W]here a state court explicitly says that a particular claim fails for a procedural reason, but still reaches the merits, that claim remains procedurally barred."  *Galdamez v. Keane*, 394 F.3d 68, 77 (2d Cir. 2005).  The Trial Court clearly and expressly imposed a procedural default, which bars this Court's review of this claim.

### 2.    Cause for the Default and Resulting Prejudice

Second, Petitioner alleges that a procedural default should not bar federal *habeas* review of this claim because the state court default is the result of the ineffective assistance of his appellate counsel.  (Pet., Dkt. 1, at ECF 10.)  This Court disagrees because Petitioner has failed to present this claim to the state courts.  When a federal *habeas* petitioner procedurally defaults a claim in state court, "[t]he bar to federal review may be lifted . . . if 'the prisoner can demonstrate cause for the [procedural] default [in state court] and actual prejudice as a result of the alleged violation of federal law.'"  *Maples v. Thomas*, 565 U.S. 266, 280 (2012) (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).  However, "ineffective assistance of appellate counsel claims cannot constitute 'cause' for procedural default unless first presented in state court as an independent constitutional claim."  *DiSimone v. Phillips*, 461 F.3d 181, 191 (2d Cir. 2006).  Petitioner has not done so, and therefore cannot rely on ineffective assistance of counsel to excuse the procedural default.

### 3.    Exorbitant Application of a State Procedural Rule

Finally, Petitioner contends that the Trial Court lacked statutory authority to adjudicate his third post-conviction motion without a hearing.  (Pet'r Reply Br., Dkt. 11, at ECF 5–7.)  Put another way, Petitioner contends that the procedural default should not bar federal *habeas* review

of this claim because the state court misapplied the state procedural rule. The Court rejects this argument.

Federal courts will adjudicate the merits of a state prisoner's procedurally defaulted claim only in "a 'limited category' of 'exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question.'" *Walker v. Martin*, 562 U.S. 307, 316 n.4 (2011) (quoting *Lee v. Kemna*, 534 U.S. 362, 376 (2002)). An "exorbitant" application of a state procedural rule will generally involve "'unique' facts and . . . 'extraordinary circumstances.'" *Whitley*, 642 F.3d at 287 (quoting *Kemna*, 534 U.S. at 376). Courts "evaluate whether a case presents such an [exorbitant application of a state procedural rule] by reference to three useful, but non-exclusive, considerations, or 'guideposts.'" *Kozlowski v. Hulihan*, 511 F. App'x 21, 25 (2d Cir. 2013) (summary order). They are:

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision;
>
> (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and
>
> (3) whether petitioner had substantially complied with the rule . . . and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

*Fulton v. Graham*, 802 F.3d 257, 262 (2d Cir. 2015) (quoting *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003)). However, these "guideposts are not all applicable in every case because [the Second Circuit] derived them from a fact-specific analysis," and courts must be careful to avoid "improperly 'forc[ing] square pegs into round holes' in considering those guideposts." *Pierotti v. Walsh*, 834 F.3d 171, 179 (2d Cir. 2016) (quoting *Clark v. Perez*, 510 F.3d 382, 391 (2d Cir. 2008)).

The first guidepost weighs against finding an exorbitant imposition of a procedural default. As discussed above, the Trial Court explicitly relied on the state procedural rule in question. Additionally, had Petitioner complied with the rule, the result of his motion could very well have been different—at the very least, the motion would have presented a closer call.  Additionally, as the Trial Court noted, the delay in presenting this claim undercut the credibility and weight assigned to the allegation.  Accordingly, this guidepost suggests that the Trial Court's decision did not exorbitantly apply the state procedural rule.

The second guidepost—whether state caselaw *demands* compliance with the rule under these circumstances—is inapplicable in Petitioner's case.  The state procedural rule at issue here allows courts to choose, in their *discretion*, whether to bar a claim raised in a post-conviction motion that could have been raised in an earlier motion.  *See* NYCPL § 440.10(3)(c).  Obviously, then, state caselaw does not "demand" compliance in Petitioner's circumstances or any circumstances.

But this does not end the inquiry.  That a state procedural rule allows state courts such discretion does not, without more, allow a federal court to ignore a procedural default imposed under that rule.  *See Johnson v. Lee*, 578 U.S. at 608 (quoting *Martin*, 562 U.S. at 319).  This is true "even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others."  *Beard v. Kindler*, 558 U.S. 53, 61 (2009).  Federal courts, therefore, must "distinguish a state rule that is exorbitantly applied from one that state courts have applied using their discretion."  *Downs v. Lape*, 657 F.3d 97, 102 n.2 (2d Cir. 2011).

When a state procedural rule allows state courts the exercise of discretion in the rule's application, the appropriate question is not whether state caselaw *demands* compliance in the circumstances presented, but whether state caselaw affirms that the state court *appropriately*

*exercised its discretion* in the circumstances presented.  Here, the Court answers that question in the affirmative.  A host of state caselaw applies NYCPL § 440.10(3)(c) in similar circumstances. *See, e.g.*, *People v. Bellamy*, 133 N.Y.S.3d 127, 129 (App. Div. 2020); *People v. Edmee*, 121 N.Y.S.3d 878, 878–79 (App. Div. 2020); *People v. Chaney*, 76 N.Y.S.3d 257, 262 (App. Div. 2018); *People v. Lewis*, 31 N.Y.S.3d 502, 503 (App. Div. 2016).  Therefore, this guidepost also weighs against a finding of exorbitant imposition of a state procedural default.

Finally, the third guidepost also weighs against finding that the Trial Court exorbitantly applied the state procedural rule.  Petitioner did not substantially comply with the rule, and enforcement of the rule in this case serves a legitimate governmental interest.

The state procedural rule at issue, NYCPL § 440.10(3)(c), allows a state court to reject a post-conviction motion where the movant could have raised the same claims in an earlier motion but failed to do so.  *See* NYCPL § 440.10(3)(c).  Here, Petitioner did not comply with the requirement that he raise his ineffective assistance claim (regarding the plea offer) earlier, despite being able to do so.  Petitioner was in a position to raise this claim as soon as he was sentenced, because even if his sentencing exposure was not clear to him before sentencing, it was as of his sentencing.  Yet, Petitioner did not raise this claim in either of his *two* post-conviction motions filed during the eight years[55] after sentencing.  This is not a case of substantial compliance; this is total non-compliance.

Additionally, enforcement of the rule serves a legitimate governmental interest.  Requiring post-conviction movants to raise all their claims at the first opportunity reduces the burden on

---

[55] Petitioner was convicted on December 10, 2010 and sentenced on February 7, 2011. (Order Denying 1st Post-Conviction Mot., Dkt. 7-18, at ECF 2.)  Petitioner's third post-conviction motion was filed on January 24, 2019.  (Pet'r 3d Post-Conviction Mot., Dkt. 7-25, at ECF 1–3.)

courts and serves the interest of justice by promoting the adjudication of claims before evidence degrades and witnesses' memories deteriorate.  Petitioner's case amply illustrates this point. Petitioner first asserted this claim nearly eight years after his sentencing.  By that time, Petitioner's trial counsel did not remember his specific conversations with Petitioner about his possible sentencing exposure.  (Aff. of Dennis Lemke, Dkt. 7-26, at ECF 28.)  Had Petitioner filed this claim earlier, his trial counsel would have had a better chance of remembering what he did, or did not, tell Petitioner about the potential consequences of a guilty verdict at trial.  Compliance with NYCPL § 440.10(3)(c) thus serves legitimate governmental interests.  Furthermore, Petitioner provides no justification for his non-compliance with the rule or for his failure to timely raise a claim he plainly knew of at the time of his sentencing.  Therefore, this third guidepost also weighs against finding that the Trial Court exorbitantly applied a state procedural rule.

In sum, all three guideposts weigh against finding that the Trial Court exorbitantly imposed a procedural default as to Petitioner's ineffective assistance of counsel claim regarding the twelve-year plea offer he rejected.  Although those three guideposts represent a non-exhaustive list of considerations, they are more than sufficient to support the Court's finding here that the Trial Court applied NYCPL § 440.10(3)(c) in routine, justifiable fashion, and not in an "exorbitant" manner. Therefore, Petitioner cannot avoid procedural default on this ground.

### B.    Merits

However, even if procedural default did not apply, the Trial Court's merits analysis did not unreasonably determine the facts in light of the evidence presented in the state court proceeding.[56] Petitioner's claim therefore could not succeed on its merits.

---

[56] There appears to be no question that the Trial Court correctly applied clearly established Supreme Court precedent.  *See Munson v. Rock*, 507 F. App'x 53, 56 (2d Cir. 2013) (summary order) ("It is well settled that an attorney's failure to properly inform his client about his sentencing exposure may constitute ineffective assistance.").

The Trial Court rejected Petitioner's assertions that (1) at the time of trial, he did not know that he could be subjected to a sentence of up to 25 years' imprisonment and (2) had he known, he would have accepted an offer to plead guilty in exchange for a sentence of twelve years.  In support of this finding, the Trial Court observed that Petitioner filed an earlier post-conviction motion that neither mentioned the prosecution's plea offer nor alleged that Petitioner was unaware of his total possible sentencing exposure before deciding to go to trial.  (Order Denying 3d Post-Conviction Mot., Dkt. 7-28, at ECF 5.)  "It would defy logic," the Trial Court explained, "that [Petitioner] would not at the time of his last motion to vacate judgment make the present allegation."  (*Id.*)  The Trial Court also found Petitioner's allegations lacked credibility, considering that Petitioner had waited eight years after his sentencing to make this allegation about his counsel's failure.  (*Id.*)  Noting the self-serving nature of Petitioner's allegation and the lack of any supporting evidence, the Trial Court rejected Petitioner's contention that he did not know of his overall sentencing exposure and that he would have accepted the plea offer had he known.  (*Id.*)

Although the Trial Court did not mention it in its decision, the state court record contains an affidavit from Petitioner's trial counsel in which counsel notes while he did "not recall specific discussions with [Petitioner]," his "regular practice" has "always been . . . to discuss sentencing ramifications with my clients—including the potential maximum jail time exposure that a client would face upon a criminal conviction—as well as the 'pros and cons' of taking a plea."  (Aff. of Dennis Lemke, Dkt. 7-26, at ECF 28.)  Trial counsel's affidavit indicated that he "explain[s] the potential sentence a defendant faces if a defendant were to reject the plea and is convicted after trial," and that he does so "[e]ven if a defendant indicates that he will not accept any plea bargain."  (*Id.* at 28.)  Trial counsel explained, "I can fathom no reason why I would have veered from my regular practice in [Petitioner's] case."  (*Id.*)

This Court cannot find that the Trial Court unreasonably determined that Petitioner (1) knew of his sentencing exposure before deciding to go to trial and (2) would not have accepted the offer to plead guilty in exchange for a sentence of twelve years.  Three points support the Trial Court's finding.

To start, "a convicted felon's self-serving testimony is not likely to be credible."  *Purdy v. Zeldes*, 337 F.3d 253, 259 (2d Cir. 2003).  As a result, "courts have expressed skepticism regarding the credibility of a defendant's post-conviction statements that he would have pleaded guilty to a tendered plea offer."  *Allen v. Graham*, No. 16-CV-1285 (KAM) (LB), 2020 WL 4482674, at *17 (E.D.N.Y. Aug. 4, 2020).  Furthermore, here, Petitioner's credibility suffers from more than just typical doubts about a *habeas* petitioner's veracity.  Petitioner's eight-year delay in raising this claim further diminishes his credibility.  *See Mills v. United States*, No. 09-CV-4090 (JSR) (MHD), 2010 WL 3825732, at *12 (S.D.N.Y. May 20, 2010), *report and recommendation adopted*, 2010 WL 3825733 (S.D.N.Y. Sept. 30, 2010); *Garcia v. Graham*, No. 15-CV-1606 (LTS) (HBP), 2016 WL 11483852, at *7 (S.D.N.Y. Mar. 15, 2016), *report and recommendation adopted*, 2016 WL 1718389 (S.D.N.Y. Apr. 29, 2016).  Even if the Court accepts at face value Petitioner's allegation that he never knew his full sentencing exposure before deciding to go to trial, he certainly knew at the time he was sentenced on February 7, 2011.  (*See* Order Denying 1st Post-Conviction Mot., Dkt. 7-18, at ECF 2.)  Following sentencing, Petitioner did not bring this claim on direct appeal (in either his counseled or *pro se* briefs) or in either of his first two post-conviction motions.  It was only in his third post-conviction motion, dated January 24, 2019, that Petitioner first raised this claim.  The Trial Court reasonably considered this extensive and inexplicable delay in assessing Petitioner's credibility.

Finally, the Court must weigh Petitioner's less-than-credible assertions against the contrary information in his attorney's affidavit. Courts generally have "no reason to doubt [an attorney's] credibility as [an] officer[] of the court." *Saada v. Golan*, No. 18-CV-5292 (AMD) (RML), 2021 WL 1176372, at *6 (E.D.N.Y. Mar. 29, 2021). The presumption of attorney credibility is so strong that, in appropriate cases, "[w]here a 'court is faced with [a post-conviction movant's] self-serving allegations that are contradicted by a credible affirmation by a trial attorney, it may choose to credit the attorney and dismiss the ineffective assistance of counsel claim without further hearings." *United States v. Brumigin*, No. 03-CR-910 (CPS), 2007 WL 3353510, at *2 (E.D.N.Y. Nov. 7, 2007) (quoting *Castrillo v. Breslin*, No. 01-CV-11284 (GBD) (GWG), 2005 WL 2792399, at *13-14 (S.D.N.Y. Oct. 26, 2005)). Here, as discussed, Petitioner's trial counsel attests, *inter alia*, that his "regular practice" has "always been . . . to discuss sentencing ramifications with my clients—including the potential maximum jail time exposure that a client would face upon a criminal conviction—as well as the 'pros and cons' of taking a plea," and that he "can fathom no reason why [he] would have veered from my regular practice in [Petitioner's] case." (Aff. of Dennis Lemke, Dkt. 7-26, at ECF 28.)

In sum, all three considerations support the Trial Court's determination that at the time of trial, Petitioner was aware that he could be sentenced to 25 years if convicted. The Court, therefore, cannot find that the Trial Court unreasonably determined the relevant facts.

Petitioner offers several arguments in response. First, Petitioner contends that, as a first-time offender, Petitioner lacked experience in the criminal justice system and could not reasonably have known about his sentencing exposure. (Pet'r Reply Br., Dkt. 11, at ECF 13.) The Court rejects this argument because, as noted above, even if his pretrial counsel and trial counsel all failed to explain his potential sentencing exposure, Petitioner became aware of his sentencing

exposure at the time of sentencing, and thus he cannot rely on purported ignorance of the law or the criminal justice system to justify his failure to timely raise this claim.

Second, Petitioner contends that the pretrial suppression hearing record supports his claim that he was unaware of his sentencing exposure if convicted at trial. (Pet'r Reply Br., Dkt. 11, at ECF 5–6, 11.) At the hearing, Petitioner's counsel noted that immediately preceding the hearing, pretrial counsel "had a conference with [Petitioner] downstairs over the noon hour and I informed him, just to make it clear, that the Court was prepared to make a commitment today to the defendant to a sentence of 12 years, if he should have chosen to enter a plea of guilty." (Suppr'n Hrg. Tr., Dkt. 7-9, at ECF 3–4.) Pretrial counsel added that Petitioner would "not [be] entering any plea of guilty." (*Id.* at 4.) The discussion on the record does not reference Petitioner's maximum sentence exposure. Though the record is inconclusive on whether pretrial counsel advised Petitioner of the possible maximum sentence he faced, it does establish that pretrial counsel explicitly discussed the prosecution's plea offer with Petitioner before the hearing, at which time, pretrial counsel presumably would have discussed Petitioner's maximum sentencing exposure. Even if pretrial counsel failed to do so, nothing in this pretrial hearing transcript casts any doubt on the later sworn statement of Petitioner's separate trial counsel, who stated that he always discusses sentencing exposure with clients and can think of no reason why he would not have done so with Petitioner. In sum, the pretrial hearing transcript does not demonstrate the unreasonableness of the Trial Court's factual determination.

Third, Petitioner contends that the Trial Court should have held a hearing to further develop the record. (Pet'r Reply Br., Dkt. 11, at ECF 6–9.) This argument does not warrant reversal of the Trial Court's decision. Obviously, a hearing "would have allowed for a more complete record for review and helped to clarify" factual issues in the case. *Cardoza v. Rock*, 731 F.3d 169, 182

(2d Cir. 2013). But 28 U.S.C. § 2254(d)(2) does not require state courts to hold hearings. Regardless of whether the state court holds a hearing before issuing its factual findings, federal courts still may not grant federal *habeas* relief if the state court did not unreasonably determine the facts in light of whatever record the state court had before it. *See Cardoza*, 731 F.3d at 182–83. Nor may this Court hold a hearing in order to supplement the record; a federal court must decide the reasonableness or unreasonableness of a state court's factual determination based on the state court record alone. *See Cullen v. Pinholster*, 563 U.S. 170, 185 n.7 (2011). The failure of the state court to hold a hearing, without more, does not render the Trial Court's decision unreasonable.

## V.      Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a) Gov'g Sec. 2254 Cases in the U.S. Dist. Cts. This Court must issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This means that a *habeas* petitioner must demonstrate "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)).

"This threshold question should be decided without 'full consideration of the factual or legal bases adduced in support of the claims.'" *Buck*, 137 S. Ct. at 773 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)). "Obtaining a certificate of appealability 'does not require a showing that the appeal will succeed,' and "[courts] should not decline the application . . . merely because [they] believe[] the applicant will not demonstrate an entitlement to relief." *Welch v.*

92

*United States*, 578 U.S. 120, 127 (2016) (quoting *Miller-El*, 537 U.S. at 337).  In fact, a certificate of appealability may be issued even if "every jurist of reason might agree, after the [certificate of appealability] has been granted and the case has received full consideration, that petitioner will not prevail."  *Miller-El*, 537 U.S. at 337–38.

### A.      Ground One (Prosecutorial Misconduct and Ineffective Assistance)

The Court denies a certificate of appealability as to all of the ineffective assistance of counsel claims in Ground One, some of which were denied based on procedural default and others on the merits.  Notwithstanding the numerous ineffective assistance claims Petitioner incorporates in his petition, the Court does not find that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Slack*, 529 U.S. at 484 (quoting *Barefoot*, 463 U.S. at 893 n.4).  The Court also denies Petitioner's claim in Ground One regarding the state law discovery violations because no reasonable jurist would find that a violation of state law is cognizable on federal *habeas* review.  The Court likewise denies a certificate of appealability for Petitioner's claim about improper prosecutorial comments.  Though the Appellate Division found that many of these comments would be better left unsaid, this Court does not believe that reasonable jurists could debate whether denial of federal *habeas* relief based on these comments is appropriate.

### B.      Ground Two (DNA Evidence)

The Court denies a certificate of appealability as to all of Petitioner' DNA evidence claims in Ground Two.  First, with regard to the claims based on an alleged misapplication of state evidence law, no reasonable jurist could find that these claims are cognizable on federal *habeas* review.  Second, the Court finds that, despite the less precise contours of the Due Process Clause, reasonable jurists still could not debate the state courts' findings that the admission of the DNA

evidence did not render Petitioner's trial fundamentally unfair, that Petitioner's Confrontation Clause rights were not violated because he was unable to cross-examine all of the DNA analysts, that Petitioner's trial counsel was not ineffective for failing to move to exclude the DNA evidence, and that the prosecutors' summation arguments about DNA were not improper.

### C.      Ground Three (Identifications and Bolstering)

The Court declines to issue a certificate of appealability as to Petitioner's bolstering claims. A wealth of authority holds that these claims are grounded in state law.  No reasonable jurist would debate whether they are cognizable on federal *habeas* review.  The Court likewise denies a certificate of appealability concerning Petitioner's *Brady* claim because no reasonable jurist would find that a criminal defendant proved guilty after a fair trial can demand the post-conviction application of the *Brady* framework.

However, the Court grants a certificate of appealability as to Petitioner's claim of ineffective assistance relating to the improper bolstering.  Given the centrality to prosecutors' case of the victims' identification of Petitioner as the First Gunman, bolstering objections take on increased importance.  Reasonable jurists could debate whether counsel should have raised an objection, whether that objection would have succeeded, and whether a successful objection produces a reasonable probability of a different result.

### D.      Ground Four (Ineffective Assistance – Plea Offer)

The Court denies a certificate of appealability as to Petitioner's claim that his pretrial and trial counsel failed to advise him of his maximum sentencing exposure, which resulted in him rejecting a twelve-year plea offer.  Based on the record before the Court, reasonable jurists could not debate the reasonableness of the state trial court's determination of the facts, which belie Petitioner's extremely and inexplicably belated claim.

### E.    Summary

In sum, the Court denies a certificate of appealability on all issues except ineffective assistance of counsel relating to eyewitness bolstering.  Although the Court grants a certificate of appealability on this claim, the Court doubts that any reasonable jurist considering the same claims would reach a different conclusion than this Court has done.  But a certificate of appealability must issue if a claim is merely debatable—even if all reasonable jurists would eventually agree, after that debate, on the appropriate outcome.  *Miller-El*, 537 U.S. at 337–38.

### CONCLUSION

For the reasons explained above, the Court denies Petitioner's *habeas* petition in its entirety.  Because this is a final order adverse to Petitioner, the Court issues a certificate of appealability on Petitioner's ineffective assistance of counsel claim related to improper eyewitness bolstering but denies certificates of appealability on all remaining claims.

SO ORDERED:

*/s/ Pamela K. Chen*
United States District Judge

Dated: May 25, 2022
       Brooklyn, New York